## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAINE PEASE,<br><br>      Plaintiff,<br><br>  -against-<br><br>THE CITY OF NEW YORK and DEODAT URPRASAD,<br><br>      Defendants. | **AMENDED COMPLAINT**<br><br>Docket No.: 1:19-cv-07693<br><br><br>**PLAINTIFF DEMANDS TRIAL BY JURY** |

Plaintiff Raine Pease, by his attorneys, The Clancy Law Firm, P.C., alleges, for his complaint against Defendants, The City of New York and Deodat Urprasad, upon information and belief and at all times relevant, as follows:

### NATURE OF THE AMENDED ACTION

1.  This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e to 2000e-17 ("Title VII"); the New York State Human Rights Law, N.Y. Exec. § 296, *et seq.* ("NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101, *et seq.* ("NYCHRL") *et seq.*, 42 U.S.C. § 1981 ("§ 1981"), 42 U.S.C. § 1983 ("§ 1983") and the Fourteenth Amendment of the Constitution of the United States of America, to remedy discrimination based upon race and/or national origin, a hostile work environment, failure to promote, retaliation and other adverse action including indefinite probation perpetrated by his employers. Plaintiff Raine Pease seeks monetary damages to remedy his discrimination claims.

2.      Plaintiff Raine Pease, an African American male, complains that Defendants unlawfully discriminated against him based on his race and national origin, treated him less favorably than similarly situated Police Officers of different races, and retaliated against him for exercising his constitutional Fourteenth Amendment rights of complaining about discrimination and having taken adverse actions against him by unwarranted disciplining and denial of promotions.

3.      Plaintiff Pease amends his prior complaint, filed Pro Se, after retaining legal counsel.

## JURISDICTION AND VENUE

4.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e-5(f)(3), 42 U.S.C. §§ 1981 and 1983 and the Fourteenth Amendment of the Constitution of the United States of America. This Court has supplemental jurisdiction over Plaintiff Raine Pease's New York State and New York City statutory causes of action pursuant to 28 U.S.C. § 1367(a).

5.      Plaintiff Pease asserts supplemental State and City law claims pursuant to the New York State Constitution, New York Executive Law § 296, *et seq*. and New York City Administrative Code § 8-101, *et seq*.

6.      Venue is properly laid in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff Raine Pease's claims occurred in this District, and the Defendants' decision-makers, including the Mayor, Police Commissioner, Deputy Inspectors, Commanding Officers, Deputy and Assistant Commissioners and Bureau Chiefs with respect to implementation, application and enforcement of Defendants'

equal employment opportunity ("EEO") policies, affecting the hiring, promotion, discipline and termination of its employees, may be found in this District.

7.      All conditions precedent to jurisdiction have occurred or been complied with including and in particular:

a.   Plaintiff Raine Pease filed a Charge of Employment Discrimination ("the Charge") based on race and/or national origin with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the adverse actions of which Plaintiff complains in this action.

b.   A Notice of Right to Sue was issued by the EEOC on May 17, 2019 and received by Plaintiff Raine Pease on May 20, 2019. Plaintiff Pease duly filed his complaint within 90 days of receipt of the Notice of Right to Sue on August 16, 2019. Attached as **Exhibit A** is a copy of the Charge and Notice of Right to Sue.

<u>**PARTIES**</u>

8.      Plaintiff Raine Pease (herein referred to as "Pease"), is an African American male and citizen of the United States of America who, at all times relevant, resides in Nassau County, State of New York.

9.      Plaintiff Pease has been continuously employed by Defendant The City of New York as a Police Officer with the New York Police Department ("NYPD") from in or about 2007 until the present.

10.     Upon information and belief, Defendant The City of New York ("City") is a municipal corporation duly organized and existing under and by virtue of the laws of the City and State of New York with its principal office at 100 Centre Street, New York, New York.

11.    Upon information and belief, Defendant City maintains a police force known as the NYPD, which has its principal place of business at 1 Police Plaza, New York, New York.

12.    The NYPD is a local governmental agency, duly formed and operating under and by virtue of the laws and Constitution of the State of New York.

13.    Upon information and belief, Defendant City controls and supervises the NYPD and its personnel.

14.    Upon information and belief, at all relevant times, Defendant City is an employer as that term is used in Title VII, the NYSHRL § 296, *et seq.,* and NYCHRL § 8-101, *et seq.*

15.    Upon information and belief, at all relevant times, Defendant City is an employer as that term is used under the NYSHRL, because it has four (4) or more employees in its employ and conducts business in the State and City of New York.

16.    Upon information and belief, at all relevant times, Defendant City is an employer as that term is used under the NYCRL 8-102(5), because it has four (4) or more employees in its employ and conducts business in the State and City of New York.

17.    Upon information and belief, Defendant Deodat Urprasad ("Urprasad") was at all relevant times an individual born in Guyana, of Guyanese descent and resides in the County of Queens, State of New York.

18.    Upon information and belief, Defendant Urprasad, a Police Officer, individually and in his official capacity, an agent, employee, licensee, servant and police officer of the NYPD and Defendant City.

19.    Upon information and belief, Defendant Urprasad, as a Police Officer, individually and in his official capacity, acted as an agent, employee, licensee, servant and Police Officer of the NYPD and Defendant City with all the actual and/or perceived/apparent authority

granted, allotted, and entrusted to him by Defendant City and/or the NYPD in accordance with his official duties, positions, ranks and titles as a New York City Police Officer.

20.    Upon information and belief, Defendant Urprasad, who is sued in his individual and official capacity as a Police Officer, acted under color of law and within the scope of his employment, to wit: under color of statutes, ordinances, regulations, policies, customs and usages of the State of New York, City of New York and/or Federal statutes.

21.    Upon information and belief, Defendant City owned, managed, controlled, maintained, employed and/or supervised Defendant Urprasad, individually and in his official capacity as a New York City Police Officer.

22.    In or about January 2015, Defendant Urprasad replaced then-Deputy Inspector Henry Sautner, Caucasian male, who came to the command in or about October 2012, becoming Plaintiff Pease's Commanding Officer ("CO"). Defendant Urprasad became the CO of Key Gardens, Richmond Hill, Woodhaven and the northern section of Ozone Park.

23.    Upon information and belief, from in or about January 2015 until in or about November 2017, Defendant Urprasad was Plaintiff Pease's 102nd Precinct Commanding Officer employed by the NYPD and Defendant City. His duties included supervising and overseeing the 102nd Precinct and its NYPD offices.

24.    Upon information and belief, from in or about January 2015 until November 2017, Defendant Urprasad was the highest-ranking officer of the NYPD in the 102nd Precinct. Defendant's directives have final decision-making authority over the NYPD and including Plaintiff.

25.    Upon information and belief, on or about November 21, 2017, Defendant Urprasad became Full Inspector of Queens assigned to Patrol Borough Queens South.

26.    Upon information and belief, at all relevant times, Defendant Urprasad is an employer as that term is used in the NYSHRL § 296, *et seq.,* and NYCHRL § 8-101, *et seq.*

27.    Upon information and belief, at all relevant times, Defendant City is an employer as that term is used in the NYSHRL § 296, *et seq.,* and NYCHRL § 8-101, *et seq.* because it has four (4) or more employees in its employ and conducts business in the State and City of New York.

## STATEMENT OF FACTS

### Defendants' History of Racial Animus

28.    At all relevant times, it has been and is the custom, practice, pattern and policy of Defendants City and Urprasad and the NYPD to discriminate against similarly situated African Americans due to animus harbored by Defendants towards them due to their race and national origin.

