**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| RAINE PEASE,<br><br>              Plaintiff,<br><br>   -against-<br><br>THE CITY OF NEW YORK and DEODAT URPRASAD,<br><br>              Defendants. | **SECOND AMENDED COMPLAINT**<br><br>Docket No.: 1:19-cv-07693<br><br><br>**PLAINTIFF DEMANDS TRIAL BY JURY** |

---

**SECOND AMENDED COMPLAINT**

Plaintiff Raine Pease, by his attorneys, The Clancy Law Firm, P.C., alleges, for his Second Amended Complaint against Defendants, The City of New York and Deodat Urprasad, upon information and belief, and at all times relevant, as follows:

**INTRODUCTION**

Despite The City of New York having its own Administrative Code prohibiting discrimination and retaliation in the workplace, it permitted a Commanding Officer of Guyanese descent to intentionally discriminate against a loyal African American New York City Police Department ("NYPD") public servant based on his racist animus towards African Americans.

Historical racial tensions between Guyanese and African Americans long existed where the Guyanese, specifically of Indian descent, have harbored animus towards African Americans and individuals of African descent, which led to the corrupted biases permitted to exist within the NYPD today and, in particular, those perpetrated by Defendant Deodat Urprasad by and through his abuse of office in violation of the alleged federal, state and city statutes herein.

1

Defendant City of New York knew of Defendant Deodat Urprasad's pattern of discriminatory practices and formal complaints and lawsuits against him as well as other similar discrimination lawsuits against the City of New York yet ignored their duty to protect Plaintiff Raine Pease and other African Americans from disparate treatment based on their race.

## NATURE OF THE ACTION

1.      This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e to 2000e-17 ("Title VII"); 42 U.S.C. § 1981 ("§ 1981"), 42 U.S.C. § 1983 ("§ 1983"), the New York State Human Rights Law, N.Y. Exec. § 296, *et seq.* ("NYHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101, *et seq.* ("NYCHRL") *et seq.*, and the Fourteenth Amendment of the Constitution of the United States of America, to remedy discrimination based upon race and/or national origin, a hostile work environment, failure to promote, retaliation and other adverse action perpetrated by his employer. Plaintiff Raine Pease seeks monetary damages and injunctive relief to remedy his discrimination claims and enjoin his pending dismissal issued by the New York City Police Commissioner based on adverse action taken against him at the direction of his Commanding Officer, Defendant Deodat Urprasad.

2.      Plaintiff Raine Pease, an African American male, complains that Defendants unlawfully discriminated against him based on his race and/or national origin, treated him less favorably in his terms and conditions, including without limitation, work assignments, promotion and/or discipline, than similarly situated Police Officers not of African American descent and retaliated against him for exercising his constitutional Fourteenth Amendment right to complain about pervasive discrimination and having taken adverse actions against him by unwarranted disciplining, unfavorable work assignments, denial of promotions and threat of termination.

2

3.    Plaintiff Pease complains that Defendant City of New York ("City") unlawfully and systemically discriminated against African American employees of Defendant City's NYPD, treated them less favorably than similarly situated Police Officers not of African American descent. Plaintiff also complains that Defendant Deodat Urprasad, Commanding Officer of the 102nd Precinct, who is of Indo-Guyanese descent harbored deep rooted discriminatory animus towards African Americans, and in particular, Plaintiff.

## JURISDICTION AND VENUE

4.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e-5(f)(3), 42 U.S.C. §§ 1981 and 1983 and the Fourteenth Amendment of the Constitution of the United States of America. This Court has supplemental jurisdiction over Plaintiff Raine Pease's New York State and New York City's statutory causes of action prohibiting discrimination pursuant to 28 U.S.C. § 1367(a).

5.    Plaintiff Pease asserts supplemental State and City law claims pursuant to the New York State Constitution, New York Executive Law § 296, *et seq*. and New York City Administrative Code § 8-101, *et seq*.

6.    Venue is properly laid in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff Raine Pease's claims occurred in this District, and the Defendants' decision-makers, including the Mayor, Police Commissioner, Deputy Inspectors, Commanding Officers, Deputy and Assistant Commissioners and Bureau Chiefs with respect to implementation, application and enforcement of Defendants' equal employment opportunity ("EEO") policies, affecting the hiring, promotion, work assignments, discipline and termination of its employees, may be found in this District.

7.      All conditions precedent to jurisdiction have occurred or been complied with including and in particular:

a.   Plaintiff Raine Pease filed a Charge of Employment Discrimination ("the Charge dated February 8, 2019") based on race and/or national origin with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the adverse actions of which Plaintiff complains in this action.

b.   A Notice of Right to Sue was issued by the EEOC on May 17, 2019 and received by Plaintiff Raine Pease on May 20, 2019. Plaintiff Pease duly filed his Complaint within 90 days of receipt of the Notice of Right to Sue on August 16, 2019. Attached as **Exhibit A** is a copy of the Charge dated February 8, 2019 and Notice of Right to Sue dated May 17, 2019.

c.   Plaintiff Raine Pease filed a Charge of Employment Discrimination ("the Charge dated July 9, 2020") based upon retaliation within 300 days of the adverse employment action.

d.   A Notice of Right to Sue was issued by the EEOC on July 13, 2020 and received by Plaintiff Raine Pease's legal counsel on July 13, 2020. Plaintiff duly filed this Second Amended Complaint within 90 days of receipt of the Notice of the Right to Sue on July 15, 2020. Attached as **Exhibit B** is a copy of the Charge dated July 9, 2020 and Notice of Right to Sue dated July 13, 2020.

**PARTIES**

8.      Plaintiff Raine Pease (herein referred to as "Pease"), is an African American male and citizen of the United States of America who, at all times relevant, resides in Nassau County, State of New York.

9.      Plaintiff Pease has been continuously employed by Defendant City as a Police Officer with the NYPD from in or about 2007 until the present.

10.     Upon information and belief, Defendant City is a municipal corporation duly organized and existing under and by virtue of the laws of the City and State of New York with its principal office at 100 Centre Street, New York, New York.

11.     Upon information and belief, Defendant City maintains a police force known as the NYPD, which has its principal place of business at 1 Police Plaza, New York, New York.

12.     The NYPD is a local governmental agency, duly formed and operating under and by virtue of the laws and Constitution of the State of New York.

13.     Upon information and belief, Defendant City's Mayor and Police Commissioner are the highest commanding officers of the NYPD.

14.     Upon information and belief, Defendant City controls and supervises the NYPD and its personnel.

15.     Upon information and belief, at all relevant times, Defendant City is an employer as that term is used in Title VII, the NYHRL § 296, *et seq.,* and NYCHRL § 8-101, *et seq.*

16.     Upon information and belief, at all relevant times, Defendant City is an employer as that term is used under the NYCHRL, because it has four (4) or more employees in its employ and conducts business in the State and City of New York.

17.     Upon information and belief, at all relevant times, Defendant City is an employer as that term is used under the NYCHRL 8-102(5), because it has four (4) or more employees in its employ and conducts business in the State and City of New York.

18.     Upon information and belief, Defendant Deodat Urprasad ("Urprasad") was at all relevant times an individual born in Guyana, of Indo-Guyanese descent and resides in the County of Queens, State of New York.

19.     Upon information and belief, Defendant Urprasad, a Police Officer, individually and in his official capacity, an agent, employee, licensee, servant and Police Officer of the NYPD and Defendant City.

20.     Upon information and belief, Defendant Urprasad, as a Police Officer, individually and in his official capacity, acted as an agent, employee, licensee, servant and Police Officer of the NYPD and Defendant City with all the actual and/or perceived/apparent authority granted, allotted and entrusted to him by Defendant City and/or the NYPD in accordance with his official duties, positions, ranks and titles as a New York City Police Officer.

21.     Upon information and belief, Defendant Urprasad, who is sued in his individual and official capacity as a Police Officer, acted under color of law and within the scope of his employment, under color of statutes, ordinances, regulations, policies, customs and usages of the State of New York, City of New York and/or Federal statutes.

22.     Upon information and belief, Defendant City owned, managed, controlled, maintained, employed and/or supervised Defendant Urprasad, individually and in his official capacity as a New York City Police Officer.

23.     Upon information and belief, at all relevant times, Defendant Urprasad is an employer as that term is used in the NYHRL § 296, *et seq.,* and NYCHRL § 8-101, *et seq.*

24.     Upon information and belief, at all relevant times, Defendant City is an employer as that term is used in the NYHRL § 296, *et seq.,* and NYCHRL § 8-101, *et seq.* because it has

four (4) or more employees in its employ and conducts business in the State and City of New York.

## STATEMENT OF FACTS

### I. GUYANESE HISTORICAL RACIAL TENSIONS BETWEEN INDIANS AND AFRICANS

#### A. Early History

25.     The history of Indo-Guyanese racism towards Afro-Guyanese led to the current racism of Guyanese in the United States against African Americans and particularly, how such unchecked racism corrupts the City and its NYPD's EEO policies. Historical references are provided in depth to support the inference of the origin of the discriminatory animus Defendant Urprasad harbors toward Plaintiff Raine Pease as an African American.

26.     The South American country known present day as Guyana, first inhabited by Amerindians tribes, received Spanish and English explorers during the 16th Century. First colonized by the Dutch during the Seventeenth and Eighteenth centuries, the British[1] captured the Dutch colonies in 1803 and retained them under the name British Guiana until it achieved independence in 1966, under the new name Guyana. African slaves began to be transported to the area.[2]

27.     In 1807, the slave trade was abolished in Guyana, which resulted in a large labor shortage used on sugar plantations. "While the population has changed significantly since the end of slavery, in several respects race relations were similar to what existed during the slavery period. Today, there is only a small European segment, and there are large African and

---

[1] As a former colony of Britain, Guyana is culturally and historically aligned to the Anglophone Caribbean. Matthews, Lionel and Wilson, Leon C., *International Review of Modern Sociology,* Vol. 29, No. 1 P. 56 (Spring 1999). https://www.jstor.org/stable/41421165.
[2] Ishmael, Dr. Odeen, *The Guyana Story From the Earliest Times to Independence*. September 2013. Ishmael, Dr. Odeen, *The Guyana Story From the Earliest Times to Independence*. September 2013. http://www.guyana.org/features/guyanastory/guyana_story.html

East Indian segments. The East Indians were introduced immediately after the end of slavery as indentured workers to meet planter needs for a large labor force, consequent on the departure of a significant number of Africans to other parts of the country."[3]

28.    The East and West Indians were used as laborers in place of the slaves of African descent in the plantation economy, were given almost the same allowances, worked as hard and were treated as less than human.[4]

29.    In or about 1835, the Portuguese arrived and began recruiting West Indian laborers from Barbados, St. Kitts, Antigua, Monserrat and Nevis. In or about 1838, East Indian laborers were transported from Calcutta, India to work as indentured servants to work on sugar plantations.[5] Upon the abolition of the slave trade in Guyana, conflict ensued between Indians and Africans competing for work on the sugar plantations and vying political views collided as to who should run the country.