29.    More than 130 federal civil rights lawsuits have been filed against Queens precinct Police Officers from 2015 to 2018, resulting in verdicts and settlements totaling $1,475,001 according to data compiled by The Legal Aid Society.[1]

30.    There were a total of 2,326 civil rights lawsuits filed against the NYPD from January 2015 to June 2018, of which 790 settled for $53,790,898.[2]

31.    The majority of the 131 lawsuits filed against police officers from Queens' 16 police precincts are still pending. Most lawsuits were filed by people of color who claimed they were improperly arrested, searched or injured by NYPD officers.[3]

---

[1] Brand, David. "Lawsuits Against Queens Cops Cost City Nearly $1.5 Million Since 2015, Database Reveals." Queens Daily Eagle. March 18, 2019.
https://queenseagle.com/all/2019/3/18/lawsuits-against-queens-cops-cost-city-nearly-15-million-since-2015-database-reveals
[2] *Id.*
[3] *Id.*

32.     Among Queens' 16 police precincts, officers from the 105th Precinct in eastern Queens cost the City the most money in settlements compared to other borough precincts: $349,500 from two settlements and a trial verdict, according to the database. Ten other cases associated with the 105th Precinct are pending, and one was dismissed. The 105th precinct covers Laurelton, Rosedale, Springfield Gardens, Queens Village and several other eastern Queens neighborhoods.[4]

33.     Queens' 103rd Precinct together with the 113th Precinct racked up the majority of federal lawsuits in Queens, with 22 each between 2015 and 2018. Most are still pending.

**Defendants' Policy and Practice of Discrimination
against African American Police Officers**

34.     Defendants have a demonstrated policy and practice of discriminating against Latino and African American Police Officers, creating an unlawful hostile work environment and retaliating against them for complaining of said discrimination and retaliation as exemplified in the September 1991 federal class-action lawsuit filed by the Latino Officer Association.[5]

35.     Upon information and belief, approximately 12,000 African American and Latino NYPD Police Officers received financial payouts of between $3,500 and $4,000 each for widespread act of agency discrimination between 1996 and 2003.[6]

---

[4] *Id.*
[5] *Latino Officers Association City of New York, et al., v. The City of New York, et al.*, Civil Docket No. 1:99-cv-9568.
[6] Menchaca, Paul. "City Settles Latino Officers' Bias Lawsuit for $26.8 Million." Queens Chronicle. February 5, 2004. https://www.qchron.com/editions/western/city-settles-latino-officers-bias-lawsuit-for-million/article_e66cbcfe-8b82-5ee8-863f-d8dfc67b3f86.html

36.     In *Latino Officers Association City of New York, et al. v. The City of New York, et al.,* the Police Officers alleged they were subject to unfair disciplinary action, and that the NYPD created a hostile work environment for them.

37.     Upon information and belief, this federal lawsuit was commenced by 22 individuals and the NYPD Latino Officers' Association alleging discriminatory and disparate application of the NYPD's disciplinary rules, procedures and punishments of Latinos, African-Americans and other minority police officers by Defendant City and the NYPD.[7]

38.     Upon information and belief, this federal lawsuit alleged that African Americans and Latino Officers were less likely to be acquitted and have their charges dismissed than Caucasians at Departmental Hearings with the NYPD and 60% (sixty percent) and 30% (thirty percent) more likely, respectively to be found guilty at the NYPD trials than Caucasians.

39.     Upon information and belief, this federal lawsuit alleged that, overall and in general, Hispanics, African-Americans and other minority officers were disciplined and treated more often, more adversely and/or more severely than Caucasian and/or non-minority officers by the NYPD.

40.     Upon information and belief, the defendant City and the NYPD settled the foregoing federal lawsuit with the plaintiffs in which defendant City provided a monetary award in the amount of $26.8 million to the plaintiffs of that lawsuit and members of the class, and more significantly, defendant City and the NYPD agreed to an injunctive relief that they would be enjoined from discriminating based upon race, color, national origin or ethnicity in the future.

41.     Upon information and belief, on or about December 2003, pursuant to the settlement of the foregoing class action lawsuit, defendant City and the NYPD entered into a

---

[7] *Latino Officers Association City of New York, et al., v. The City of New York, et al.*, Civil Docket No. 1:99-cv-9568.

signed stipulation of settlement – a contract by the terms and conditions of which they were obligated to establish a review unit to analyze the NYPD's disciplinary process regarding discrimination and retaliation with respect to African American and Latino/Hispanic members of the NYPD and the manner in which they were investigated, charged, disciplined or penalized, to wit: a "Disciplinary Review Unit."[8]

42.    Defendant Urprasad has a custom, pattern, practice and policy of discriminating against non-Guyanese Police Officers, specifically, African Americans, and retaliating against them if they complained about discrimination or retaliation.

43.    Federal lawsuits were filed against Defendant Urprasad and Defendant City by Latino and/or African American plaintiffs for discrimination based on race, ethnicity, and/or national origin, including the following: *Frank De Michele v. The City of New York, Deodat Urprasad, et al.*, Civil Docket No. 1:09-cv-09334; O*sselito v. The City of New York, Deodat Urprasad, et al.* Civil Docket No. 1:05-cv-07296; M*arco Trujillo v. The City of New York, Deodat Urprasad et al.* Civil Docket No. 1:14-cv-085502; and *Toya Foy et al. v. The City of New York, Deodat Urprasad, et al.*, Civil Docket No. 1:10-cv-08553.

**Plaintiff's Employment History**

44.    Prior to becoming a Police Officer, Plaintiff Pease, an African American male, served in the United States Navy. He was honorably discharged and received a citation of exemplary performance and service.

45.    After his service in the Navy, Plaintiff Pease entered the NYPD Police Academy to train to become a Police Officer. Plaintiff was appointed to the position of Police Officer

---

[8] Defendant City and the NYPD were obligated to establish this "Disciplinary Review Unit" to track and analyze whether minority members of the NYPD, like the Plaintiff herein, were being treated in a discriminatory manner when disciplined, establish as "Advisory Committee" to address employment discrimination and retaliation concerns as well as develop a "Know Your Rights" guide to the NYPD discipline system and to enhance existing databases and create new ones to report relevant data regarding the disciplining of African American and Latino officers.

("PO") on or about January 23, 2007 and was assigned to the 102nd Precinct. Plaintiff has been a Police Officer for approximately 13 years.

46.     Throughout his career, Plaintiff Pease consistently received 3.0 to 3.5, the majority being 3.5, performance evaluation ratings on a 5.0 scale and positive reviews from his supervisors.

47.     In or about 2008 to 2009, Plaintiff Pease, as a new PO, was assigned to work night shifts at the 102nd Precinct patrolling areas of Key Gardens, Richmond Hill, Woodhaven and the northern section of Ozone Park.

48.     From in or about 2009 to May 2014, Plaintiff Pease was assigned to work morning shifts, which were far more preferable for POs and are granted to those with seniority. Plaintiff Pease had been a PO for approximately seven (7) years by 2014 when he came under Defendant Urprasad's supervision as the Commanding Officer of the 102nd Precinct.

49.     In or about December 2013, the New York City Department of City Planning issued a detailed report showing that Guyanese are the second largest immigrant group in Queens and the fifth-largest group of foreign-born residents in New York City, behind Dominican, Chinese, Mexican and Jamaican people, according to the U.S. Census Bureau.[9]

50.     Upon information and belief, the 102nd Precinct's Ozone Park and Richmond Hill, Queens, have the highest population of Guyanese immigrants and descendants, so much that the strip of Liberty Avenue that cuts through the neighborhoods is dubbed "Little Guyana."[10]

51.     From 2012 to January 2015, Henry Sautner was Plaintiff Pease's CO at the 102nd Precinct.

---

[9] NYC Department of City Planning. "Population Analysis of Guyanese and Trinidadians in NYC Based on *The Newest New Yorker Report*." (December 2013). https://www.indocaribbean.org/blog/population-analysis-of-guyanese-and-trinidadians-in-nyc
[10] Chun, Christine. "Guyanese Food in NYC Blends Cultures to Offer 'Something for Everyone'". amNY. October 2, 2018. https://www.amny.com/eat-and-drink/guyanese-food-nyc-1-21348016/

52.     In May 2014, Plaintiff Pease accepted a position in Highway Patrol. Plaintiff's CO Sautner highly recommended him for the position. Plaintiff had a good working relationship with CO Sautner.