30.    "The White population in Guyana orchestrated these conflicts carefully in order to exploit both groups and maintain what they perceived as necessary security in the colony. This was done partly through keeping the groups physically apart as far as possible, and partly through stereotyping them."[6] Unfortunately, these oppressed groups adopted racist stereotypes of the other.[7]

---

[3] Thompson, Alvin O. *NWIG: New West Indian Guide.* Vol. 80, No ¾ P. 194 (2006). https://www.jstor.org/stable/41850454.
[4] Id.
[5] Id.
[6] *Id.*
[7] *Id*.

31.    "In the early 1960s, as Guyana approached independence, Africans and Indians came into conflict over who would inherit the British mantle of government."[8] "The issue surfaced of who suffered most and on whose blood and sweat the country was mainly built assumed prominence during this struggle for political power – Afro-Guyanese during slavery or Indo-Guyanese during indentured slavery, both being exploited at the hands of colonialism and racism."[9]

32.    In or about 1964, Guyana experienced a serious sugar production shortage. At this time, an overwhelming majority of sugar laborers were Indians and were supporters of the People's Progressive Party (PPP), a major political party in power at that time. All sugar estates were severely affected by this shortage.[10]

33.    "A strike began amongst the sugar laborers after Indian cane-cutters were told by the management of a particular sugar estate that only half of the laborers were offered to work on the estate that day. As a result, all the laborers called a strike the following day and after approximately a week and a half, all cane-cutters on every estate joined the strike in a display of solidarity."[11]

34.    "The Sugar Productions' Association (SPA), comprised of all the Guyanese sugar estates, ignored the existing political and *racial* clashes between Africans and Indians festering within the country by hiring African cane-cutters to work on the sugar estates replacing the

---

[8] Moore, Robert. Colonial Images of Blacks and Indians in Nineteenth Century Guyana. *In* Bridget Brereton & Kevin A. Yelvington (eds.), *The Colonial Caribbean in Transition: Essays on Postemancipation Social and Cultural History*. Gainsville: University of Florida Press, pp. 157 (1997).
[9] Thompson, Alvin O. *NWIG; West Indies Guide*. Vol 80, No. ¾ (2006), pp. 195. https://www.jstor.org/stable/41850454
[10] *Id.*
[11] *Id.*

Indian laborers on strike. The SPA also recruited African laborers to protect the property of the estates from being damaged by the Indian laborers still on strike."[12]

35.     "As a result, violent clashes ensued between the African and Indian populations residing near the sugar estates, eventually extending far beyond the estates placing the entire country in a state of [racial] tension."[13]

36.     Reprisal beatings, destruction of property and murders took place in Guyana. Both races "attacked each other, looted homes and burned and bombed government and privately owned buildings."[14] "Over 350 individuals lost their lives in the politically charged ethnic conflict between Afro and Indo-Guyanese before the intervention of troops from Britain."[15]

37.     "Both ethnic harmony and conflict in colonial societies are perceived as a function of the maneuvering of the dominant ruling class."[16] In social scientist, Donald Horowitz's *Ethnic Groups in Conflict* (1985), he noted, "colonial powers in multi-ethnic societies deliberately create and reinforce ethnic boundaries through missionary education, favoritism, importation of cheap labor and political maneuvering to ensure easy governance."[17] In social scientist, Perry Mars's "Ethnic Conflict and Political Control: The Guyana Case"

---

[12] *Id.*

[13] As the violence escalated, the sugar industry strike continued. On March 6, 1964, one notable incident in particular at the Leonora Estate occurred when a female sugar laborer, Kowsilia, was run over and her body severed in two by a tractor driven by an African strike-breaker. She and other women laborer on strike were sitting on a bridge near a factory to prevent strike-breakers from crossing when the incident occurred. Fourteen other women were seriously injured. In the ensuing fracas, the police arrived on the scene and used tear gas to break up the demonstration. Kowsilia became an immediate martyr for the cause of sugar laborers in their struggle for democracy in the trade union movement in Guyana.

[14] According to local police records, wide spread violent disturbances resulted in 176 persons killed and more than 900 persons seriously injured. More than 1,425 buildings were destroyed by arson, and about 15,000 persons (from 2,600 families) were displaced and they subsequently re-settled in areas where their race group was in the majority. As a long-term result of these disturbances, the country suffered increased racial polarization.

[15] Matthews, Lionel and Wilson, Leon C., *International Review of Modern Sociology,* Vol. 29, No. 1 pp. 56 (Spring 1999). https://www.jstor.org/stable/41421165.

[16] Id., at 58.

[17] *Id.* Horowitz, Donald. *Ethnic Groups in Conflict.* Berkeley: University of California Press.

10

(1990), he noted, economic conflict between the ethnic groups in Guyana is traceable to colonial policies."[18] He argued that these policies discriminated against Africans and Indians.[19]

38.     The statement by Cheddi Jagan, Indo-Guyanese leader of the PPP and his followers "that democracy was restored to Guyana on October 5, 1992, when the PPP came to power for the first time since independence in 1966," [20] rubs salt into the wounds of Afro-Guyanese. Jagan declared in that speech, "Black people are at the lowest scale of the social ladder."[21]

## II.    INDO-GUYANESE AND AFRICAN AMERICANS RESIDING IN NEW YORK CITY

### A. Present Day Racial Tensions

39.     In or about December 2013, the New York City Department of City Planning issued a detailed report showing that Guyanese are the second largest immigrant group in Queens and "the fifth-largest group of foreign-born residents in New York City, behind Dominican, Chinese, Mexican and Jamaican people, according to the U.S. Census Bureau."[22]

40.     Upon information and belief, Plaintiff Pease's Precinct, the 102nd Precinct's Ozone Park and Richmond Hill, Queens, have the highest population of Guyanese immigrants and descendants, so much that the strip of Liberty Avenue that cuts through the neighborhoods is dubbed "Little Guyana."[23]

---

[18] Id. Mars, Perry. "Ethnic Conflict and Political Control: The Guyana Case." Social and Economic Studies, 39(3).
[19] Id.
[20] Thompson, Alvin O. NWIG; West Indies Guide. Vol 80, No. ¾ (2006), pp. 197. See "President Not Surprised at PNC Fuss," Guyana Chronicle, November 19, 1996.
[21] Id., at pp. 197. See "President Not Surprised at PNC Fuss," Guyana Chronicle, November 19, 1996.
[22] NYC Department of City Planning. "Population Analysis of Guyanese and Trinidadians in NYC Based on The Newest New Yorker Report." (December 2013). https://www.indocaribbean.org/blog/population-analysis-of-guyanese-and-trinidadians-in-nyc
[23] Chun, Christine. "Guyanese Food in NYC Blends Cultures to Offer 'Something for Everyone'". amNY. October 2, 2018. https://www.amny.com/eat-and-drink/guyanese-food-nyc-1-21348016/

41.     According to the research relied upon in Natassaja M. Chowthi's Master's thesis, "Changing Places and Questions of Identity: The Fluid Lives of First-Generation Indo-Guyanese," Little Guyana was not always home to Indo-Caribbeans.[24] "Large numbers of Guyanese began emigrating to the Queens enclave, Little Guyana, due to the emergence of Forbes Burnham as a Guyanese political leader whose politics resulted in 'ethnicity-based politics'"[25] which would lead to "the most violent racial conflict that polarized around the 1964 elections."[26]

42.     "In addition to the push factors occurring in Guyana in the 1960s, events transpiring in United States immigration became pull factors attracting Guyanese immigrants to the U.S."[27]

43.     From the author Lear Matthews of *English-Speaking Caribbean Immigrants: Transnational Identities*, "West Indian and [African] Guyanese find that 'remaining an immigrant means higher status because becoming American for West Indians entails becoming black American-something that they perceive as downward mobility."[28]

## III.     DEFENDANTS' HISTORY OF RACIAL ANIMUS

### A.     A Custom, Pattern, Practice and Policy of Discrimination Implemented by Defendants City and Urprasad exists within the NYPD

44.     At all relevant times, it has been and is the custom, practice, pattern and policy of Defendants City and Urprasad within the NYPD to discriminate against similarly situated

---

[24] During the 1980s, Richmond Hill in Queens, New York was mainly populated by Italians, Irish Germans.
[25] Chowthi, Natassaja M. "Changing Places and Questions of Identity: The Fluid Lives of First-Generation Indo-Guyanese." University of North Carolina, pp. 26 (2009).
[26] Id.
[27] *Id.*, at 27.
[28] Matthews, Lear. *English-Speaking Caribbean Immigrants: Transnational Identities*. University Press of America, Inc., pp. 179 (2013).

African Americans due to animus harbored by Defendants, in particular, Defendant Urprasad, towards them due to their race and/or national origin.

45.    Based upon the overall number of Defendant City's NYPD POs, African Americans constituted a minority of the POs in the NYPD and were a minority in the 102nd Precinct as well. More specifically, there were approximately eight (8) African American POs out of approximately 65 POs employed at the 102nd Precinct.

46.    According to the NYPD's own data, as of July 14, 2020, the NYPD is composed of 15% African American Police Officers.[29] Approximately forty percent (40%) of current NYPD Officers have not received a Civilian Complaint Review Board ("CCRB") complaint. However, twenty percent (20%) of NYPD Officers have received one CCRB complaint, twelve percent (12%) have received two CCRB complaints, eight percent (8%) have received three CCRB complaints and seventeen (17%) have received four *or more* CCRB complaints. Therefore, approximately 57% (20,613 Officers) of Defendant City's police force have received at least one complaint for any type of *use of force, abuse of authority, discourtesy and offensive language* (FADO) allegations with any type of disposition.[30] The NYPD currently employs approximately 36,000 Police Officers.[31]

47.    More than 130 federal civil rights lawsuits have been filed against Queens precinct Police Officers from 2015 to 2018, resulting in verdicts and settlements totaling $1,475,001 according to data compiled by The Legal Aid Society.[32]

---

[29] https://www1.nyc.gov/site/ccrb/policy/data-transparency-initiative-mos.page
[30] Id.
[31] *Id.*
[32] Brand, David. "Lawsuits Against Queens Cops Cost City Nearly $1.5 Million Since 2015, Database Reveals." Queens Daily Eagle. March 18, 2019. https://queenseagle.com/all/2019/3/18/lawsuits-against-queens-cops-cost-city-nearly-15-million-since-2015-database-reveals

48.     There were a total of 2,326 civil rights lawsuits filed against the NYPD from January 2015 to June 2018, of which 790 settled for $53,790,898.[33]

49.     The majority of the 131 lawsuits filed against Police Officers from Queens' 16 precincts are still pending. Most lawsuits were filed by people of color and predominantly African American, who claimed they were improperly arrested, searched or injured by NYPD Officers.[34]

50.     Among Queens' 16 precincts, Officers from the 105th Precinct currently under Defendant Urprasad's command in eastern Queens cost the City the most money in settlements compared to other borough precincts: $349,500 from two settlements and a trial verdict, according to the database. Ten other cases associated with the 105th Precinct are pending, and one has been dismissed. The 105th precinct covers Laurelton, Rosedale, Springfield Gardens, Queens Village and several other eastern Queens neighborhoods.[35]

51.     Queens' 103rd Precinct together with the 113th Precinct racked up the majority of federal lawsuits in Queens, with 22 each between 2015 and 2018. Most are still pending.