53.     In December 2014, due to a medical condition requiring an accommodation, Plaintiff was transferred back to the 102nd Precinct.

54.     In December 2014, CO Sautner assigned Plaintiff Pease to temporarily work midnight shifts.

55.     In January 2015, Defendant Urprasad became Plaintiff Pease CO.

56.     In January 2015, Defendant Urprasad kept Plaintiff Pease working midnight shifts through April 2016. Defendant ordered the roll call to reflect Plaintiff only work night shifts. Rookie POs are typically assigned the night shifts, not POs with seniority like Plaintiff. A commonly known reason amongst POs was that reassignment from a day shift to a night shift is a form of discipline.

57.     In mid-February 2015, Plaintiff Pease and Defendant Urprasad were both responding to an incident at a nightclub. While on scene, Plaintiff Pease addressed Defendant for the first time stating, "How are you doing Inspector?" Defendant completely ignored Plaintiff and walked off without responding to him.

58.     Prior to Defendant Urprasad becoming Plaintiff Pease's CO and supervisor, Plaintiff had positive performance reviews and good working relationships with his supervisors throughout his career as a PO as well as during his service in the Navy. In fact, his supervisors expressed their appreciation of Plaintiff's high level of professionalism.

59.     In mid-February, 2015, Plaintiff Pease was assigned foot post midnight shifts. During these shifts, Plaintiff fell ill and informed Police Benevolent Association ("PBA")

Delegate and PO Barbara Lester he was ill and took one week off of work after completing a week of these shifts. Plaintiff was diagnosed with walking pneumonia. PO Lester stated she would speak to Defendant Urprasad regarding Plaintiff's foot post shifts ending. Despite Plaintiff becoming ill while on foot post due to the harsh weather and PBA Delegate Lester's input, Defendant Urprasad chose to assign Plaintiff another full week on foot post with no vehicle.

60.    PO Lester informed Plaintiff Pease that Defendant Urprasad "wants what he wants, and he wants his two weeks."

61.    Plaintiff Pease remained working midnight tours until in or about April 2016.

62.    In or about May 2016, Plaintiff Pease was assigned to work day tours.

**Plaintiff's Discriminatory Treatment Based Upon Racial Animus**

63.    In or about May 2017, Plaintiff Pease and PO Gurvinder Bachhal received written assignment to patrol a Guyanese festival located at Smokey Park within the 102nd Precinct.

64.    Prior to patrolling the festival, Plaintiff Pease and PO Bachhal met with Sergeant ("Sgt.") Shereen Summa, Caucasian female, within the 102nd Precinct by the front desk area. At that time, Defendant Urprasad was also standing beside the front desk with Sgt. Joseph Cornier, when Plaintiff and his partner, PO Bachhal exited out of a side entrance of the building. While outside, Defendant Urprasad instructed Sgt. Summa to remove Plaintiff from his assignment to patrol the Guyanese festival. He was instead against to guard a hospitalized prisoner.

65.    Minutes later, Plaintiff Pease reentered the Precinct and Sgt. Summa informed Plaintiff that he was no longer assigned to the festival. Plaintiff expressed confusion, especially because he was notified via a written authorization of his festival assignment. Sgt. Cornier approached him at that time and informed Plaintiff his new assignment was to guard a hospitalized prisoner without his partner. It was common knowledge among POs that such an

assignment was deemed dis-favorable and not typically relegated to senior officers. Sgt. Cornier expressed that he knew it was not favorable, but that it was not on his authority.

66.     Upon leaving the Precinct that same day, Plaintiff Pease, PO Bachhal and Sgt. Summa traveled in a NYPD van to drop off officers to their details. While in the van, prior to dropping Plaintiff at his hospital prisoner detail, Sgt. Summa expressed to Plaintiff, "I don't have any issue with you."

**The September 10, 2017 Incident (Pretext)**

67.     On or about September 10, 2017, Plaintiff Pease and his partner, PO Bachhal responded to a 911 call reporting stolen items being unlawfully removed from a vehicle on Eldert's Lane, Queens, New York. Plaintiff's and his partner's response was delayed due to their handling of two other previously received priority 911 calls that morning from the same address located at Woodhaven Boulevard in Queens, New York.

68.     On or about September 10, 2017, Sgt. Sharon Itwaru, Guyanese female, was on scene to witness Plaintiff's resolution of those two (2) previous priority 911 calls. The calls came in being Code 54, person in need of emergency medical attention, which were high priority. The first call was received by Plaintiff at approximately 9:33 a.m. involving an 89 year-old female who had fallen and was trapped behind a door for four (4) days. After properly assisting the 89 year old woman, Plaintiff and his partner had to wait for a locksmith to fix the door involved in the initial 911 call. The second call was received at 9:52 a.m. to assist an unconscious or possible deceased person within their apartment located within the same building as the first 911 call. Plaintiff and his partner arrive on scene at Woodhaven Blvd. at approximately 10 a.m.

69.     Plaintiff Pease and PO Bachhal received the September 10, 2017 vehicle break in 911 call at approximately 11 a.m. Code 22, signaling the incident occurred in the past and was of

low priority. Plaintiff and his partner Bachhal departed Woodhaven Blvd. at approximately 11:30 a.m. Plaintiff and his partner PO Bachhal arrived on the scene located at Eldert's Lane at approximately 11:40 a.m. to address the call. Plaintiff and his partner to arrive on scene at Eldert's Lane at approximately 11:40 a.m.

70.    Upon arriving on scene, the complainant was not present. Plaintiff and his partner waited approximately five (5) minutes for the complainant to arrive. During that time, PO Bachhal used his NYPD issued cell phone to locate the complainant on the call back number provided to command.

71.    While PO Bachhal was using his NYPD issued cell phone calling complainant, complainant approached PO Bachhal, who was seated in the front seat of the police vehicle. Complainant reported to Plaintiff and his partner that he was the individual who called to report an unknown male who had been tampering with his brother in law's vehicle. Complainant was of Guyanese descent.

72.    The complainant revealed he did attempt to confront the unknown male tampering with the vehicle, which led to a physical altercation between the two men. Complainant stated he was punched in the face by the unknown male causing pain to his jaw area, but he was not bleeding. The complainant then stated the unknown male fled the scene toward Jamaica Avenue.

73.    At that time, PO Bachhal asked the complainant if any items were taken from his brother in law's vehicle, and if he needed medical attention. The complainant refused any medical assistance stating he would seek medical attention at a later time.

74.    When PO Bachhal exited the police vehicle to retrieve paperwork and before re-entering the police vehicle, the complainant asked if Plaintiff and his partner were going to search for the unknown male.

14

75.     Plaintiff and PO Bachhal explained to the complainant that given the elapsed time from his 911 call, NYPD protocol was to refer the complainant to the NYPD's detective squad to further investigate the complaint using all of the information provided by the complainant and the reporting officers.

76.     Upon entering the police vehicle, PO Bachhal noted to Plaintiff Pease he smelled alcohol emanating from the complainant. Shortly thereafter, the complainant's brother-in-law, Ansar (last name unknown) and owner of the vehicle that was tampered with appeared on the scene. The brother-in-law approached the police vehicle's driver side window where Plaintiff was seated.