B.     **Defendants' Litigation History**

52.     Defendants have demonstrated a custom, practice, pattern and policy of discriminating against African American and Latino Police Officers, creating an unlawful hostile work environment and retaliating against them for complaining of said discrimination and/or

---

[33] *Id.*
[34] *Id.*
[35] *Id.*

retaliation as exemplified in the September 1991 federal class-action lawsuit filed by the Latino Officer Association on behalf of African Americans and Latinos.[36]

53.    Upon information and belief, approximately 12,000 African American and Latino NYPD Police Officers received financial payouts of between $3,500 and $4,000 each for widespread act of agency discrimination between 1996 and 2003.[37]

54.    In Latino Officers Association City of New York, et al. v. The City of New York, et al., the Police Officers alleged they were subjected to unfair disciplinary action, and that the NYPD created a hostile work environment for them.

55.    Upon information and belief, this federal lawsuit was commenced by 22 individuals and the NYPD Latino Officers' Association alleging discriminatory and disparate application of the NYPD's disciplinary rules, procedures and punishments of African-Americans, Latinos and other minority Police Officers by Defendant City and its NYPD.[38]

56.    Upon information and belief, the Honorable Judge Lewis A. Kaplan of the United States District Court for the Southern District of New York certified the foregoing lawsuit as a class action, which included all African-American and Hispanic POs and certain civilian employees of the NYPD from 1996 forward and then employed with the NYPD and those who will be employed by the NYPD as uniformed officers.[39]

57.    Upon information and belief, this federal lawsuit alleged that African Americans and Latino Officers were less likely to be acquitted and have their charges dismissed than

---

[36] Latino Officers Association City of New York, et al., v. The City of New York, et al., Civil Docket No. 1:99-cv-9568.

[37] Menchaca, Paul. "City Settles Latino Officers' Bias Lawsuit for $26.8 Million." Queens Chronicle. February 5, 2004. https://www.qchron.com/editions/western/city-settles-latino-officers-bias-lawsuit-for-million/article_e66cbcfe-8b82-5ee8-863f-d8dfc67b3f86.html

[38] Latino Officers Association City of New York, et al., v. The City of New York, et al., Civil Docket No. 1:99-cv-9568.

[39] Moynihan, Colin. "Latino Police Officers and City Settle Suit." The New York Times. February 1, 2004. https://www.nytimes.com/2004/02/01/nyregion/latino-police-officers-and-city-settle-suit.html

Caucasians at Departmental Hearings with the NYPD and 60% (sixty percent) and 30% (thirty percent) more likely, respectively to be found guilty at NYPD trials than Caucasians.

58.    Upon information and belief, this federal lawsuit alleged that, overall and in general, African-Americans, Hispanics and other minority Officers were disciplined and treated more often, more adversely and/or more severely than Caucasian and/or non-minority Officers by the NYPD.

59.    Upon information and belief, Defendant City and its NYPD settled the foregoing federal lawsuit with the plaintiffs in which Defendant City provided a monetary award in the amount of $26.8 million to the plaintiffs of that lawsuit and members of the class, and more significantly, Defendant City and its NYPD agreed to injunctive relief that they would be enjoined from discriminating based upon race, color, national origin or ethnicity in the future.

60.    Upon information and belief, in or about December 2003, pursuant to the settlement of the foregoing class action lawsuit, Defendant City and its NYPD entered into a signed stipulation of settlement – a contract by the terms and conditions of which they were obligated to establish a review unit to analyze the NYPD's disciplinary process regarding discrimination and retaliation with respect to African American and Latino/Hispanic members of the NYPD and the manner in which they were investigated, charged, disciplined or penalized, to wit: a "Disciplinary Review Unit."[40]

61.    Upon information and belief, pursuant to the signed stipulation of settlement, Defendant City and its NYPD were obligated to establish this "Disciplinary Review Unit" to track and analyze whether minority members of the NYPD, like Plaintiff herein, were being

---

[40] Defendant City and the NYPD were obligated to establish this "Disciplinary Review Unit" to track and analyze whether minority members of the NYPD, like the Plaintiff herein, were being treated in a discriminatory manner when disciplined, establish as "Advisory Committee" to address employment discrimination and retaliation concerns as well as develop a "Know Your Rights" guide to the NYPD discipline system and to enhance existing databases and create new ones to report relevant data regarding the disciplining of African American and Latino officers.

treated in a discriminatory manner when being disciplined as well as establish an "Advisory Committee" to address employment discrimination and retaliation concerns.

62.    Upon information and belief, the Advisory Committee was required to include members of the Latino Officer Association and meet quarterly to address employment discrimination and retaliation. Improvements were to be made to the NYPD's discipline database, which would allow officers, union representatives and lawyers to easily monitor whether disciplinary action in a current matter matches that taken for similar incidents in the past.[41]

63.    Further, upon information and belief, pursuant to the stipulation of settlement, Defendant City and its NYPD were to develop a "Know Your Rights" guide to the NYPD discipline system and to enhance existing databases and create new databases and report data thought to be relevant to analyzing whether or not discrimination was continuing in the NYPD discipline system.

64.    Upon information and belief, on or about September 17, 2004, the District Court entered a judgment and order approving said stipulation of settlement/contract, and its terms and conditions, in the foregoing class action lawsuit.

65.    Upon information and belief, the settlement agreement required Defendant City and the NYPD to establish specific procedures to prevent discrimination.

### C.    Defendant Urprasad's Abusive Discriminatory Practices

66.    At all relevant times, Defendant Urprasad has had a custom, practice, pattern and policy under which he governed his precincts and Police Officers of discriminating against non-Guyanese Police Officers, and more specifically, African Americans, and of retaliating against

---

[41] Menchaca, Paul. "City Settles Latino Officers' Bias Lawsuit for $26.8 Million." Queens Chronicle. February 5, 2004. https://www.qchron.com/editions/western/city-settles-latino-officers-bias-lawsuit-for-million/article_e66cbcfe-8b82-5ee8-863f-d8dfc67b3f86.html

them based upon his racial animus and particularly if they complained about disparate treatment or was perceived to not bow down to their superior as a Guyanese Commanding Officer.

67.    Federal lawsuits were filed against defendant Urprasad and defendant City by African American and/or Latino plaintiffs for discrimination based on race, ethnicity and/or national origin as well as excessive force and Monell claims, including the following: Frank De Michele v. The City of New York, Deodat Urprasad, et al., Civil Docket No. 1:09-cv-09334[42]; Osselito Beaubrun v. The City of New York, Deodat Urprasad, et al., Civil Docket No. 1:05-cv-07296[43]; Marco Trujillo v. The City of New York, Deodat Urprasad et al., Civil Docket No. 1:14-cv-085502; Michael Roopchand v. City, Deodat Urprasad, et al., Civil Index No.: 717991/2018[44] and Toya Foy, et al. v. The City of New York, Deodat Urprasad, et al., Civil Docket No. 1:10-cv-08553.[45]

---

[42] In 2009, Frank De Michele filed suit against Defendants City and Urprasad and other NYPD POs. According to Mr. De Michele's Amended Complaint, on or about January 18, 2009, as Captain of the 45th Precinct in Bronx County, Defendant Urprasad directed PO Christian M. Gutierrez to arrest Mr. De Michele in his residence on the basis of only probable cause that he may have committed a robbery.[42] Mr. De Michele was physically assaulted during this arrest. Mr. De Michele brought causes of action for excessive force, false arrest, malicious prosecution and deprivation of access to the courts under Section 1983; Monell claims against the County and defendant City; and state law causes of action for false arrest, malicious prosecution, battery and assault. Three (3) months after the arrest, the Queens County District Attorney dropped all charges against Mr. De Michele as the NYPD arrested the wrong person.

[43] Plaintiff Osselito Beaubrun filed this action against the City and Deodat Urprasad describing him and other NYPD Officers as "lawless" for falsely arresting him, assaulting him and bringing fabricated criminal charges against him as part of a cover up which launched a criminal case lasting over a year requiring numerous court appearances only to end in complete dismissal of all charges against Plaintiff.

[44] On or about November 25, 2018, Michael Roopchand filed a complaint with the Supreme Court of the State of New York, Queens County against Deputy Inspector Deodat Urprasad, Sgt. Christopher Winiarz and Kevin Bischoff alleging Defendant Urprasad fabricated that Mr. Roopchand was drinking from an open alcohol container on his front lawn and arrested him. Mr. Roopchand alleged defendants deprived him of his rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eight and Fourteenth Amendments of the Constitution of the United States of America and in violation of §§ 1981, 1983.

[45] Plaintiff Toya Foy and her infant son, G.M. brought a civil action for damages pursuant to 42 U.S.C. § 1983 against Ms. Foy's husband and G.M.'s father, Officer Gerald McCoy, Sr. as well as Defendant Deodat Urprasad individually for participating in and turning a blind eye to the emotional and physical abuse and malicious abuse of the criminal process perpetrated by Officer Foy as a fellow Officer.

D.    **Marco Trujillo v. City, Deodat Urprasad, et al.**

68.    In 2014, Marco Trujillo filed a complaint against Defendant The City of New York, Defendant Urprasad and the NYPD for violating his Eighth Amendment Constitutional rights as well as various other federal and state laws. Mr. Trujillo's EEOC complaint contained a charge of discrimination against defendants based upon race, national origin, color, ethnicity, retaliation, disparate treatment, hostile work environment, breach of contract and constructive termination.[46]

69.    Mr. Trujillo, a male Spanish/Hispanic/Latino of Dominican descent was a Police Officer serving for 22 years with the NYPD. His complaint includes allegations of coercion, physical assault and retaliation against a Guyanese Sergeant, John Rajan, who harbored discriminatory animus and was directly under the command of Defendant Urprasad.

70.    During his employment with the NYPD, Mr. Trujillo was discriminated against by Sgt. Rajan's adverse action taken against him, including involuntary transfers, denial of overtime and was strangled/choked resulting in a broken shoulder.

71.    After Defendant Urprasad became aware of his fellow Guyanese Sergeant's assault upon Mr. Trujillo, he *improperly brought charges against Mr. Trujillo and conducted an investigation against him*. He did not discipline or recommend discipline against favored Sgt. Rajan in any manner. [47] Pursuant to Defendant City's internal discipline policy, the IAB should have performed the investigation not Defendant Urprasad, and its focus, logically, should have

---

[46] See 1:14-cv-08501 (PGG) Docket No. 1.

[47] Sgt. Rajan was a close friend of Defendant Urprasad, who at this time, was the Commanding Officer of the Unit. Both Defendant and Sgt. Rajan are Guyanese and members of the NYPD Desi Society, the first South Asian American fraternal law enforcement organization in the United States formed by approximately 70 NYPD Police Officers on January 20, 2004. The Society is meant to improve mutual understanding between the NYPD and South-Asian communities, increase the number of South Asian American Officers in the NYPD and support NYPD officers of South Asian descent. See NYPD Desi Society Records. "History." Accessed April 16, 2020. https://apa.nyu.edu/survey/?p=187

been on Sgt. Rajan's criminal actions. Defendant Urprasad failed to notify the NYPD's OEEO

Office and IAB of Mr. Trujillo's complaints of discrimination and assault against of Sgt. Rajan.