77.     Ansar stated to Plaintiff Pease he was the owner of the vehicle, and that the vehicle had been locked. He further stated that credit cards were now missing from the vehicle, and that he still was in possession of the car key.

78.     Pursuant to NYPD protocol, Plaintiff Pease offered Ansar a complaint report for the stolen credit cards. Ansar declined the complaint report forms because he had already cancelled his credit cards.

79.     Pursuant to NYPD Protocol, Plaintiff and PO Bachhal then finalized the 911 call in their complaint report as an assault.

80.     On September 12, 2017, PO Bachhal informed Plaintiff Pease an issue arose involving their handling of the 911 call on Eldert's Lane. The assault complainant who Plaintiff and PO Bachhal first interacted with on the scene telephoned the an officer 105th Precinct accusing Plaintiff and PO Bachhal of mishandling his complaint and falsely stated the officers offered him no medical attention, were using personal cell phones and did not exit the vehicle at

any time to speak with him. The officer from the 105th Precinct reported the accusations to an officer in the 102nd Precinct.

81.    Plaintiff Pease and PO Bachhal explained their version of events to the Integrity Control Officer Lieutenant ("Lt.") Alberano, Caucasian male, and in addition, Ansar, the complainant's brother-in-law, telephoned the NYPD to corroborate the PO's version of events on Plaintiff's and his partner's behalf and dispute the complainant's false accusations.

82.    The above facts concerning this 911 call were presented directly to Defendant Urprasad by Lt. Alberano. Lt. Alberano stated to Plaintiff he believed his version of events and would try to convince Defendant Urprasad on Plaintiff's and that he did not deserve any discipline as a result of this 911 call incident.

83.    However, Defendant Urprasad rejected Plaintiff Pease's and PO Bachhal's version of events despite the credible evidence to the contrary without proper and fair consideration. Thereafter, Lt. Alberano informed Plaintiff and PO Bachhal that they would be charged with discipline for improper report classification under specific authority of Defendant Urprasad.

84.    During their conversation, Lt. Alberano made it clear to Plaintiff Pease that he would not have issued any discipline had it been up to him. Lt. Alberano stated this directive came straight from Defendant Urprasad and was entirely within his discretion.

85.    Confirming the disciplinary action imposed by Defendant Urprasad, Lt. McGorty of the NYPD administrative department informed Plaintiff Pease and PO Bachhal that they would be removed from their current day tours. Plaintiff was consequently immediately transferred to the "4x12" tour with hours from 3 p.m. to 11:35 p.m. and PO Bachhal to the "12x8" tour with hours from 11:15 p.m. to 7:50 a.m.

86.     On or about September 12, 2017, Lt. John McGorty, Caucasian (retired), stated to Plaintiff Pease, "It's not me, it's from Commanding Officer" *i.e.* Defendant Urprasad, informing Plaintiff it was not his decision to reassign him from morning shifts to night shifts.

87.     Prior to this disciplinary reassignment, Plaintiff Pease was working to the "8x4" tour with hours from 7:05 a.m. to 3:40 p.m., which is a much more preferable assignment amongst the POs.

88.     On or about September 12, 2017, during a conversation with Tour Platoon Commander Lt. Gulienello, Lt. Gulienello, Caucasian male, informed Plaintiff Pease that he attempted to "do damage control" when speaking to Defendant Urprasad, and defended Plaintiff regarding the 911 call, but Defendant Urprasad refused to reconsider his adverse discipline against Plaintiff. Lt. Gulienello noted to Plaintiff that Defendant Urprasad's treatment of Plaintiff was unusual, because he was otherwise professional to his reports. Lt. Gulienello further stated that he was surprised by Defendant's treatment of Plaintiff.

**Defendant Urprasad's Extreme and Continuous Harassment of Plaintiff**

89.     From in or about September 16, 2017 to November 22, 2017, at the direction of Defendant Urprasad, Plaintiff Pease was placed on solo foot post at various locations during the night shift. The locations were known to have no means of or accommodation for restrooms. No prior notification nor reasonable justification for the dis-favorable assignments was afforded to Plaintiff.

90.     On October 2, 2017 to October 3, 2017 and on October 9, 2017, Defendant Urprasad assigned Plaintiff Pease to foot post with no vehicle or partner to guard an abandoned house that had caught fire located at address 95-48 114th Street, Jamaica, New York. This abandoned house was known to the NYPD as a homeless squatters' location and was awaiting

being boarded up for security purposes. This post provided no access to restrooms or food during the shift. Due to the high volume of 911 calls generated by these tours, it was difficult for Plaintiff to obtain relief when necessary.

91.     During these tours, Plaintiff Pease only had one supervised visit per tour and minimal coworker contact. Plaintiff was not afforded a police vehicle during these tours contrary to all other previous day tour posts and night posts he had been assigned. The POs who were afforded police vehicles were typically Caucasian and Guyanese.

92.     By November 2017, it became commonly known amongst POs in the 102nd Precinct that Defendant Urprasad had it out for Plaintiff Pease and that he favored Guyanese POs.

93.     On or about November 1, 2017, Plaintiff Pease spoke with Lt. Alberano regarding his concerns about Defendant Urprasad's continued mistreatment of him. Lt. Alberano responded to Plaintiff, "COs come and go…[you'll get a] clean slate with a new person." He believed Defendant Urprasad's issue with Plaintiff stemmed from the September 10, 2017 complaint from the Guyanese complainant, who falsely accused Plaintiff of not offering him medical attention. Without investigating, let alone even speaking directly to Plaintiff to obtain his account, Defendant Urprasad labeled Plaintiff as being untruthful and favoring the veracity of the Guyanese complainant.

94.     During the November 1, 2017 discussion between Plaintiff Pease and Lt. Alberano. Lt. Alberano stated he believed Plaintiff and his partner's version of events, including that he offered the complainant medical attention. During this conversation, Lt Alberano reminded Plaintiff Pease that he only had nine (9) years left until qualifying for retirement and not to allow Defendant Urprasad to beat him down mentally, even in the face of his assignment

to solo foot post for several weeks straight without any justification and outside the typical assignments of other similarly situated POs.

95.    On November 2, 2017, Plaintiff Pease spoke with Third Platoon Commander Lt. Kimberly Maldonado and Sgt. Jason Rozenfeld, while PO Rojas was present, about his unfair treatment by Defendant. Sgt. Rozenfeld sympathized with Plaintiff regarding Defendant Urprasad's disparate treatment of Plaintiff, and further stated that Defendant had mandated a "zero tolerance" policy with regards to Plaintiff that he did not enforce upon other POs.

96.    During this conversation, Sgt. Rozenfeld revealed to Plaintiff that Defendant Urprasad now had Plaintiff Pease under a microscope and that if Defendant wants to "scratch [Plaintiff Pease] 20 times, he can…he can use every patrol guide to harass you" and by doing that, "[Defendant is] being him." Sgt. Rozenfeld advised him to "be careful" when appealing Defendant Urprasad's written discipline and alluded that Plaintiff would experience worse retaliation from Defendant Urprasad if he did so.

97.    During this conversation, Lt. Maldonado agreed that if it was within her discretion, she would have not issued written discipline to Plaintiff.

98.    Sgt. Rozenfeld then suggested a meeting with his PBA Delegate and Lt. Alberano to discuss Defendant's unfair treatment and continuous harassment of Plaintiff spanning from 2015 to 2017.

99.    During this conversation, Sgt. Rozenfeld reiterated Plaintiff should not have been issued any discipline as other POs will regularly experience delays with all calls and are typically issued only an oral warning.