## IV.    PLAINTIFF RAINE PEASE'S EMPLOYMENT HISTORY

### A.    From Naval Officer to NYPD Officer

72.    Prior to becoming a Police Officer, Plaintiff Pease, an African American male,

served in the United States Navy.

73.    During his service, the U.S. Navy issued Plaintiff Pease a Letter of

Commendation on behalf of the Commanding Officer of the Battle Group that participated in the

2004 operation, "Safe Horizon" for his meritorious performance, which contributed to mission

readiness resulting in a 100% success rate with no loss to aircraft or personnel. This

commendation was particularly outstanding because Plaintiff was an E3[48] at the time he received

the commendation and his contribution was more typical of a higher-ranking officer.

74.    While carrying out the Safe Horizon mission, Plaintiff Pease performed the duties

of an E4, Petty Officer (one position above his rate) because his head supervisor had the utmost

confidence in him to take on the heightened responsibilities of this rank for the safe completion

of the mission.

75.    Upon completing his service with the United States Navy, Plaintiff Pease was

honorably discharged and received a citation of exemplary performance and service.

76.    After his service in the Navy, Plaintiff Pease entered the NYPD Police Academy

to train to become a Police Officer. Plaintiff was appointed to the position of Police Officer

---

[48] The United States Navy employs the following Pay Grade and Rates to signify its officers' level of experience: E-1 Seaman Recruit (no stripes on upper sleeve), E-2 Seaman Apprentice (two stripes on upper sleeve), E-3 Seaman (3 stripes on upper sleeve), E-4 Petty Officer Third Class, E-5 Petty Officer Second Class, E-6 Petty Officer First Class, E-7 Chief Petty Officer, E-8 Senior Chief Petty Officer, E-9 Master Chief Petty Officer and E-9 Master Chief Petty Officer of the Navy.

("PO") on or about January 23, 2007 and was assigned to the 102nd Precinct. Plaintiff has been a Police Officer for approximately 13 years.

77.     Throughout his career, Plaintiff Pease consistently received 3.0 to 3.5, the majority being 3.5, performance evaluation ratings on a 5.0 scale and positive reviews from his supervisors.

78.     In or about 2008 to 2009, Plaintiff Pease, as a new PO, was assigned to work night shifts at the 102nd Precinct patrolling areas of Key Gardens, Richmond Hill, Woodhaven and the northern section of Ozone Park.

79.     From in or about 2009 to May 2014, Plaintiff Pease was assigned to work morning shifts, which were far more preferable for POs and are granted to those with seniority.

80.     From 2012 to January 2015, Henry Sautner was Plaintiff Pease's Commanding Officer ("CO") at the 102nd Precinct.

81.     In May 2014, Plaintiff Pease accepted a position in Highway Patrol. Plaintiff's CO Sautner highly recommended him for the position. Plaintiff had a good working relationship with CO Sautner.

82.     In December 2014, due to a medical condition requiring an accommodation, Plaintiff was transferred back to the 102nd Precinct and was no longer working Highway Patrol.

83.     As a result, Plaintiff Pease was temporarily assigned midnight shifts in the 102nd Precinct.

84.     In or about January-February 2015, Defendant Urprasad replaced CO Sautner becoming Plaintiff Pease's new CO. Defendant Urprasad became the CO of Key Gardens, Richmond Hill, Woodhaven and the northern section of Ozone Park.

85.     From in or about January-February 2015 until November 2017, Defendant Urprasad was Plaintiff Pease's 102nd Precinct CO.

86.     From in or about January-February 2015 until November 2017, Defendant Urprasad was the highest-ranking officer of the NYPD in the 102nd Precinct. Defendant's directives had decision-making authority over the 102nd Precinct POs, including Plaintiff.

87.     In January 2015, Defendant Urprasad continued to require Plaintiff Pease to work midnight shifts continuously through April 2016. Defendant ordered the roll call to reflect Plaintiff only work night shifts. Rookie POs are typically assigned the night shifts, not POs with seniority like Plaintiff. A commonly known reason amongst POs was that reassignment from a day shift to a night shift is a form of discipline, unless for some other accommodation request by the PO.

### B.     Plaintiff Raine Pease's Disparate Treatment Based Upon Racial Animus

88.     In or about mid-February 2015, Plaintiff Pease and Defendant Urprasad were both responding to an incident at a nightclub. While on scene, Plaintiff Pease addressed Defendant for the first time stating, "How are you doing Inspector?" Defendant completely ignored Plaintiff and walked off without responding to him.

89.     In or about mid-February 2015, while dressed in plain clothes, Defendant Urprasad detained a female civilian and had her pressed up against a wall. While Plaintiff Pease was securing the perimeter, Defendant directed Plaintiff to relieve him and secure the female civilian. As Plaintiff attempted to do so, Defendant then yelled at Plaintiff for not moving fast enough to relieve him. Defendant remarked, "you and your damn feet," inappropriately commenting on Plaintiff's medical condition and accommodation, which resulted in his transfer from Highway Patrol to the 102nd Precinct.

90.     In or about mid-February 2015, Plaintiff Pease mentioned Defendant Urprasad's comment concerning his medical condition and the two week assignment of foot post to reprimand him for not moving quickly enough to relieve Defendant to his Sergeant, Sgt. Breen. Sgt. Breen stated he would request, on Plaintiff's behalf, a meeting between Plaintiff and Defendant to address any issues that may exist and would ensure Police Benevolent Association ("PBA") Delegate PO Barbara Lester as Plaintiff's Delegate would be present. However, Defendant Urprasad refused to meet with Plaintiff.

91.     Prior to Defendant Urprasad becoming Plaintiff Pease's CO and supervisor, Plaintiff had positive performance reviews and good working relationships with his supervisors throughout his seven (7) year career as a PO as well as during his service in the Navy. In fact, his supervisors expressed their appreciation of Plaintiff's high level of professionalism.

92.     In mid-February, 2015, Defendant Urprasad assigned Plaintiff midnight foot post shifts without a patrol vehicle. During these shifts, Plaintiff informed Police Benevolent Association ("PBA") Delegate and PO, Barbara Lester he became ill and needed to take sick time after completing a week of these outside winter patrols. Plaintiff was diagnosed with walking pneumonia. PO Lester stated she would speak to Defendant Urprasad regarding Plaintiff's ending foot post shifts. Despite Plaintiff having experienced pneumonia while on foot post due to the harsh weather and PBA Delegate Lester's intervention, Defendant Urprasad chose to assign Plaintiff another full week on foot post with no vehicle.

93.     PO Lester informed Plaintiff Pease that Defendant Urprasad "does not care…he wants his two weeks [of foot post duty]."

94.     Plaintiff Pease remained working midnight tours until in or about April 2016 while other non-African American Officers were not required to work such unfavorable assignments.

95.     In or about May 2016, Plaintiff Pease was finally re-assigned to work day tours.

96.     Upon information and belief, on or about November 21, 2017, Defendant Urprasad was promoted to Full Inspector of Queens assigned to Patrol Borough Queens South. However, as Full Inspector, all Queens Precincts' Commanding Officers are under his supervision.

### 1.     The May 2017 Guyanese Festival Incident

97.     In or about May 2017, Plaintiff Pease and PO Gurvinder Bachhal received written assignment to patrol a Guyanese festival located at Smokey Park within the 102nd Precinct.

98.     Prior to patrolling the festival, Plaintiff Pease and PO Bachhal met with 102nd Precinct's Sergeant ("Sgt.") Shereen Summa by the front desk. At that time, Defendant Urprasad was also standing beside the front desk with Sgt. Joseph Cornier, when Plaintiff and his partner, PO Bachhal exited out of a side entrance of the building. While outside, Defendant Urprasad instructed Sgt. Summa to remove Plaintiff from his assignment to patrol the Guyanese festival. He was instead assigned to guard a hospitalized prisoner.

99.     Minutes later, Plaintiff Pease reentered the Precinct and Sgt. Summa informed Plaintiff that he was no longer assigned to the festival but instead to guard the hospitalized prisoner. Plaintiff expressed confusion, especially because he was notified via a written authorization of his festival assignment from the NYPD. Sgt. Cornier approached him at that time and informed Plaintiff his new assignment was to guard the prisoner *without his partner*. It was common knowledge among POs that such an assignment was deemed unfavorable and not

typically relegated to senior officers with approximately eight (8) years of experience such as Plaintiff. Sgt. Cornier expressed that he knew it was not favorable, but that it was not on his authority and rather was Defendant Urprasad's decision.

100.    Upon leaving the Precinct that same day, Plaintiff Pease, PO Bachhal and Sgt. Summa traveled in an NYPD van to drop off officers to their details. While in the van, prior to dropping Plaintiff at his hospital prisoner detail, Sgt. Summa expressed to Plaintiff, "I don't have any issue with you," implying it was Defendant Urprasad who had an issue with Plaintiff.

## 2.    The September 10, 2017 Incident (Pretext)

101.    On or about September 10, 2017, Plaintiff Pease and his partner, PO Bachhal responded to a 911 call reporting stolen items being unlawfully removed from a vehicle on Eldert's Lane, Queens, New York. Plaintiff's and his partner's response was delayed due to their handling of two other previously received priority 911 calls that morning from the same address located at Woodhaven Boulevard in Queens, New York.

102.    On or about September 10, 2017, Sgt. Sharon Itwaru was on scene to witness Plaintiff's resolution of those two (2) previous priority 911 calls. The calls came in being Code 54, person in need of emergency medical attention, which were high priority. The first call was received by Plaintiff at approximately 9:33 a.m. involving an 89 year-old female who had fallen and was trapped behind a door for four (4) days. After properly assisting the 89-year-old woman, Plaintiff and his partner had to wait for a locksmith to fix the door involved in the initial 911 call. The second call was received at 9:52 a.m. to assist an unconscious or possible deceased person within their apartment located within the same building as the first 911 call. Plaintiff and his partner arrived on scene at Woodhaven Blvd. at approximately 10 a.m.

103.    Plaintiff Pease and PO Bachhal received the September 10, 2017 vehicle break in 911 call at approximately 11 a.m. as a Code 22, signaling the incident occurred in the past and was of low priority. Plaintiff and his partner Bachhal departed Woodhaven Blvd. at approximately 11:30 a.m. Plaintiff and his partner PO Bachhal arrived on the scene located at Eldert's Lane at approximately 11:40 a.m. to address the call.

104.    Upon arriving on scene, the complainant was not present. Plaintiff and his partner waited approximately five (5) minutes for the complainant to arrive. During that time, PO Bachhal used his NYPD issued cell phone to locate the complainant on the call back number provided to command by the complainant.

105.    While PO Bachhal was using his NYPD issued cell phone calling the complainant, complainant approached PO Bachhal, who was seated in the front seat of the police vehicle. Complainant reported to Plaintiff and his partner that he was the individual who called to report an unknown male who had been tampering with his brother in law's vehicle. Complainant was of Guyanese descent.

106.    The complainant revealed he attempted to confront the unknown male tampering with the vehicle, which led to a physical altercation between the two men. Complainant stated he was hit in the face by the unknown male causing pain to his jaw area, but he was not bleeding. The complainant then stated the unknown male fled the scene toward Jamaica Avenue.