100.    Sgt. Rozenfeld instructed Plaintiff to describe the circumstances with an Integrity Control Officer ("ICO"), Lt. Alberano and his PBA Delegate, PO John Baccera for the meeting

scheduled the next day. Sgt. Rozenfeld told Plaintiff, "If you think you're absolutely right … and your boss [Defendant Urprasad] is absolutely wrong … schedule a one on one meeting with your CO through ICO…and you can lay it out on the table what you feel, what you truly believe…I know he's bipolar…but he will listen to you…do it professionally." Sgt. Rozenfeld further expressed that he felt Plaintiff's unfair treatment had gone on long enough, and that he "did not become a cop to be treated like this." Plaintiff agreed.

101.    Plaintiff mentioned during this meeting that he had previously tried to schedule a meeting with Defendant Urprasad to discuss his concerns but was denied.

102.    During the meeting with a PBA Delegate and ICO, Lt. Alberno informed Plaintiff Pease that Defendant reassigned Plaintiff's tours and regularly changed the Precinct's roll call and assign him to solo foot posts. Plaintiff also expressed that while alone at his foot post, day after day with no partner or vehicle, he was forced to go to the bathroom in abandoned houses, and additionally, due to the danger and difficulty of the post, he was experiencing increased levels of stress on his body, which began manifesting in physical complaints and symptoms.

103.    Lt. Alberano stated it was the first time he heard of Plaintiff Pease's assignment to solo foot post since September 15, 2017. Sgt. Rozenfeld questioned why none of Plaintiff's PBA delegates advocated on his behalf to prevent him from being assigned to the post for several weeks straight. Plaintiff explained that he believed they were intimidated by Defendant Urprasad to challenge the adverse employment action. Lt. Alberano's response was that Defendant was the CO, implying he neither was not in a position to question the CO's authority. He told Plaintiff that he would not transfer Plaintiff back to day tours and that he would have to endure the unfair treatment.

104.    Following his conversation with Lt. Alberano, Plaintiff contemplated taking medical leave due to the mental distress he experienced under Defendant's supervision and control.

105.    As of the November 1, 2017 meeting, Plaintiff Pease had complained to his PBA Delegate, Baccera regarding Defendant Urprasad's ongoing harassment, hostile work environment and retaliation against him.

106.    As of November 1, 2017, Plaintiff Pease was assigned to Cabaret duty for the second time in a row, which was also an unusual practice for NYPD senior officers. The prior Saturday in October 2017, Plaintiff was assigned to stand in the rain for his entire shift without a patrol vehicle. Defendant Urprasad, who was working at the 102nd Precinct that day, inquired about Plaintiff specifically, and asked who his partner was at that time.

107.    In comparison, PO Bartalameo DeAngelo, Caucasian male, was also assigned to Cabaret duty but was given a patrol vehicle.

108.    On or about November 2, 2017, Plaintiff Pease and PO Rojas, a mixed-race Caucasian and Hispanic male, were standing post at 88th Street and Atlantic Avenue. The outside noise was making it very difficult for Plaintiff to hear his own radio transmissions over the loud street traffic. PO Rojas received a telephone call on his personal cell phone from PO Luie Malave informing Plaintiff and PO Rojas that central command tried to raise their post to make sure they were safe. Plaintiff and PO Rojas immediately returned communication, and they were accounted for. There were heightened safety concerns due to recent PO shootings occurring in New York City.

109.    On the November 2, 2017 tour, Sgt. Rozenfeld reported to Plaintiff Pease's and PO Rojas's post to inquire why they had failed to respond sooner. Plaintiff explained that both he

and PO Rojas had difficulty hearing their radio transmissions because of street noise. Sgt. Rozenfeld informed the POs that Defendant Urprasad was angry due to their delay in responding.

110.    At the end of the tour, Sgt. Rozenfeld informed Plaintiff Pease and PO Rojas that discipline would be issued based on Defendant Urprasad's authority.

111.    On November 6, 2017, Plaintiff Pease reported to the NYPD's Deputy Commissioner, Equal Employment Opportunity's ("EEO") office to complain to an investigator regarding unfair treatment he was receiving from Defendant Urprasad.

112.    Plaintiff Pease informed the investigator that he and his partner, PO Gurvinder Bachhal, East Indian male, were transferred to different squads by Defendant Urprasad after Defendant accused Plaintiff and his partner of improperly notifying of an assault in a formal complaint report that occurred on September 10, 2017.

113.    On or about November 9, 2017 and November 11, 2017, Plaintiff Pease was assigned to a post under the elevated J train subway station, located at the intersection of 102nd Street and Jamaica Avenue, on solo foot post duty with no police vehicle, as discipline issued by Defendant Urprasad for the radio incident on November 2, 2017. In contrast, PO Rojas did not receive any adverse assignments or discipline. Instead, he was assigned to a patrol vehicle.

114.    While Plaintiff Pease was at his foot post, PO Maria Aruza and PO Brandon Dildy offered Plaintiff Pease temporary shelter in their police vehicle due to the cold weather conditions and the heightened alert from the PO shootings. Both POs informed Plaintiff that after helping him, they were reprimanded.

115.    On November 12, 2017, Plaintiff Pease was again assigned to a solo foot post at the intersection of Jamaica Avenue and Van Wyck Expressway without a police vehicle.

116.    On November 15, 2017, Plaintiff Pease was again assigned to a solo foot position at the intersection of 111st and Jamaica Avenue.

117.    From November 17, 2017 through November 19, 2017, Plaintiff Pease was assigned to guard hospitalized prisoners.

118.    It was commonly known, the NYPD views guarding hospitalized prisoners as an undesirable assignment signifying incompetence by the PO. This assignment was used as a tool to embarrass and isolate the PO, especially, if the officer had a steady partner whom they would be separated from by the assignment. When an officer was assigned to guard hospitalized prisoners, other POs would typically question what that officer did to deserve such an undesirable assignment.

**Plaintiff's Formal EEO Complaint/Retaliation**

119.    On November 21, 2017, Plaintiff Pease and PO Bachhal arrived at 1 Police Plaza to file a formal departmental EEO Complaint against Defendant Urprasad. Upon learning of Defendant's rank as Commanding Officer and newly appointed Full Inspector of Queens, the EEO employees discouraged Plaintiff and PO Bachhal from filing a formal complaint.

120.    On November 21, 2017, Plaintiff instead filed a federal EEOC Complaint at the Manhattan district office on Whitehall Street.

121.    Due to Defendant Urprasad's promotion on November 21, 2017 to Full Inspector of Queens, Captain Courtney Nilan became the new CO of the 102nd Precinct. CO Nilan was the former executive officer from the Rockaway-based 101st Precinct, and a Caucasian female. Although he was no longer CO, Defendant Urprasad retained oversight of the 102nd Precinct.

122.    In or about late November to December 2017, Plaintiff Pease learned that several POs, comprising a Unit known as "Jamaica Auto", were specifically created by Defendant

Urprasad. The Jamaica Auto Unit was involved in an unauthorized vehicle pursuit: PO Darmalingum, Guyanese male, PO Czerw, Caucasian male, and PO Vasiliof Rabbie, Caucasian male. Defendant handpicked each of these Rookie officers for his Unit. Each PO had approximately two (2) years of experience as a PO.

123.    The POs of the Jamaica Auto Unit involved in the November 21, 2017 unauthorized vehicle pursuit were directed by Defendant Urprasad to make as many arrests on Jamaica Avenue as possible. The unauthorized pursuit resulted in a vehicular accident on Myrtle Avenue near the entrance of Jackie Robinson Parkway, which hospitalized a civilian driver the POs were pursuing. The Jamaica Auto Unit initially reported the accident as a "pick up" of a Code 53, which meant they stumbled upon an accident that did not involve them and had already occurred upon their arrival on the scene. The Unit falsely reported the situation at the scene over the NYPD's radio. The proper radio transmission to the Duty Captain was "following vehicle" to alert command the Unit was following a particular vehicle.