107.    At that time, PO Bachhal asked the complainant if any items were taken from his brother-in-law's vehicle and if he needed medical attention. The complainant refused any medical assistance stating he would seek medical attention at a later time.

108.    When PO Bachhal exited the police vehicle to retrieve paperwork and before re-entering the police vehicle, the complainant asked if Plaintiff and his partner were going to search for the unknown male.

109.    Plaintiff and PO Bachhal explained to the complainant that given the elapsed time from his 911 call, NYPD's protocol was to refer the complainant to the NYPD's detective squad to further investigate the complaint using all of the information provided by the complainant and the reporting Officers.

110.    Upon re-entering the police vehicle, PO Bachhal noted to Plaintiff Pease he smelled alcohol emanating from the complainant. Shortly thereafter, the complainant's brother-in-law, Ansar (last name unknown) and owner of the vehicle that was tampered with, appeared on the scene. The brother-in-law approached the police vehicle's driver side window where Plaintiff was seated.

111.    Ansar stated to Plaintiff Pease he was the owner of the vehicle, and that the vehicle had been locked. He further stated that credit cards were now missing from the vehicle, and that he still was in possession of the car key.

112.    Pursuant to NYPD's protocol, Plaintiff Pease offered Ansar a complaint report for the stolen credit cards. Ansar declined the complaint report forms because he had already cancelled his credit cards.

113.    Pursuant to NYPD's Protocol, Plaintiff and PO Bachhal then finalized the 911 call in their complaint report as involving an assault.

114.    On September 12, 2017, PO Bachhal informed Plaintiff Pease an issue arose involving their handling of the 911 call on Eldert's Lane. The assault complainant who Plaintiff and PO Bachhal first interacted with on the scene telephoned an officer at the 105th Precinct

accusing Plaintiff and PO Bachhal of mishandling his complaint and falsely stated the officers offered him no medical attention, were using personal cell phones at the scene and did not exit the vehicle at any time to speak with him. The officer from the 105th Precinct reported the accusations to an officer in the 102nd Precinct, where Plaintiff and PO Bachhal were stationed.

115.    Plaintiff Pease and PO Bachhal explained their version of events to the Integrity Control Officer Lieutenant ("Lt.") Alberano, and in addition, Ansar, the complainant's brother-in-law, telephoned the NYPD to corroborate Plaintiff and his partner's version of events and disputed the truth of complainant's false accusations against the officers.

116.    The above facts concerning this 911 call were presented directly to Defendant Urprasad by Lt. Alberano. Lt. Alberano stated to Plaintiff Pease he believed his version of events and would try to convince Defendant Urprasad that Plaintiff did not deserve any discipline as a result of this 911 call incident because of no malfeasance.

117.    However, Defendant Urprasad rejected Plaintiff Pease's and PO Bachhal's version of events despite the credible witness and evidence to the contrary without proper and fair consideration. Thereafter, Lt. Alberano informed Plaintiff and PO Bachhal that they would be charged with discipline for improper report classification under the specific authority and directive of Defendant Urprasad.

118.    During their conversation, Lt. Alberano made it clear to Plaintiff Pease that he would not have issued any discipline had it been up to him. Lt. Alberano stated this directive came straight from Defendant Urprasad.

119.    Confirming the disciplinary action imposed by Defendant Urprasad, Lt. McGorty of the NYPD administrative department informed Plaintiff Pease and PO Bachhal that they would be removed from their current day tours. Plaintiff was consequently immediately

transferred from the "4x12" tour (working hours of 3 p.m. to 11:35 p.m.) and PO Bachhal to the "12x8" tour (working hours of 11:15 p.m. to 7:50 a.m.) and thus relieved as partners.

120.    On or about September 12, 2017, Lt. John McGorty stated to Plaintiff Pease, "It's not me, it's from Commanding Officer" *i.e.* Defendant Urprasad. Lt. McGorty informed Plaintiff it was not his decision to reassign him from morning shifts to night shifts but rather Defendant's.

121.    Prior to this disciplinary reassignment, Plaintiff Pease was working the "8x4" tour (7:05 a.m. to 3:40 p.m.), which is a much more preferable assignment amongst the POs than his new schedule of 11:15 p.m. to 7:50 a.m.

122.    On or about September 12, 2017, during a conversation with Tour Platoon Commander, Lt. Gulienello, Lt. Gulienello informed Plaintiff Pease that he attempted to "do damage control" when speaking to Defendant Urprasad and defended Plaintiff regarding the 911 call. However, Defendant Urprasad refused to reconsider his adverse discipline action against Plaintiff without justification. Lt. Gulienello noted to Plaintiff that Defendant Urprasad's treatment of Plaintiff was unusual because he was otherwise fair and professional to his reports, who were of non-African American descent. Lt. Gulienello further commented that he was surprised by Defendant's treatment of Plaintiff.

**C.    Defendant Urprasad's Severe and Pervasive Harassment of Plaintiff Raine Pease (Hostile Work Environment)**

123.    Again from in or about September 16, 2017 through November 22, 2017, Defendant Urprasad assigned Plaintiff Pease solo foot post at various locations during the "12x8" night shift. The locations were known to have no means of or accommodation for a restroom. No prior notification nor reasonable justification for the unfavorable assignment was afforded to Plaintiff.

124.    During this prolonged unfavorable assignment, on October 2, 2017 to October 3, 2017 and on October 9, 2017, Defendant Urprasad's assignment of Plaintiff Pease's foot post with no vehicle or partner was to guard an abandoned house that had caught fire located at address 95-48 114th Street, Jamaica, New York. This abandoned house was known to the NYPD as a homeless squatters' location and was awaiting being boarded up for security purposes. This post provided no access to a restroom or break during the shift. Due to the high volume of 911 calls generated by the tours in this area during this shift time, it was difficult for Plaintiff to obtain any relief or shelter.

125.    During the relevant time period in which Plaintiff Pease complained of his discriminatory treatment, other African American POs within the 102nd Precinct were treated less favorably than officers of non-African American descent. For example, PO Williams, African American, complained to Plaintiff that she received less favorable assignments than officers who were not African American.

126.    PO Williams was assigned to Post 9848 located at 114th Street in Queens, New York with Plaintiff Pease to secure an abandoned house. At that time, PO Williams broke down in tears visibly shaking about how she felt discriminated against, demeaned and was suffering being in such a hostile work environment.

127.    During these tours, Plaintiff Pease was isolated, had only one supervised visit per tour and minimal, if any, coworker contact. Plaintiff was not afforded a police vehicle during these tours contrary to protocol for all previous day tour posts and night posts he had been previously assigned. The POs who were afforded police vehicles were typically Guyanese or Caucasian.

128. After several months of Defendant Urprasad's disparate treatment of Plaintiff Pease, by November 2017, it became commonly known amongst the 102nd Precinct's POs and including Plaintiff that Defendant Urprasad targeted Plaintiff Pease because he was African American by assigning him unfavorable tours and assignments, and that Defendant Urprasad generally favored Guyanese POs over African American POs.

129. On or about November 1, 2017, Plaintiff Pease spoke with Lt. Alberano regarding his concerns about Defendant Urprasad's continued mistreatment and targeting of him. Lt. Alberano responded to Plaintiff, "COs come and go…[you'll get a] clean slate with a new person." Lt. Alberano believed Defendant Urprasad's issue with Plaintiff stemmed from the September 10, 2017 complaint from the Guyanese complainant, who falsely accused Plaintiff of not offering him medical attention. Without undertaking any investigation and/or speaking directly with Plaintiff to obtain his account, Defendant Urprasad labeled Plaintiff as being untruthful and favored the veracity of the Guyanese complainant.

130. During the November 1, 2017 discussion between Plaintiff Pease and Lt. Alberano, Lt. Alberano stated he believed Plaintiff and his partner's version of events, including that Plaintiff offered the complainant medical attention. During this conversation, Lt Alberano reminded Plaintiff Pease that he only had nine (9) years left until qualifying for retirement and not to allow Defendant Urprasad to beat him down mentally, even in the face of his assignment to solo foot post for several weeks straight without any justification. Such an assignment was atypical of other similarly situated POs and particularly those who were not African American.

131. On November 2, 2017, Plaintiff Pease spoke with Third Platoon Commander Lt. Kimberly Maldonado and Sgt. Jason Rozenfeld, while PO Rojas was present, about his unfair treatment by Defendant. Sgt. Rozenfeld sympathized with Plaintiff regarding Defendant

Urprasad's disparate treatment of Plaintiff, and further stated that Defendant Urprasad had mandated a "zero tolerance" discipline policy with regards to Plaintiff that he did not enforce upon other POs and particularly, any Guyanese POs.

132.    During this conversation, Sgt. Rozenfeld revealed to Plaintiff Pease that Defendant Urprasad now had Plaintiff Pease under a microscope and that if Defendant wants to "scratch [Plaintiff Pease] 20 times, he can…he can use every patrol guide to harass you" and by doing that, "[Defendant is] being him." Sgt. Rozenfeld advised him to "be careful" when appealing Defendant Urprasad's written discipline and alluded that Plaintiff would experience worse retaliation from Defendant Urprasad if he did so.

133.    During this conversation, Lt. Maldonado agreed that if it was within her discretion, she would have not have issued any written discipline to Plaintiff involving the September 10, 2017 incident with the Guyanese complainant.

134.    Sgt. Rozenfeld then suggested a meeting with his PBA Delegate and Lt. Alberano to discuss Defendant's unfair treatment and continuous harassment of Plaintiff Pease spanning from 2015 to 2017.

135.    During this conversation, Sgt. Rozenfeld reiterated Plaintiff should not have been issued any discipline as other POs regularly experience delays with calls and are typically issued *only an oral warning*.

136.    Sgt. Rozenfeld instructed Plaintiff to describe the circumstances with an Integrity Control Officer ("ICO"), Lt. Alberano and his PBA Delegate, PO John Baccera for the meeting scheduled the next day. Sgt. Rozenfeld told Plaintiff, "If you think you're absolutely right … and your boss [Defendant Urprasad] is absolutely wrong … schedule a one on one meeting with your CO through ICO…and you can lay it out on the table what you feel, what you truly believe…I

know he's bipolar…but he will listen to you…do it professionally." Sgt. Rozenfeld further expressed that he felt Defendant Urprasad's unfair treatment of Plaintiff Pease had gone on long enough, and that Plaintiff "did not become a cop to be treated like this." Plaintiff agreed.

137.    Plaintiff Pease mentioned during this meeting that he had previously tried to schedule a meeting with Defendant Urprasad to discuss his concerns but was denied.

138.    During the meeting with a PBA Delegate and ICO, Plaintiff Pease complained again about Defendant Urprasad's reassignment of Plaintiff's tours and regular change of the Precinct's roll call to impose these solo foot posts. Plaintiff also expressed that while alone at his foot post, day after day with no partner or vehicle, he was forced to go to the bathroom in abandoned houses, and additionally, due to the danger and difficulty of the post, he was experiencing increased levels of stress on his body, which began manifesting in negative physical symptoms.