124.    On November 21, 2017, the Unit was following this vehicle due to what the POs believed to be marijuana being thrown from the moving vehicle. Pursuant to NYPD procedures, due to the dangerousness of a vehicle pursuit, command would have directed the Unit to terminate pursuit had the Unit radioed that pursuit was commenced over marijuana being possibly thrown from the vehicle. During the pursuit, despite entering another command that was out of their jurisdiction, the Unit continued their pursuit of the civilian driver.

125.    On November 21, 2017, the civilian driver sustained a broken leg and shattered pelvis as a result of the accident brought on by this pursuit.

126.    Defendant Urprasad also assembled other POs to comprise the Unit "101 Auto" with the same purpose of making as many arrests on Jamaica Avenue as possible.

127.    Plaintiff Pease learned that the Jamaica Auto Unit the above-mentioned POs were operating was immediately disbanded after the unauthorized vehicle pursuit. The POs were placed in different specialized units in the 102nd Precinct that are deemed more favorable than the patrol. Despite the fact that an unauthorized vehicle pursuit resulting in the hospitalization of a civilian warranted significant discipline, Defendant Urprasad chose not to discipline the POs involved. In fact, PO Darmalingum was assigned to a specialized unit, Domestic Violence affording him weekends off with preferable hours.

128.    The Integrity Control Office was not called in to investigate despite the Unit failing to properly notify command of their involvement in causing the accident.

129.    In or about December 2017, Plaintiff Pease and his partner PO Bachhal were placed on separate day tours.

130.    On or about January 10, 2018, Plaintiff Pease was working a patrol sector with PO Ahmed Ali, East Indian male, when they were called to a possible crime scene. PO Blake and PO Daniel Oliver, Caucasian male, were also assigned to patrol that sector but had not arrived at the scene yet. PO Nicolas Bellacosa, Caucasian male, and PO Rohtibir Singh, East Indian male were both at the scene upon Plaintiff's arrival.

131.    Once at the scene, Plaintiff Pease and PO Ali were informed by the other officers of a cell phone dispute between a male and female that knew each other. All the officers present attempted to reach an amicable resolution between the male and female.

132.    While on scene, Plaintiff Pease noticed a woman's shoulder bag on the trunk of a nearby vehicle with an open pocket, which contained a small amount of marijuana. When POs Blake and Oliver arrived on the scene, Plaintiff informed them of his marijuana observations.

133.    Based on his investigation, Plaintiff Pease voiced his opinion to the other POs that the female should not be charged for possession of marijuana, and they agreed. Ultimately, PO Blake took control of the scene, and discarded the marijuana in a nearby trashcan at the 102nd Precinct.

134.    Plaintiff Pease learned the January 10, 2018 incident involving marijuana resulted in an Internal Affairs Bureau ("IAB") test.

135.    The IAB conducts integrity tests throughout the Department to ensure that NYPD employees are acting in accordance with Department procedures, rules and regulations.

136.    In February 2018, the investigation resulted in PO Blake's separation from the NYPD's employment. All POs involved were interviewed by IAB. PO Blake was the subject (target) of the IAB test. The other POs were issued command disciplines and forfeiture of two (2) vacation days by IAB.

137.    In comparison to his fellow POs, on April 17, 2018, Plaintiff was served with Charges and Specifications accusing Plaintiff of violating Department procedures.[11]

138.    On April 15, 2018, PO Bachhal and PO Calazos were assigned with Plaintiff Pease to a Sikh Festival located in the 102nd Precinct at the intersection of 114th Street and 101 Avenue. Sgt. Itwaru was in charge of the PO assignments, which was to patrol from their marked Ratio Motor Patrol ("RMP") vehicle.

139.    The Sikh Festival began at approximately 9:30 a.m. and ended at approximately 6:05 p.m.

---

[11] Charges and Specifications are formal charges filed against NYPD employees to discipline said employee for breaches of the Department rules and regulations. Such charges may culminate in a formal Department trial where the Department is represented by an attorney and the respondent is represented by counsel. The penalty may include, but is not limited to, termination from employment or forfeiture of vacation time.

140.    On April 15, 2018 at approximately 3:45 p.m. Defendant Urprasad made an appearance at the Festival location in a civilian four (4) door gray sedan with an out of state license plate at the intersection of 114th Street and 101 Avenue.

141.    As Defendant Urprasad approached the RMP Plaintiff was sitting in, PO Calazos and Plaintiff recognized Defendant and exited the RMP to approach Defendant's sedan.

142.    As Plaintiff Pease approached Defendant's vehicle, Defendant Urprasad sped away heading east on 101st Avenue.

143.    At 4 p.m., Sgt. Jimmy Centeno, Third Platoon Sgt., accompanied by PO DeMarco arrived at Plaintiff's location at the festival. As Sgt. Centerno approached, Plaintiff, PO Bachhal and PO Calazos exited their vehicle. Sgt. Centeno questioned all three POs about the traffic conditions because Defendant Urprasad apparently had telephoned the 102nd Precinct desk and complained.

144.    As the POs explained the traffic pattern at the festival, Sgt. Centeno began questioning Plaintiff Pease specifically and became aggressive towards him. Sgt. Centeno abruptly dismissed Plaintiff's explanation and shouted at him to stand at a location further up the street and told him that he could no longer remain in the vehicle. As Plaintiff walked to the RMP to grab his equipment, Sgt. Centeno yelled, "Hurry up! . . . Do you want me to call Urprasad?"

145.    On May 3, 2018, while patrolling with PO Ali, Plaintiff Pease and PO Ali responded to a 911 call at Planet Fitness involving a locker theft. The complainant was an off-duty Corrections Officer Willie Barnes. Barnes informed Plaintiff and PO Ali that his job I.D. and shield were stolen from his locker. Barnes' fiancé was also present and assisted with the investigation. As PO Ali and Plaintiff concluded their report, all four exited the Planet Fitness.

146.    Plaintiff Pease and PO Ali's police vehicle was parked in front of the Planet Fitness. PO Ali sat in the front passenger seat of the vehicle with the door open as he finished his report. As Plaintiff stood outside of the Planet Fitness with Barnes, an unknown male approached Plaintiff seeking advice concerning his daughter. The unknown male described a communication breakdown between him and his child's mother and inquired of a better way to handle the exchange involving his daughter. The unknown male did not report any allegations of criminal conduct against his child's mother or concern for the child's welfare.

147.    In response, Plaintiff Pease proposed he utilize the family court system. The unknown male then disclosed he had an upcoming family court date scheduled. Plaintiff responded the unknown male should address the issue on that court date. The male then asked Plaintiff to write a police report for him.

148.    Plaintiff Pease explained to the male that the reported situation did not meet NYPD requirements to warrant a police report. Plaintiff interpreted the situation as custodial interference, and a family court issue. Off duty Corrections Officer Barnes then shared his own personal experience, which was resolved through family court. Plaintiff acknowledged Barnes' experience and continued explaining to the male the NYPD procedures.

149.    At that time, a woman appeared on the scene stating she was the child's mother and voiced the same custodial communication issues as the male. Plaintiff Pease reiterated the family court solution to both parties. The male again requested a police report. Plaintiff restated his position. The parties then left and went their separate ways.

150.    Approximately one month following the custodial incident in June 2018, Plaintiff Pease and PO Ali were interviewed by the IAB. The encounter with the male and female was

disclosed to them as an integrity test. The IAB accused Plaintiff of not offering any help to the male and female and claimed that he should have filed a domestic report.