139.    Lt. Alberano stated it was the first time he heard of Plaintiff Pease's assignment to solo foot post since September 15, 2017 lasting to the present. Sgt. Rozenfeld questioned why none of Plaintiff's PBA delegates advocated on his behalf to prevent him from being assigned to the post for several weeks straight. Plaintiff explained that he believed they were intimidated by Defendant Urprasad and deterred from challenging the adverse employment action. Lt. Alberano's response was that Defendant was the CO, implying he was not in a position to question the CO's authority. He told Plaintiff that he would not transfer Plaintiff back to day tours, and that he would have to unfortunately endure the unfair treatment.

140.    During a November 11, 2017 discussion, Lt. Alberano mentioned to Plaintiff Pease that he did not appear himself lately, and that he was concerned for his wellbeing. Lt. Alberano insisted Plaintiff reach out to POPPA Inc., as a volunteer support network offering

services of intervention, prevention and self-care with approximately 200 active and retired members known as Peer Support Officers (PSOs).[49] Lt. Alberano also stated, "I don't want to read about you and if you do not call, I will call for you." Plaintiff responded that he did not want to keep being pushed and felt he was going down a hole that he could not recover from.

141.    As a result, Plaintiff Pease reached out to POPPA and two (2) seasoned volunteer POs were assigned to meet with him. The POs met with Plaintiff at a Dunkin Donuts on Elmont Road in Elmont, New York to discuss the difficulties he was experiencing. During this meeting, the POPPA POs listened with concern to Plaintiff's grievances regarding the discrimination and harassment he was enduring. However, as soon as Plaintiff mentioned Defendant Urprasad as the ranking Officer targeting him over the past two (2) years, the POPPA POs disengaged and did not assist Plaintiff further.

142.    Following his conversation with Lt. Alberano and POPPA, Inc. meeting, Plaintiff contemplated taking medical leave due to the mental distress he experienced under Defendant Urprasad's supervision and control. However, Plaintiff decided to continue fulfilling his duties.

### D.    Defendant City's Failed EEO Anti-Discrimination Complaint Procedures Lead to Further Retaliation

143.    As of the November 1, 2017 meeting, Plaintiff Pease had complained to his PBA Delegate, PO Baccera regarding Defendant Urprasad's ongoing discrimination, harassment, creation of a hostile work environment and retaliation against him to no avail.

144.    As of November 1, 2017, Plaintiff Pease was assigned to Cabaret Duty, the patrolling of the certain locations for illegal conduct *i.e.* validity of liquor licenses, drug use, fire conditions, occupancy restrictions etc. at locations such as bars and night clubs, for the second time in a row, which was also an unusual practice for NYPD senior officers. The prior Saturday

---

[49] https://poppanewyork.org/about/accomplishments/

in October 2017, Plaintiff was assigned to stand in the rain for his entire shift without a patrol vehicle. Defendant Urprasad, who was working at the 102nd Precinct that day, inquired about Plaintiff specifically and asked who his partner was at that time.

145.    In comparison, PO Bartalameo DeAngelo, a non-African American, was also assigned to Cabaret Duty at that time but was afforded a patrol vehicle.

146.    On or about November 2, 2017, Plaintiff Pease and PO Rojas, a mixed-race Caucasian and Hispanic male, were standing post at 88th Street and Atlantic Avenue. The outside noise was making it very difficult for Plaintiff to hear his own radio transmissions over the loud street traffic. PO Rojas received a telephone call on his personal cell phone from PO Luie Malave informing Plaintiff and PO Rojas that central command tried to raise their post *i.e.* contact them to make sure they were safe. Plaintiff and PO Rojas immediately returned communication, and they were accounted for. At that time, there were heightened safety concerns for NYPD POs due to PO shootings occurring in New York City.

147.    On the November 2, 2017 tour, Sgt. Rozenfeld reported to Plaintiff Pease's and PO Rojas's post to inquire why they had failed to respond sooner. Plaintiff explained that both he and PO Rojas had difficulty hearing their radio transmissions because of street noise where they were stationed. Sgt. Rozenfeld informed the POs that Defendant Urprasad was angry due to their delay in responding.

148.    At the end of the tour, Sgt. Rozenfeld informed Plaintiff Pease and PO Rojas that discipline would be issued under Defendant Urprasad's authority.

149.    Following Plaintiff's internal complaint, Defendant Urprasad continued his retaliatory unfavorable assignments against Plaintiff. On or about November 9, 2017 and November 11, 2017, Plaintiff Pease was assigned to a post under the elevated J train subway

station, located at the intersection of 102nd Street and Jamaica Avenue, on solo foot post duty with no police vehicle, as discipline issued by Defendant Urprasad for the radio incident on November 2, 2017. In contrast, PO Rojas did not receive any adverse assignment or discipline. Instead, he was assigned to a patrol vehicle.

150.    While Plaintiff Pease was at his foot post, PO Maria Aruza and PO Brandon Dildy offered Plaintiff Pease temporary shelter in their police vehicle due to the cold weather conditions and the heightened alert from the PO shootings. Both POs informed Plaintiff that soon after helping him by providing temporary shelter, they were reprimanded by CO Uprasad.

151.    On November 12, 2017, Plaintiff Pease was again assigned to a solo foot post at the intersection of Jamaica Avenue and Van Wyck Expressway without a police vehicle.

152.    On November 15, 2017, Plaintiff Pease was again assigned to a solo foot position at the intersection of 111st and Jamaica Avenue without a police vehicle.

153.    From November 17, 2017 through November 19, 2017, Plaintiff Pease was assigned to guard hospitalized prisoners, an assignment atypical for POs with Plaintiff's seniority level.

154.    It was commonly known among NYPD POs that guarding hospitalized prisoners was an undesirable and demeaning assignment. It was typically was used as a tool to embarrass and isolate the PO, especially, if the Officer had a steady partner who he would be separated from, which was the case for Plaintiff.

V.    **PLAINTIFF RAINE PEASE'S FORMAL EEO COMPLAINT**

   **A. The Power of Defendant Deodat Urprasad's Rank**

155.    On November 21, 2017, Plaintiff Pease and PO Bachhal arrived at 1 Police Plaza to file a formal departmental EEO Complaint with the NYPD's Deputy Commissioner, Equal

Employment Opportunity's ("EEO") Office to complain to an investigator regarding unfair treatment he was receiving from Defendant Urprasad.

156.    Plaintiff Pease informed the investigator that he and his partner, PO Bachhal were transferred to different squads by Defendant Urprasad after Defendant wrongly accused Plaintiff and his partner of improperly classifying a formal complaint report that occurred on September 10, 2017.

157.    Upon learning of Defendant's rank as Commanding Officer and as newly appointed Full Inspector of Queens, the EEO employees discouraged Plaintiff and PO Bachhal from filing a formal complaint because they would experience retribution.

158.    On November 21, 2017, Plaintiff instead filed a federal EEOC Complaint at the Manhattan district office on Whitehall Street.

159.    Due to Defendant Urprasad's promotion on November 21, 2017 to Full Inspector of Queens, Captain Courtney Nilan became the new CO of the 102nd Precinct. CO Nilan was the former executive officer from the Rockaway-based 101st Precinct. However, although he was no longer CO, Defendant Urprasad retained oversight of the 102nd Precinct as Full Inspector.

### 1.    Favorable Treatment of Guyanese Officers

160.    In or about late November to December 2017, Plaintiff Pease learned that several Rookie POs were specially chosen by Defendant Urprasad to comprise a Unit known as "Jamaica Auto." Each Rookie PO had merely two (2) years of experience as a PO with the NYPD. No African Americans were chosen by Defendant for inclusion in his Unit, which was deemed a favorable assignment.

161.    The POs of the Jamaica Auto Unit, PO Darmalingum, PO Czerw and PO Vasiliof Rabbie were involved in an unauthorized vehicle pursuit on November 21, 2017. Defendant

Urprasad had directed the Jamaica Auto Unit to make as many arrests on Jamaica Avenue as possible. The unauthorized pursuit resulted in a vehicular accident on Myrtle Avenue near the entrance of Jackie Robinson Parkway, which hospitalized a civilian driver. The Jamaica Auto Unit falsely reported the accident over the radio initially as a "pick up" of a Code 53, which meant they came upon an accident that did not involve them and had already occurred upon their arrival on the scene. The proper radio transmission to the Duty Captain would have been "following vehicle" to alert command the Unit had been following a particular vehicle and in pursuit.

162.    Pursuant to NYPD's procedures, based on the circumstances and the dangerousness of a high-speed vehicle pursuit in a residential neighborhood, command would have directed the Unit to terminate pursuit.

163.    The Jamaica Auto Unit's high-speed pursuit resulted in the civilian driver sustained a broken leg and shattered pelvis.

164.    The Jamaica Auto Unit was immediately disbanded after the unauthorized vehicle pursuit. Yet, the POs were placed in specialized units in the 102nd Precinct that are deemed *more favorable* than the patrol.

165.    Despite the fact that an unauthorized vehicle pursuit resulting in the serious injuries and hospitalization of a civilian warranted significant discipline, Defendant Urprasad chose not to discipline the POs involved and in fact, rewarded them. For example, PO Darmalingum, a Unit member, was assigned to a specialized unit, Domestic Violence, affording him weekends off with preferable hours to those he previously worked.

166.    Notably, Defendant Urprasad did not alert the Integrity Control Office to investigate despite the Unit failing to properly notify command of their involvement in causing the accident.

167.    In or about December 2017, Plaintiff Pease and his partner, PO Bachhal were placed on separate day tours.

168.    On or about January 10, 2018, Plaintiff Pease was working a patrol sector with PO Ahmed Ali when they were called to a possible crime scene. PO Blake and PO Daniel Oliver were also assigned to patrol that sector but had not arrived at the scene yet. PO Nicolas Bellacosa and PO Rohtibir Singh were both at the scene upon Plaintiff's arrival.

169.    Once at the scene, Plaintiff Pease and PO Ali were informed by the other Officers of a cell phone dispute between a male and female that knew each other. All the Officers present attempted to reach an amicable resolution between the male and female.

170.    While on scene, Plaintiff Pease noticed a woman's shoulder bag on the trunk of a nearby vehicle with an open pocket, which contained a small amount of marijuana. When POs Blake and Oliver arrived on the scene, Plaintiff informed them of his marijuana observations.

171.    Based on his investigation, Plaintiff Pease voiced his opinion to the other POs that the female should not be charged for possession of marijuana, and they agreed. Ultimately, PO Blake took control of the scene and chose to discard the marijuana in a nearby trashcan at the 102nd Precinct.

172.    Plaintiff Pease learned the January 10, 2018 incident involving marijuana resulted in an Internal Affairs Bureau ("IAB") test, a process routinely used by the NYPD to maintain a level of integrity among its POs.

173.    The IAB conducts integrity tests throughout the Department to ensure that NYPD employees are acting in accordance with Department procedures, rules and regulations.

174.    In or about February 2018, the investigation resulted in PO Blake's separation from the NYPD's employment. All POs involved were interviewed by the IAB. PO Blake was the subject (target) of the IAB test. The other POs were issued command disciplines and forfeiture of two (2) vacation days by the IAB.