151.    Within two (2) months, on August 1, 2018, Plaintiff Pease was informed by the 102nd Precinct Desk Officer, Sgt. Jonathan Peyer that he was immediately being transferred to the 70th Precinct in Brooklyn. The 70th Precinct has a reputation within the NYPD and the City of New York as the precinct COs banish POs they deem 'problem' officers. Plaintiff was given no prior written notification, explanation or justification for the transfer.

152.    On January 15, 2019, Plaintiff Pease was ordered to 1 Police Plaza where for the second time he was served with Charges and Specifications now relating to the custodial incident report.

153.    On January 29, 2019, Plaintiff Pease was presented with a settlement offer of one (1) year of probation and forfeiture of 30 vacation days. Plaintiff declined the offer and opted for a departmental trial.

154.    On February 5, 2019, Plaintiff Pease was ordered to 1 Police Plaza for trial preparation. Prior to Plaintiff requesting a departmental trial, his partner PO Ali had not been charged. Once Plaintiff requested the trial, PO Ali was also charged.

155.    On or about February 8, 2019, Plaintiff Pease filed a Charge of Discrimination with the EEOC complaining of discrimination based on race and/or national origin, hostile work environment, retaliation and failure to promote against Defendants City and Urprasad, as well as the NYPD.

156.    On or about May 17, 2019, Plaintiff Pease was issued the Right to Sue Notice.

157.    In or about July 2019, Plaintiff Pease's departmental trial resulted in the Charges being upheld against him. The Judge Advocate recommended 30 days of forfeited vacation days and a year of probation as Plaintiff's punishment.

158.    On August 16, 2019, Plaintiff Pease filed a complaint with the Court *Pro Se*.

159.    On or about February 6, 2020, Plaintiff Pease was informed by the NYPD by letter with the subject "DISMISSAL PROBATION FOR DISCIPLINARY" notifying him that a penalty of dismissal from the NYPD had been approved by the Police Commissioner. It further stated the penalty was to be held in abeyance for a period of time of one (1) year during which he shall be placed on Dismissal Probation.

160.    During Plaintiff Pease's Dismissal Probationary period, retroactive commencing on January 23, 2020, the Police Commissioner may dismiss him at any time without further proceedings pursuant to Administrative Code, Section 14-115(d). Plaintiff was informed the probationary period could be extended by any period of time if he became suspended, was on Modified Assignment, Restricted Duty, Limited Capacity, Sick Leave, Leave of Absence (Military, Personal, Educational, Child Care etc.,) or Annual Leave, or in any other way the NYPD deemed him not performing the duties of his position.

161.    Plaintiff Pease's probationary period will continue to on or about January 23, 2021 unless otherwise ordered by the Police Commissioner.

### Plaintiff Denied Promotions, Received Lower Rating and Complains Regarding His Biased Treatment

162.    In or about 2015, Plaintiff Pease applied to be considered for a promotional opportunity as Over Time (OT) position in the Summons Unit at the 102nd Precinct. The position required the PO to have extensive training in speed estimation. Despite Plaintiff's qualifications

and nine (9) years of experience, Police Officer Chris Destaphano, Caucasian male, with only three (3) years of experience was awarded the promotion.

163.   In 2017, Plaintiff Pease was passed over a second time for promotion to Radio Motor Patrol Coordinator. As a former naval and aviation mechanic who also had extensive experience working on automobiles, Plaintiff was over-qualified for the position. Instead of Plaintiff being awarded the position with his 11 years of relevant experience, PO Keith Dumas, a Caucasian male, with far less experience received the promotion.

164.   On February 23, 2019, Plaintiff Pease attended a scheduled orientation with Maryland National Capital Park and Planning Commission involving a new employment position that opened within the Police Division. He applied in or about January 2019. In his application, Plaintiff was obligated to disclose his IAB investigations as well as the relevant documentation. The investigator expressed to Plaintiff that open IAB investigations could greatly negatively affect the Commission's consideration of a candidate.

165.   On or about April 23, 2019, Plaintiff Pease received a formal rejection letter stating he did not receive the position. Plaintiff was willing to take this position, which paid $25,000 less than his current position's annual salary to avoid any negative influence exerted by Defendant Urprasad over him.

## FIRST CAUSE OF ACTION
## RACE AND NATIONAL ORIGIN DISCRIMINATION (TITLE VII)

166.   Plaintiff Pease hereby repeats and re-alleges each allegation contained in the paragraphs above as if fully set forth herein.

167.   Plaintiff Pease has been discriminated against by Defendants on the basis of his race and national origin in violation of Title VII. Defendants engaged in a course of conduct which included without limitation: holding him to a higher standard in the terms and conditions

of his employment than similarly situated non-African American Police Officers and/or members outside his protected class; disciplining Plaintiff in a manner not applied to similarly situated non-African American Police Officers and/or members outside his protected class; creating a discriminatory and hostile work environment for Plaintiff resulting in terms and conditions of employment inferior to similarly situated non-African American Police Officers and/or members outside his protected class; suspending Plaintiff and/or placing him on probation from employment because of his race; passing over Plaintiff for promotion and selecting less qualified officers outside of his protected class for said promotion. Such conduct is demonstrative of Defendants' reckless indifference to the laws prohibiting discrimination; and distributing less severe discipline to fellow Police Officers than Plaintiff for the same conduct.

168.    Defendants' willful acts and omissions constitute unlawful discrimination against Plaintiff based on his race and national origin in violation of Title VII.

169.    But for Plaintiff's race and nationalism, he would not have been harassed, treated unfairly, disciplined, retaliated against and placed on probation. Any reasons proffered by Defendants for suspending Plaintiff's employment are a pretext for discriminating against Plaintiff based on his race and national origin.

170.    As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities and other prerequisites of employment.

171.    As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation and career.

## SECOND CAUSE OF ACTION
## HOSTILE WORK ENVIRONMENT (TITLE VII)

172.    Plaintiff Pease hereby repeats and re-alleges each allegation contained in the paragraphs above as if fully set forth herein.

173.    Defendants' persistent, frequent and pervasive conduct created an atmosphere that was hostile, abusive, humiliating and degrading to its African-American employees and in particular, Plaintiff.

174.    Defendants subjected Plaintiff to a hostile work environment permeated with harassment based on race sufficiently severe and pervasive to alter the conditions of Plaintiff's employment, in violation of Title VII.

175.    As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities and other prerequisites of employment.

176.    As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation and career.

## THIRD CAUSE OF ACTION
## RETALIATION (TITLE VII)

177.    Plaintiff Pease hereby repeats and re-alleges each allegation contained in the paragraphs above as if fully set forth herein.

178.    Plaintiff Pease engaged in protected activities when he made multiple complaints of discrimination against Defendants to his supervisors, the EEO Office and the EEOC.

179.    Plaintiff made multiple complaints and experienced adverse employment actions as a result including, but not limited to, the following: Defendants altered Plaintiff's shifts from mornings to nights, issued unwarranted written discipline, placed him on solo foot post for a

prolonged period of time without a partner or patrol vehicle for several weeks without explanation, denied him promotions he was over qualified for on two (2) separate occasions, forced Plaintiff to transfer from the Queens borough 102nd Precinct where he resides to a Precinct in Brooklyn and placed him on probation indefinitely, in retaliation for complaining of discrimination against him by Defendant Urprasad.

180.    By the acts and practices described above, the individually named Defendant Urprasad and Defendant City have retaliated against Plaintiff for engaging in protected activities in violation of Title VII.

181.    By the above-described unlawful conduct, the individually named Defendant Urprasad, in his official capacity, retaliated against Plaintiff for engaging in protected activities in violation of Title VII.