175.    In comparison to his fellow POs who only received command disciplines and a forfeiture of two (2) vacation days, on April 17, 2018, Plaintiff Pease was served with Charges and Specifications accusing Plaintiff of violating Department procedures in addition.[50] Plaintiff received excessive and undue punishment compared to the other POs involved for allegedly violating the NYPD's Department procedures, rules and regulations.

## 2.    Sikh Festival Event

176.    On April 15, 2018, PO Bachhal and PO Calazos were assigned with Plaintiff Pease to a Sikh Festival located in the 102nd Precinct at the intersection of 114th Street and 101 Avenue. POs were to patrol from their marked Ratio Motor Patrol ("RMP") vehicle.

177.    The Sikh Festival began at approximately 9:30 a.m. and ended at approximately 6:05 p.m.

178.    On April 15, 2018 at approximately 3:45 p.m., Defendant Urprasad made an appearance at the Festival location in a civilian four (4) door gray sedan with an out of state license plate at the intersection of 114th Street and 101st Avenue.

---

[50] Charges and Specifications are formal charges filed against NYPD employees to discipline said employee for breaches of the Department rules and regulations. Such charges may culminate in a formal Department trial where the Department is represented by an attorney and the respondent is represented by counsel. The penalty may include, but is not limited to, termination from employment or forfeiture of vacation time.

179.    As Defendant Urprasad approached the RMP Plaintiff Pease was sitting in, PO Calazos and Plaintiff recognized Defendant and exited the RMP to approach Defendant's sedan to greet him.

180.    As Plaintiff Pease approached Defendant's vehicle, Defendant Urprasad sped away heading east on 101st Avenue.

181.    At 4 p.m., Sgt. Jimmy Centeno, Third Platoon Sgt., accompanied by PO DeMarco arrived at Plaintiff Pease's location at the festival. As Sgt. Centerno approached, Plaintiff, PO Bachhal and PO Calazos exited their vehicle. Sgt. Centeno questioned all three (3) POs about the traffic conditions because Defendant Urprasad apparently had telephoned the 102nd Precinct desk and complained there was excessive traffic congestion in that area.

182.    As the POs explained the traffic pattern at the festival, Sgt. Centeno began questioning Plaintiff Pease and became aggressive towards him. Sgt. Centeno abruptly dismissed Plaintiff's explanation and shouted at him to stand at a location further up the street and told him that he could no longer remain in the vehicle. As Plaintiff walked to the RMP to grab his equipment, Sgt. Centeno yelled, "Hurry up! . . . Do you want me to call Urprasad?"

### 3.    Planet Fitness Incident

183.    On May 3, 2018, while patrolling with PO Ali, Plaintiff Pease and PO Ali responded to a 911 call at Planet Fitness involving a locker theft. The complainant was an off-duty Corrections Officer, Willie Barnes. Barnes informed Plaintiff and PO Ali that his job I.D. and shield were stolen from his locker. Barnes' fiancé was also present and assisted with the investigation. As PO Ali and Plaintiff concluded their report, all four exited the Planet Fitness.

184.    Plaintiff Pease and PO Ali's police vehicle was parked in front of the Planet Fitness. PO Ali sat in the front passenger seat of the vehicle with the door open as he finished his

report. As Plaintiff stood outside of the Planet Fitness with Barnes, an unknown male approached Plaintiff seeking advice concerning his daughter. The unknown male described a communication breakdown between him and his child's mother and inquired how to handle the issue involving his daughter. The unknown male did not report any allegations of criminal conduct against his child's mother or concern for the child's welfare.

185.    In response, Plaintiff Pease proposed he utilize the family court system. The unknown male then disclosed he had an upcoming family court date scheduled. Plaintiff responded that the unknown male should address the issue on that court date. The male then asked Plaintiff to write a police report for him.

186.    Plaintiff Pease explained to the male that the situation the male described did not meet NYPD requirements to warrant a written police report. Plaintiff interpreted the situation as custodial interference and a family court issue. Off duty Corrections Officer Barnes then shared his own personal experience, which was resolved through family court. Plaintiff acknowledged Barnes' experience and continued explaining to the male the NYPD's procedures.

187.    At that time, a woman appeared on the scene stating she was the child's mother and voiced the same custodial communication issues with the male. Plaintiff Pease reiterated the family court solution to both parties. The male again requested a police report. Plaintiff restated his position. The parties then left and went their separate ways.

188.    Approximately one (1) month following the custodial incident in June 2018, Plaintiff Pease and PO Ali were interviewed by the IAB. The encounter with the male and female was disclosed to them as an integrity test. Plaintiff was accused of not offering any help to the male and female and that he failed to file a domestic police report.

**B.    Defendants' Retaliation Against Plaintiff Raine Pease Results in Transfer From the 102nd Precinct**

189.    Within two (2) months, on August 1, 2018, Plaintiff Pease was informed by the 102nd Precinct Desk Officer, Sgt. Jonathan Peyer that he was being transferred to the 70th Precinct in Brooklyn. The 70th Precinct has a well-known reputation within the NYPD and the City of New York as the precinct COs banish POs they deem 'problem' Officers. Plaintiff was given no prior written notification, explanation or justification for the transfer.

190.    Upon being transferred to the 70th Precinct, within the first two (2) weeks, despite not being afforded training on where to park his personal vehicle, Plaintiff Pease was written up for parking in a superior Officer's parking spot. Plaintiff requested to be issued an oral warning instead but was denied.

191.    Within a couple of months of being transferred to the 70th Precinct, Plaintiff Pease informed his coworker he was running a few minutes late and was in the locker room changing into his uniform as roll call commenced. Responsible for conducting roll call, Sgt. Jerry Sukhanandan, of Indian descent, called Plaintiff's name and another PO informed Sgt. Sukhanandan Plaintiff was in the Precinct and on his way to roll call. Sgt. Sukhanandan remarked, "Yeah, figures," embarrassing Plaintiff in front all of his new coworkers.

192.    Upon information and belief, Sgt. Sukhanandan, of Guyanese decent, was known to POs in the 70th Precinct for being transferred there due to an incident where he choked his wife and was arrested. After being investigated, he was not criminally or departmentally charged and received no further discipline besides being transferred from his prior Precinct to the 70th. In fact, he was promoted to the rank of Sergeant.

193.    While serving at the 70th Precinct, another similarly situated African American, PO Hayward was discriminated against based upon his race and assigned less favorable

assignments. For example, PO Hayward and Plaintiff along with other African American POs were denied the favorable assignment of driving his or her superior Officer. This assignment was typically reserved for non-African American POs only.

### C.    Formal Charges Issued Against Plaintiff Raine Pease

194.    On January 15, 2019, Plaintiff Pease was ordered to 1 Police Plaza where for the second time he was served with Charges and Specifications now relating to the custodial incident occurring on May 3, 2018.

195.    On January 29, 2019, Plaintiff Pease was presented with a settlement offer of one (1) year of probation and forfeiture of 30 vacation days. Plaintiff declined the offer the charges were unwarranted and opted for a departmental trial.

196.    On February 5, 2019, Plaintiff Pease was ordered to 1 Police Plaza for trial preparation. Prior to Plaintiff requesting a departmental trial, his partner PO Ali had not been charged. Once Plaintiff requested the trial, PO Ali was also charged.

### D.    Plaintiff Raine Pease's February 8, 2019 EEOC Charge

197.    On or about February 8, 2019, Plaintiff Pease filed a Charge of Discrimination with the EEOC complaining of discrimination based on race and/or national origin, hostile work environment, retaliation and failure to promote against Defendants City and Urprasad, as well as the NYPD.

198.    On or about May 17, 2019, Plaintiff Pease was issued the Right to Sue Notice by the EEOC.

199.    In or about July 2019, Plaintiff Pease's departmental trial resulted in the Charges being upheld against him. The Judge Advocate recommended 30 days of forfeited vacation days

and one (1) year of probation as Plaintiff's punishment, which were the same terms as the settlement offer.

200.    On August 16, 2019, Plaintiff Pease filed a federal lawsuit with the Court *pro se*.

201.    On or about February 6, 2020, Plaintiff Pease was informed by the NYPD by letter with the subject "DISMISSAL PROBATION FOR DISCIPLINARY" notifying him that a penalty of dismissal from the NYPD had been approved by the Police Commissioner. It further stated the penalty was to be held in abeyance for a period of time of one (1) year during which he shall be placed on Dismissal Probation.

202.    During Plaintiff Pease's Dismissal Probationary period, retroactive commencing on January 23, 2020, the Police Commissioner may dismiss him at any time without further proceedings pursuant to Administrative Code, Section 14-115(d). Plaintiff was informed the probationary period could be extended by any period of time if he became suspended, was on Modified Assignment, Restricted Duty, Limited Capacity, Sick Leave, Leave of Absence (Military, Personal, Educational, Child Care etc.,) or Annual Leave, or in any other way the NYPD deemed him not performing the duties of his position.

203.    Plaintiff Pease's probationary period will continue to on or about January 23, 2021 unless otherwise ordered by the Police Commissioner or by this Court.

204.    On July 9, 2020, Plaintiff Pease filed a Charge of Discrimination for retaliation for the ongoing adverse action with the EEOC and received the Notice of Right to Sue on July 13, 2020.

### E.    Failure to Promote Plaintiff Raine Pease

205.    In or about 2015, Plaintiff Pease applied to be considered for a promotional opportunity as Over Time (OT) position in the Summons Unit at the 102nd Precinct. The position required the PO to have extensive training in speed estimation. Despite Plaintiff's qualifications

and eight (8) years of experience, Police Officer Chris Destaphano, a non-African American, with only three (3) years of experience was awarded the promotion.

206.   In or about 2017, Plaintiff Pease was passed over a second time for promotion to Radio Motor Patrol Coordinator. As a former naval and aviation mechanic who also had extensive experience working on automobiles, Plaintiff was over-qualified for the position. Instead of Plaintiff being awarded the position with his 11 years of relevant experience, PO Keith Dumas, a non-African American, with far less experience received the promotion.

207.   On or about February 23, 2019, Plaintiff Pease attended a scheduled orientation with Maryland National Capital Park and Planning Commission involving a new employment position that opened up within the Police Division. He applied in or about January 2019. In his application, Plaintiff was obligated to disclose his IAB investigations as well as the relevant documentation. The investigator expressed to Plaintiff that open IAB investigations could greatly negatively affect the Commission's consideration of a candidate for the position.

208.   On or about April 23, 2019, Plaintiff Pease received a formal rejection letter stating he did not receive the position. Plaintiff was willing to take this position, which paid $25,000 less than his current position's annual salary to avoid any further adverse action taken against him by Defendant Urprasad and remove himself from a stressful, racially charged hostile work environment.

## FIRST CAUSE OF ACTION
## RACE AND NATIONAL ORIGIN DISCRIMINATION
## ON BEHALF OF DEFENDANT CITY (TITLE VII)

209.   Plaintiff Pease hereby repeats and re-alleges each allegation contained in the paragraphs above as if fully set forth herein.