182.    As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities, and other prerequisites of employment.

183.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation.

## FOURTH CAUSE OF ACTION
## MUNICIPAL LIABILITY (§§ 1981, 1983)

184.    Plaintiff Pease hereby repeats and re-alleges each allegation contained in the paragraphs above as if fully set forth herein.

185.    Defendants subjected Plaintiff Pease to discrimination on the basis of his race and national origin by *inter alia*, altering his shifts from mornings to nights, placed him on solo foot post for a prolonged period of time without a partner or patrol vehicle without explanation, denied him promotions he was over qualified for on two (2) separate occasions, forced Plaintiff

to transfer from the Queens borough 102nd Precinct where he resides to a Precinct in Brooklyn and placed him on probation in retaliation for complaining of discrimination against Defendant Urprasad.

186.     The acts complained of were carried out by the aforementioned Defendant City and Defendant Urprasad in his capacities as Commanding Officer and Full Inspector with all the actual and/or apparent authority attendant thereto.

187.     The acts complained of were carried out by the aforementioned individual Defendant Urprasad in his capacities as Commanding Officer and Full Inspector pursuant to the customs, policies, usages, practices, procedures and rules of Defendant City, all under the supervision of ranking offices of the NYPD.

188.     The aforementioned customs, policies, usages, practices, procedures and rules of Defendant City and the NYPD include, but are not limited to, the following unconstitutional practices:

(a)     Failing to properly train;

(b)     Failing to properly supervise; and

(c)     Subjecting persons to violations of their constitutionally protected rights.

189.     The existence of the aforesaid unconstitutional customs, policies, usages, practices, procedures and rules may be inferred from the actions taken by the Defendants City and Urprasad.

190.     The foregoing customs, policies, usages, practices, procedures and rules of Defendants and the NYPD constituted a deliberate indifference to the constitutional rights of Plaintiff.

191.    The foregoing customs, policies, usages, practices, procedures and rules of Defendants and the NYPD were the direct and proximate cause of the constitutional violations suffered by Plaintiff as alleged herein.

192.    Defendants, collectively and individually, while acting under color of State and City law, acquiesced in a pattern of unconstitutional conduct by Defendant Urprasad and were directly responsible for the violation of Plaintiff's constitutional rights, for which Defendants are liable.

193.    As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities, and other prerequisites of employment.

194.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation.

## FIFTH CAUSE OF ACTION
## RACE AND NATIONAL ORIGIN DISCRIMINATION (NYSHRL and NYCHRL)

195.    Plaintiff Pease hereby repeats and re-alleges each allegation contained in the paragraphs above as if fully set forth herein.

196.    By the aforementioned acts, Plaintiff Pease has been discriminated against by Defendants, on the basis of his race and national origin in violation of the NYCHRL and the NYSHRL.

197.    But for Plaintiff's race and national origin, he would not have been discriminated against, disciplined, retaliated against and placed on probation. Any reasons proffered by Defendants for disciplining and placing him on probation are a pretext for discriminating against Plaintiff based on his race and national origin.

198.    Defendants' acts and omissions constitute unlawful and willful discrimination against Plaintiff based on his race and national origin in violation of the NYSHRL and the NYCHRL.

199.    As a proximate result of the foregoing, Plaintiff Pease has sustained loss of wages, bonuses, benefits, promotional opportunities, and other prerequisites of employment.

200.    As a direct and proximate result of Defendants' unlawful termination, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation and career.

### SIXTH CAUSE OF ACTION
### HOSTILE WORK ENVIRONMENT (NYSHRL and NYCHRL)

201.    Plaintiff Pease hereby repeats and re-alleges each allegation contained in the paragraphs above as if fully set forth herein.

202.    Defendants' persistent, frequent and pervasive conduct created an atmosphere that was hostile, abusive, humiliating and degrading to its African-American employees and in particular, Plaintiff.

203.    Defendants subjected Plaintiff to a hostile work environment permeated with harassment based on race sufficiently severe and pervasive to alter the conditions of Plaintiff's employment, in violation of NYSHRL and NYCHRL.

204.    As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities and other prerequisites of employment.

205.    As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation and career.

## SEVENTH CAUSE OF ACTION
## RETALIATION (NYSHRL and NYCHRL)

206.    Plaintiff Pease hereby repeats and re-alleges each allegation contained in the paragraphs above as if fully set forth herein.

207.    Plaintiff Pease engaged in protected activities when he made multiple complaints of discrimination against Defendants to his supervisors, the EEO Office and the EEOC.

208.    Plaintiff made multiple complaints and experienced adverse employment actions as a result including, but not limited to, the following: Defendants altered Plaintiff's shifts from mornings to nights, issued unwarranted written discipline, placed him on solo foot post for a prolonged period of time without a partner or patrol vehicle without explanation, denied him for promotions he was over qualified for on two (2) separate occasions, placed him on probation and forced Plaintiff to transfer from the Queens borough 102nd Precinct where he resides to a Precinct in Brooklyn in retaliation for complaining of discrimination against Defendant Urprasad.

209.    By the acts and practices described above, the individually named Defendant Urprasad and Defendant City have retaliated against Plaintiff for engaging in protected activities in violation of the NYSHRL and the NYCHRL

210.    By the above-described unlawful conduct, the individually named Defendant Urprasad, in his official capacity, retaliated against Plaintiff for engaging in protected activities in violation of the NYSHRL and the NYCHRL.

211.    As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities, and other prerequisites of employment.

212.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation.

**EIGHT CAUSE OF ACTION**
**AIDING, ABETTING, INITING, COMPELLING**
**AND COERCING (NYSHRL and NYCHRL)**

213.    Plaintiff Pease hereby repeats and re-alleges each allegation contained in the paragraphs above as if fully set forth herein.

214.    As a result of the foregoing, Defendant Urprasad aided, abetted, incited, compelled and coerced acts forbidden under New York City Human Rights Law, Administrative Code § 8-101, *et seq*., in violation of Administrative Code § 8-107(6). Specifically, Defendant Urprasad has retaliated against Plaintiff based on assertion of claims.

215.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Pease demands a trial by jury.

**DEMAND FOR RELIEF**

**WHEREFORE**, Plaintiff Raine Pease requests judgment against Defendants The City of New York and Deodat Urprasad and respectfully requests that this court:

(a)    Declare the discriminatory acts and practices of Defendants complained of herein violated Plaintiff Pease's rights under the Title VII, NYSHRL, NYCHRL, §§ 1981, 1983 and the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States;

(b)    Grant a permanent injunction restraining Defendants, its officers, successors, assigns and all persons in active concert or participation with them, from engaging in any employment practice which unlawfully discriminates based on race and/or national origin or which retaliates against an individual for complaining of an unlawful employment practice;

(c)    Order Defendants to remove Plaintiff from probation;

(d)    Order Defendants to make Plaintiff Pease, whole by providing the affirmative relief necessary to eradicate the effects of Defendants' unlawful practices;

(e)    Grant Plaintiff Pease actual, consequential, liquidated, punitive and any other damages that the Court may deem appropriate against Defendants;

(f)    Order Defendants to pay lost, foregone and future wages to Plaintiff Pease;

(g)    Order Defendants to pay Plaintiff Pease's reasonably incurred attorneys' fees, costs and disbursements;

(h)    Grant Plaintiff Pease, such other and further relief as this Court deems just and proper.

Dated: New York, New York
        May 1, 2020

_____/s/_____
Donna H. Clancy (DHC-0737)
The Clancy Law Firm, P.C.
*Attorneys for Plaintiff Raine Pease*
40 Wall Street, 61st Floor
New York, New York 10005
(212) 747-1744