210.    Plaintiff Pease has been discriminated against by Defendant City on the basis of his race and national origin in violation of Title VII. Defendant engaged in a course of conduct which included without limitation: holding him to a higher standard in the terms and conditions of his employment than similarly situated non-African American Police Officers and/or members outside his protected class; disciplining Plaintiff in a manner not applied to similarly situated non-African American Police Officers and/or members outside his protected class; creating a discriminatory and hostile work environment for Plaintiff resulting in terms and conditions of employment inferior to similarly situated non-African American Police Officers and/or members outside his protected class; disciplining Plaintiff and/or placing him on probation under threat of termination from employment because of his race and/or national origin and/or protected activity and distributing less severe discipline to fellow Police Officers than Plaintiff for the same conduct; passing over Plaintiff for promotion and selecting less qualified officers outside of his protected class for promotion. Such conduct is demonstrative of Defendant's reckless indifference to the laws prohibiting discrimination.

211.    Defendants' willful acts and omissions constitute unlawful discrimination against Plaintiff based on his race and national origin in violation of Title VII.

212.    But for Plaintiff's race and national origin as an African American, he would not have been harassed, treated unfairly, disciplining, retaliated against and placed. Any reasons proffered by Defendant for placing Plaintiff Pease on probation are a pretext for masking discriminatory practices against Plaintiff as an African American based on his race and/or national origin.

213.    As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities and other prerequisites of employment.

214.    As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation and career.

**SECOND CAUSE OF ACTION**
**HOSTILE WORK ENVIRONMENT (TITLE VII)**
**AGAINST DEFENDANT CITY**

215.    Plaintiff Pease hereby repeats and re-alleges each allegation contained in the paragraphs above as if fully set forth herein.

216.    Defendants' persistent, frequent and pervasive conduct created an atmosphere that was hostile, abusive, humiliating and degrading to African-American employees and in particular, Plaintiff.

217.    Defendants subjected Plaintiff to a hostile work environment permeated with harassment based on race and national origin sufficiently severe and pervasive to alter the conditions of Plaintiff's employment, in violation of Title VII.

218.    As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities and other prerequisites of employment.

219.    As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation and career.

**THIRD CAUSE OF ACTION**
**RETALIATION (TITLE VII)**
**AGAINST DEFENDANT CITY**

220.    Plaintiff Pease hereby repeats and re-alleges each allegation contained in the paragraphs above as if fully set forth herein.

221.    Plaintiff Pease engaged in protected activities when he made multiple complaints of discrimination against Defendant to his supervisors, the EEO Office and the EEOC.

222.    Plaintiff made multiple complaints and experienced adverse employment actions as a result including, but not limited to, the following: Defendants altered Plaintiff's shifts from mornings to nights, issued unwarranted written discipline, placed him on solo foot post for a prolonged period of time without a partner or patrol vehicle for several weeks without explanation, denied him promotions he was over qualified for on two (2) separate occasions, forced Plaintiff to transfer from the Queens borough 102nd Precinct where he resides to a Precinct in Brooklyn and placed him on probation indefinitely under threat of termination, in retaliation for complaining of discrimination against him by Defendant Urprasad.

223.    By the acts and practices described above, Defendant City retaliated against Plaintiff for engaging in protected activities in violation of Title VII.

224.    As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities, and other prerequisites of employment.

225.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation.

### FOURTH CAUSE OF ACTION
### MUNICIPAL LIABILITY (§ 1983)
### AGAINST DEFENDANT DEODAT URPRASAD

226.    Plaintiff Pease hereby repeats and re-alleges each allegation contained in the paragraphs above as if fully set forth herein.

227.    Defendants subjected Plaintiff Pease to discrimination on the basis of his race and national origin as a result of Defendant Urprasad's inherent discriminatory view of African

Americans, specifically Plaintiff Pease, *inter alia*, the altering of his shifts from mornings to nights, the placing of Plaintiff on solo foot post for a prolonged period of time without a partner or patrol vehicle without explanation, denying him promotions he was over qualified for on two (2) separate occasions, forcing Plaintiff to transfer from the Queens borough 102nd Precinct nearby his residence to a Precinct in another county, Brooklyn, and placing him on probation for one (1) year to be extended at the discretion of the NYPD at any time in retaliation for complaining of discrimination perpetrated by Defendant Urprasad.

228.    The acts complained of were carried out by Defendant Urprasad in his capacities as Commanding Officer and Full Inspector with all the actual and/or apparent authority attendant thereto.

229.    The acts complained of were carried out by the aforementioned individual Defendant Urprasad in his capacities as Commanding Officer and Full Inspector pursuant to the customs, policies, usages, practices, procedures and rules of Defendant City, all under the supervision of ranking offices of the NYPD.

230.    The aforementioned customs, policies, usages, practices, procedures and rules of Defendant City and the NYPD including, but are not limited to, the following unconstitutional practices:

(a)    Discrimination against African American Police Officers by assigning them unfavorable assignments;

(b)    Failing to properly train Police Officers;

(c)    Failing to properly supervise Police Officers; and

(d)    Failing to properly implement and enforce EEO policies prohibiting discrimination and retaliation;

(e)    Subjecting NYPD employees to violations of their constitutionally protected rights as well as rights guaranteed by the State and City of New York.

231.    The existence of the aforesaid unconstitutional customs, policies, usages, practices, procedures and rules may be inferred from the actions taken by the Defendant Urprasad, individually and in his official capacity.

232.    The foregoing customs, policies, usages, practices, procedures and rules of Defendants and the NYPD constituted a deliberate indifference with the constitutional rights of Plaintiff.

233.    The foregoing customs, policies, usages, practices, procedures and rules of Defendants and the NYPD were the direct and proximate cause of the constitutional violations suffered by Plaintiff as alleged herein.

234.    Defendants, collectively and individually, while acting under color of State and City law, acquiesced in a pattern of unconstitutional conduct perpetrated by Defendant Urprasad and were directly responsible for the violation of Plaintiff's constitutional rights, for which Defendants are liable.

235.    As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities and other prerequisites of employment.

236.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation.

**FIFTH CAUSE OF ACTION**
**RACE AND NATIONAL ORIGIN DISCRIMINATION (NYHRL and NYCHRL)**

237.    Plaintiff Pease hereby repeats and re-alleges each allegation contained in the paragraphs above as if fully set forth herein.

238.    By the aforementioned acts, Plaintiff Pease has been discriminated against by Defendants, on the basis of his race and/or national origin in violation of the NYCHRL and the NYHRL.

239.    But for Plaintiff's race and/or national origin, he would not have been discriminated against, disciplined, retaliated against and placed on probation. Any reasons proffered by Defendants for disciplining and placing him on probation are a pretext for discriminating against Plaintiff based on his race and/or national origin.

240.    Defendants' acts and omissions constitute unlawful and willful discrimination against Plaintiff based on his race and/or national origin in violation of the NYHRL and the NYCHRL.

241.    As a proximate result of the foregoing, Plaintiff Pease has sustained loss of wages, bonuses, benefits, promotional opportunities, and other prerequisites of employment.

242.    As a direct and proximate result of Defendants' unlawful termination, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation and career.

## SIXTH CAUSE OF ACTION
## HOSTILE WORK ENVIRONMENT (NYHRL and NYCHRL)

243.    Plaintiff Pease hereby repeats and re-alleges each allegation contained in the paragraphs above as if fully set forth herein.

244.    Defendants' persistent, frequent and pervasive conduct created an atmosphere that was hostile, abusive, humiliating and degrading to African-American employees and in particular, Plaintiff.

245.    Defendants subjected Plaintiff to a hostile work environment permeated with harassment based on race sufficiently severe and pervasive to alter the conditions of Plaintiff's employment, in violation of NYHRL and NYCHRL.

246.    As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities and other prerequisites of employment.

247.    As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation and career.

## SEVENTH CAUSE OF ACTION
## RETALIATION (NYHRL and NYCHRL)

248.    Plaintiff Pease hereby repeats and re-alleges each allegation contained in the paragraphs above as if fully set forth herein.

249.    Plaintiff Pease engaged in protected activities when making multiple complaints of discrimination against Defendants to his supervisors, the EEO Office and the EEOC.

250.    Plaintiff made multiple complaints and experienced adverse employment actions as a result including, but not limited to, the following: Defendants altered Plaintiff's shifts from mornings to nights, issued unwarranted written discipline, placed him on solo foot post for a prolonged period of time without a partner or patrol vehicle without explanation, denied him promotions he was over qualified for on two (2) separate occasions, placed him on probation for one (1) year under the threat of termination and forced Plaintiff to transfer from the Queens borough 102nd Precinct to a Precinct in Brooklyn in retaliation for complaining of discrimination against Defendant Urprasad.

251.    By the acts and practices described above, Defendant City retaliated against Plaintiff for engaging in protected activities in violation of the NYHRL and the NYCHRL.

252.     By the above-described unlawful conduct, the individually named Defendant Urprasad, in his official capacity, retaliated against Plaintiff for engaging in protected activities in violation of the NYHRL and the NYCHRL.

253.     As a proximate result of the foregoing, Plaintiff has sustained loss of wages, bonuses, benefits, promotional opportunities, and other prerequisites of employment.

254.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation.

### EIGHTH CAUSE OF ACTION
### AIDING, ABETTING, INCITING, COMPELLING
### AND COERCING (NYCHRL)

255.     Plaintiff Pease hereby repeats and re-alleges each allegation contained in the paragraphs above as if fully set forth herein.

256.     As a result of the foregoing, Defendant Urprasad aided, abetted, incited, compelled and coerced acts forbidden under New York City Human Rights Law, Administrative Code § 8-101, *et seq*., in violation of Administrative Code § 8-107(6). Specifically, Defendant Urprasad has discriminated against Plaintiff based on his race and/or national origin.

257.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has and is now suffering irreparable injury and monetary damages, including, without limitation, emotional distress and pain and suffering, humiliation and damage to reputation.

### JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Pease demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Raine Pease requests judgment against Defendants The City of New York and Deodat Urprasad and respectfully requests that this court:

(a)     Declare the discriminatory acts and practices of Defendants complained of herein violated Plaintiff Pease's rights under Title VII, § 1983, the NYHRL, NYCHRL and the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States;

(b)     Grant a permanent injunction restraining Defendants, its officers, successors, assigns and all persons in active concert or participation with them, from engaging in any employment practice which unlawfully discriminates based on race and/or national origin or which retaliates against an individual for complaining of an unlawful employment practice;

(c)     Order Defendants to remove Plaintiff Pease from probation immediately;

(d)     Order Defendants to make Plaintiff Pease, whole by providing the affirmative relief necessary to eradicate the effects of Defendants' unlawful practices;

(e)     Grant Plaintiff Pease actual, consequential, liquidated, punitive and any other damages that the Court may deem appropriate against Defendants;

(f)     Order Defendants to pay lost, foregone and future wages to Plaintiff Pease;

(g)     Order Defendants to pay Plaintiff Pease's reasonably incurred attorneys' fees, costs and disbursements;

(h)     Grant Plaintiff Pease, such other and further relief as this Court deems just and proper.

Dated: New York, New York
     July 15, 2020

                       _____/s/_____
                       Donna H. Clancy (DHC-0737)
                       The Clancy Law Firm, P.C.
                       *Attorneys for Plaintiff Raine Pease*
                       40 Wall Street, 61st Floor
                       New York, New York 10005
                       (212) 747-1744