UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RAINE PEASE,

                       Plaintiff,

        -v.-

THE CITY OF NEW YORK and DEODAT
URPRASAD,

                   Defendants.

19 Civ. 7693 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Raine Pease, a probationary police officer with the New York City Police Department (the "NYPD"), brings this action against his former supervisor, Deodat Urprasad, and the City of New York (the "City," and together with Urprasad, "Defendants"), alleging that Urprasad discriminated against Plaintiff based on Plaintiff's race and national origin, created a hostile work environment for Plaintiff, and retaliated against Plaintiff for engaging in protected activity, all in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e to 2000e-17, the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law §§ 290-297, and the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code §§ 8-107 to 8-131. Plaintiff additionally brings a claim for municipal liability under 42 U.S.C. § 1983. Defendants have moved to dismiss Plaintiff's Second Amended Complaint (or "SAC"), which is the operative pleading in this matter, pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth herein, the Court grants Defendants' motion in full.

**BACKGROUND**[1]

**A.    Factual Background**

**1.    The Parties**

Plaintiff is an African American male who resides in Nassau County, New York.  (SAC ¶ 8).  Defendant Urprasad was born in Guyana, is of Indo-Guyanese descent, and resides in Queens County, New York.  (*Id.* at ¶ 18).  The City is a municipal corporation organized and existing under the laws of the City and State of New York.  (*Id.* at ¶ 10).  It controls the NYPD and qualifies as an "employer" as that term is used in Title VII, the NYSHRL, and the NYCHRL.  (*Id.* at ¶¶ 11-17).

**2.    Plaintiff's Early Employment at the NYPD**

Plaintiff was appointed to the position of Police Officer ("PO") in the NYPD on or about January 23, 2007, and was assigned to the 102nd Precinct in Queens.  (SAC ¶¶ 76, 78).  Between 2008 and 2009, Plaintiff worked night shifts; from in or about 2009 to May 2014, he worked morning shifts.  (*Id.* at ¶¶ 78-79).  In May 2014, Plaintiff transferred to a position in Highway Patrol.  (*Id.* at ¶ 81).  In December 2014, due to a medical condition, Plaintiff transferred back to the 102nd Precinct and was assigned to midnight shifts.

---

[1]    This Opinion draws its facts from Plaintiff's Second Amended Complaint, which is the operative pleading in this matter ("SAC" (Dkt. #29)), and the exhibits attached thereto ("SAC Ex. []").  The Court accepts as true, for purposes of resolving the instant motion, the well-pleaded allegations of Plaintiff's pleadings.

For ease of reference, the Court refers to Defendants' Memorandum of Law in Support of Their Motion to Dismiss as "Def. Br." (Dkt. #35); to Plaintiff's Memorandum of Law in Opposition as "Pl. Opp." (Dkt. #41); and to Defendants' Reply Memorandum of Law as "Def. Reply" (Dkt. #42).

(*Id.* at ¶¶ 82-83). The Commanding Officer ("CO") of the 102nd Precinct from 2012 to January 2015 was Henry Sautner. (*Id.* at ¶ 80).

### 3. Plaintiff's 2015-2016 Allegations

In or about January or February 2015, Defendant Urprasad replaced Sautner as CO of the 102nd Precinct and thereby became Plaintiff's CO. (SAC ¶ 84). Plaintiff's SAC depicts a chilly working relationship between the two men. Early on, in or about mid-February 2015, Plaintiff and Urprasad both responded to an incident at a nightclub. (*Id.* at ¶ 88). When Plaintiff attempted to talk to Urprasad, Urprasad did not respond and walked away. (*Id.*). Around the same time, Urprasad yelled at Plaintiff for not moving quickly enough to relieve Urprasad in detaining a female civilian and remarked, "you and your damn feet," which Plaintiff interpreted as a comment on the medical condition that had precipitated Plaintiff's transfer from Highway Patrol back to the 102nd Precinct. (*Id.* at ¶ 89).

Urprasad subsequently assigned Plaintiff to two weeks of foot post shifts without a patrol vehicle. (SAC ¶¶ 90, 92). Plaintiff consulted his sergeant regarding his interactions with Urprasad and, more specifically, the assignment to foot post; his sergeant said that he would attempt to set up a meeting between Plaintiff and Urprasad, with a union representative present. (*Id.* at ¶ 90). However, Urprasad refused to meet with Plaintiff. (*Id.*). Later, after Plaintiff became ill during the first week of working his foot post shifts, he notified his union representative, who said that she would speak to Urprasad regarding ending that assignment. (*Id.* at ¶ 92). Despite the union

representative raising the issue with Urprasad, Urprasad decided to continue Plaintiff on foot post duty for the full two weeks. (*Id.* at ¶¶ 92-93).

At Urprasad's direction, Plaintiff continued to work midnight shifts through April 2016. (SAC ¶¶ 87, 94). In or about May 2016, Plaintiff was re-assigned to daytime shifts. (*Id.* at ¶ 95). Plaintiff further alleges that at some point in 2015, he applied for a position in the Summons Unit at the 102nd Precinct, but was passed over in favor of a non-African American officer with fewer years of experience in the NYPD. (*Id.* at ¶ 205).

### 4. Plaintiff's 2017 Allegations

In or about May 2017, Plaintiff and his partner, PO Gurvinder Bachhal, received a written assignment to patrol a Guyanese festival located at Smokey Park within the 102nd Precinct. (SAC ¶ 97). However, before Plaintiff and Bachhal could depart for the festival, Plaintiff was notified that Urprasad had removed him from festival duty and reassigned him to guard a hospitalized prisoner. (*Id.* at ¶ 99).

On or about September 10, 2017, at approximately 11:00 a.m., Plaintiff and Bachhal were notified of a 911 call reporting an individual attempting to break into a vehicle. (SAC ¶¶ 101, 103). The report was designated as a "Code 22," meaning that the reported conduct had occurred in the past and was of low priority. (*Id.* at ¶ 103). Consequently, before responding to this report, Plaintiff and Bachhal handled two other, higher-priority 911 calls regarding, first, a person in need of emergency medical attention, and second, an unconscious or possibly deceased person in the same building as the first call.

(*Id.* at ¶ 102). Plaintiff and Bachhal arrived at the scene of the attempted vehicle break-in at approximately 11:40 a.m., forty minutes after they received the report. (*Id.* at ¶ 103). The complainant was not present when Plaintiff and Bachhal reached the scene, but arrived approximately five minutes later and identified himself to the officers. (*Id.* at ¶¶ 104-105). He told the officers that he had confronted an unknown male attempting to break into his brother-in-law's vehicle, and that the confrontation had led to a physical altercation between the two men. (*Id.* at ¶ 106). The officers asked the complainant if he needed medical attention, which he declined. (*Id.* at ¶ 107). And when asked by the complainant whether the officers would search for the unknown male, Plaintiff and Bachhal said that, given the lapse in time since the call, they would refer the matter to the NYPD's detective squad for further investigation. (*Id.* at ¶¶ 108-109). During the interaction, the complainant's brother-in-law appeared on the scene and told the officers that his credit cards were missing from his vehicle. (*Id.* at ¶¶ 110-111). He declined the officers' offer to fill out a complaint report for the stolen credit cards. (*Id.* at ¶ 112). Plaintiff and Bachhal then finalized the 911 report, noting that the complainant had been assaulted. (*Id.* at ¶ 113).

On September 12, 2017, Bachhal told Plaintiff that the complainant in the September 10 incident had called another precinct and accused Plaintiff and Bachhal of mishandling his complaint, failing to offer him medical attention, using personal cell phones at the scene, and failing to exit their vehicle to speak with him. (SAC ¶ 114). These accusations were relayed to the

102nd Precinct, where Plaintiff and Bachhal worked. (*Id.*). Plaintiff and Bachhal explained their version of events to the Integrity Control Officer, identified in the parties' submissions as Lieutenant Alberano, who then presented the information to Defendant Urprasad. (*Id.* at ¶¶ 115-116). In response, Urprasad directed that Plaintiff and Bachhal be charged with discipline for improper report classification and reassigned to different shifts from the one they had been working together. (*Id.* at ¶¶ 117-119).

From on or about September 16, 2017, through November 22, 2017, Defendant Urprasad assigned Plaintiff to solo foot posts at various locations during the "12x8" night shift, with working hours from 11:15 p.m. to 7:50 a.m. (SAC ¶¶ 119, 123). From October 2, 2017, to October 3, 2017, and again on October 9, 2017, Urprasad assigned Plaintiff to guard an abandoned house in Jamaica, which house was known to be used by homeless individuals for shelter. (*Id.* at ¶ 124). Plaintiff worked alone and did not have a police vehicle during his foot post shifts, and had no access to a restroom or shelter for a break. (*Id.* at ¶¶ 124, 127). On one day in October 2017, Plaintiff had to stand in the rain for his entire shift because he had no patrol vehicle. (*Id.* at ¶ 144).

On November 1, 2017, Plaintiff was assigned to "Cabaret Duty," which involves the patrolling of certain locations — such as bars and night clubs — to monitor validity of liquor licenses, drug use, fire conditions, occupancy restrictions, and other legal compliance issues. (SAC ¶ 144). On or about November 2, 2017, Plaintiff and PO Rojas, a mixed-race Caucasian and Hispanic male, were standing post at 88th Street and Atlantic Avenue when PO

6

Rojas received a call on his personal cell phone from another officer informing Plaintiff and Rojas that central command had been trying to contact them by radio. (*Id.* at ¶ 146). Plaintiff and Rojas then checked in with central command. (*Id.*). Later during their shift, Sergeant Jason Rozenfeld questioned Plaintiff and Rojas as to why they had failed to respond sooner to the communications from central command. (*Id.* at ¶ 147). Plaintiff explained that they had had difficulty hearing their radio transmissions because of street noise where they were stationed. (*Id.*). Rozenfeld informed the officers that Urprasad was angry with them due to their delay in responding and had directed that they be disciplined. (*Id.* at ¶¶ 147-148). Plaintiff alleges that he continued to be assigned to "unfavorable" assignments, but that PO Rojas did not receive any adverse assignment or discipline. (*Id.* at ¶ 149).

On or about November 9, 2017, and November 11, 2017, Plaintiff was assigned to a solo foot post under the elevated J train subway station, as discipline for the November 2, 2017 communications issue. (SAC ¶ 149). While Plaintiff was at his foot post, two other officers offered Plaintiff temporary shelter in their police vehicle. (*Id.* at ¶ 150). They later told Plaintiff that Urprasad had reprimanded them for doing so. (*Id.*). On November 12, 2017, and November 15, 2017, Plaintiff was again assigned to solo foot posts. (*Id.* at ¶¶ 151-152). From November 17, 2017, to November 19, 2017, Plaintiff was assigned to guard hospitalized prisoners. (*Id.* at ¶ 153).

Plaintiff alleges that in or about late November to December 2017, he learned that Urprasad had chosen several junior police officers for assignment

to a unit known as "Jamaica Auto." (SAC ¶ 160). The members of this unit were involved in an unauthorized vehicle pursuit on November 21, 2017, which pursuit resulted in a vehicular accident and the hospitalization of a civilian driver for injuries sustained in the accident. (*Id.* at ¶¶ 161, 163). The unit inaccurately reported the accident over the radio as if they had merely come upon the accident, rather than been involved in it. (*Id.* at ¶ 161). The "Jamaica Auto" unit was disbanded following the accident but, in contrast to Plaintiff, the officers involved were not investigated or disciplined for their misconduct. (*Id.* at ¶¶ 165-166).

At an unspecified point in 2017, Plaintiff was passed over a second time for promotion to Radio Motor Patrol Coordinator, in favor of a non-African American officer with fewer years in the Department. (SAC ¶ 206). On or about November 21, 2017, Urprasad was promoted to Inspector and assigned to Patrol Borough Queens South, in which capacity he oversaw all Queens precincts, including the 102nd. (*Id.* at ¶¶ 96, 159). Captain Courtney Nilan replaced him as CO of the 102nd Precinct. (*Id.* at ¶ 159).

By early November 2017, Plaintiff had complained to his union delegate about Urprasad's treatment of him. (SAC ¶ 143). On or about November 1, 2017, Plaintiff spoke with Lieutenant Alberano about his grievances. (*Id.* at ¶ 129). The next day, Plaintiff addressed the same issues with two other senior officers, Lieutenant Kimberly Maldonado and Sergeant Rozenfeld. (*Id.* at ¶ 131). Rozenfeld advised Plaintiff that Urprasad had Plaintiff "under a microscope," and that Plaintiff should be careful when appealing written

discipline Urprasad had issued him. (*Id.* at ¶ 132). Plaintiff subsequently spoke again with Lieutenant Alberano and a union delegate on November 3, 2017, during which conversation Plaintiff complained about being assigned to solo foot posts since September 2017 and the increased physical stress he experienced as a result of these tours. (*Id.* at ¶¶ 136, 138). During a November 11, 2017 discussion, Lieutenant Alberano suggested that Plaintiff reach out to POPPA, Inc., a volunteer network offering support services to police officers. (*Id.* at ¶ 140). Plaintiff contacted POPPA and two volunteer Peer Support Officers were assigned to meet with him. (*Id.* at ¶ 141). However, when Plaintiff identified Defendant Urprasad as the senior officer who was targeting him, the Peer Support Officers disengaged and did not provide any further assistance to Plaintiff. (*Id.*).

On November 21, 2017, Plaintiff went to file a formal departmental equal employment opportunity ("EEO") complaint regarding Defendant Urprasad's treatment of him with the office of the NYPD Deputy Commissioner for EEO. (SAC ¶ 155). Plaintiff informed the investigator that he and his partner, PO Bachhal, had been transferred to different squads by Urprasad following the September 10, 2017 incident. (*Id.* at ¶ 156). Upon learning of Urprasad's rank and position, the EEO employees discouraged Plaintiff and Bachhal from filing a formal complaint. (*Id.* at ¶ 157). Instead, Plaintiff filed his first complaint with the federal Equal Employment Opportunity Commission ("EEOC") later that day. (*Id.* at ¶ 158). Plaintiff does not allege that he received a notice of right to sue in connection with this complaint.

### 5. Plaintiff's 2018 Allegations

On or about January 10, 2018, Plaintiff was working a patrol sector with PO Ahmed Ali when they were called to a possible crime scene. (SAC ¶ 168). PO Nicolas Bellacosa and PO Rohtibir Singh were already at the scene and informed Plaintiff and PO Ali of a dispute between a man and woman who knew each other. (*Id.* at ¶¶ 168-169). While on scene, Plaintiff noticed a shoulder bag on the trunk of a nearby vehicle and observed a small amount of marijuana in an open pocket of the bag. (*Id.* at ¶ 170). When two other officers, PO Blake and PO Oliver, arrived on the scene, Plaintiff informed them of his observation of the marijuana. (*Id.*). Plaintiff told the other officers that he did not believe the woman should be charged for possession of marijuana, and they agreed. (*Id.* at ¶ 171). PO Blake assumed command over the scene and chose to discard the marijuana in a trashcan at the 102nd Precinct. (*Id.*).

Plaintiff later learned that the January 10, 2018 incident was in fact an Internal Affairs Bureau ("IAB") test, a process used by the NYPD to ensure its officers are acting in accordance with Department procedures, rules, and regulations. (SAC ¶¶ 172-173). In or about February 2018, PO Blake was separated from the NYPD as a result of the IAB investigation. (*Id.* at ¶ 174). Other officers involved in the incident were issued command disciplines and forfeited two vacation days. (*Id.*). Plaintiff alone was additionally served with formal charges and specifications accusing him of violating Department procedures. (*Id.* at ¶ 175).

On April 15, 2018, Plaintiff, PO Bachhal, and PO Calazos were assigned to patrol a Sikh festival in the 102nd Precinct from their marked patrol vehicle. (SAC ¶ 176). At approximately 3:45 p.m., Defendant Urprasad made an appearance at the festival in a civilian sedan with an out-of-state license plate. (*Id.* at ¶ 178). As Urprasad neared the marked patrol vehicle, Plaintiff and PO Calazos exited the vehicle and approached Urprasad's sedan. (*Id.* at ¶ 179). As the officers approached, Urprasad sped away. (*Id.* at ¶ 180). At 4:00 p.m., Sergeant Jimmy Centeno and PO Demarco arrived at Plaintiff's location at the festival and questioned Plaintiff, Bachhal, and Calazos regarding traffic conditions in the area. (*Id.* at ¶ 181). Sergeant Centeno told Plaintiff that he could no longer remain in the vehicle, ordered him to stand at a location further up the street, and threatened to call Urprasad if Plaintiff did not hurry up. (*Id.* at ¶ 182).

On May 3, 2018, Plaintiff and PO Ali responded to a 911 call involving a locker theft at a gym. (SAC ¶ 183). The complainant, Willie Barnes, was an off-duty corrections officer and informed Plaintiff and Ali that his job identification card and shield had been stolen from his locker. (*Id.*). After speaking with Barnes and his fiancée, Plaintiff and Ali departed the gym. (*Id.*). PO Ali sat in the front passenger seat of the officers' police vehicle with the door open as he finished his report, while Plaintiff stood outside. (*Id.* at ¶ 184). An unknown man then approached Plaintiff, described to Plaintiff a communication breakdown between the man and his child's mother, and inquired of Plaintiff how to handle an issue involving his daughter. (*Id.*). The

man did not report any allegations of criminal conduct against the child's mother or concern for the child's welfare. (*Id.*). In response, Plaintiff proposed that the man address the issue in the family court system. (*Id.* at ¶ 185). The man asked Plaintiff to write a police report, but Plaintiff explained that the situation described did not meet NYPD requirements for a written police report. (*Id.* at ¶ 186). At some point, a woman appeared on the scene and stated that she was the child's mother and had the same concerns regarding communication and custody. (*Id.* at ¶ 187). Plaintiff reiterated that the parties should raise their issues in family court, and again declined to write a police report. (*Id.*). Approximately one month after this incident, Plaintiff and PO Ali were interviewed by IAB, during which interview IAB disclosed that this incident, too, was an integrity test. (*Id.* at ¶ 188). Plaintiff was accused of not offering any help to the man and woman and failing to file a domestic police report. (*Id.*).

On August 1, 2018, Plaintiff was informed that he was being transferred to the 70th Precinct in Brooklyn. (SAC ¶ 189). Plaintiff had not received prior notice or explanation for the transfer. (*Id.*). Within Plaintiff's first two weeks in the 70th Precinct, he was given a written reprimand for parking in a superior officer's parking spot. (*Id.* at ¶ 190). At some point in his first few months in the 70th Precinct, a police sergeant embarrassed Plaintiff in front of his coworkers by commenting on the fact that Plaintiff was running late to roll call. (*Id.* at ¶ 191).

### 6.    Plaintiff's 2019-2020 Allegations

On January 15, 2019, Plaintiff was served with charges and specifications relating to the May 3, 2018 integrity test. (SAC ¶ 194). On January 29, 2019, Plaintiff was presented with a settlement offer of one year of probation and forfeiture of 30 vacation days. (*Id.* at ¶ 195). Plaintiff declined the offer and opted for a departmental trial. (*Id.*). In or about July 2019, Plaintiff's departmental trial resulted in the charges being upheld against him. (*Id.* at ¶ 199). The Judge Advocate recommended the same punishment as the settlement offer, *i.e.*, one year of probation and forfeiture of 30 vacation days. (*Id.*). On or about February 6, 2020, Plaintiff received a letter notifying him that a penalty of dismissal from the NYPD had been approved by the Police Commissioner. (*Id.* at ¶ 201). The letter further stated that the penalty would be held in abeyance for a period of one year, beginning January 23, 2020, during which year Plaintiff would be placed on dismissal probation. (*Id.* at ¶¶ 201-202). During the probationary period, the Police Commissioner retained the authority to dismiss Plaintiff at any time without instituting further proceedings pursuant to New York City Administrative Code Section 14-115(d). (*Id.* at ¶ 202).

### B.    Procedural Background

On February 8, 2019, Plaintiff filed a second complaint with the EEOC against Urprasad, the NYPD, and the City, claiming discrimination based on race and/or national origin, hostile work environment, retaliation, and failure to promote. (SAC ¶¶ 7(a), 197; *id.* at Ex. A). The EEOC dismissed his charge

as untimely and issued a notice of right to sue on May 17, 2019. (*Id.* at ¶¶ 7(b), 198; *id.* at Ex. A). Plaintiff subsequently filed another claim of employment discrimination based on retaliation with the EEOC on July 9, 2020, for which he received a notice of right to sue on July 13, 2020. (*Id.* at ¶ 7(c)-(d); *id.* at Ex. B).

After receiving the first notice of right to sue, Plaintiff — then proceeding *pro se* — filed the original complaint in this matter on August 16, 2019, naming as defendants Urprasad and the NYPD. (Dkt. #1). By Order dated November 25, 2019, the Court directed that the City be substituted for the NYPD, in accordance with Section 396 of the New York City Charter. (Dkt. #6). The Court also noted that it appeared that Plaintiff had failed to effect service in a timely manner, and ordered Plaintiff to serve Urprasad and the City on or before December 31, 2019. (*Id.*). On January 6, 2020, the Court dismissed the action without prejudice for failure to prosecute. (Dkt. #7). On January 16, 2020, after Plaintiff filed affidavits of service as to both Defendants, the Court reinstated the action. (Dkt. #11). The Court referred the matter to the Southern District of New York's Mediation Program on January 31, 2020, and ordered the Clerk of Court to attempt to locate *pro bono* counsel to represent Plaintiff at the mediation. (Dkt. #14).

Counsel for Plaintiff entered a general notice of appearance on behalf of Plaintiff on March 18, 2020. (Dkt. #15; *see also* Dkt. #28). On April 6, 2020, the Court authorized Plaintiff to file an amended complaint if he so desired (Dkt. #19), and Plaintiff did so on May 5, 2020 (Dkt. #24). The Court held an

initial pretrial conference on June 18, 2020, during which conference the parties discussed Defendants' anticipated motion to dismiss Plaintiff's First Amended Complaint. (Minute Entry for June 18, 2020). The Court granted Plaintiff leave to further amend his pleadings on or before July 15, 2020. (*Id.*). On that date, Plaintiff, through counsel, filed his SAC. (Dkt. #29).

Defendants filed their motion to dismiss the SAC on October 2, 2020 (Dkt. #34-35); Plaintiff filed a memorandum of law in opposition to the motion on November 6, 2020 (Dkt. #38), and a corrected version of the memorandum on November 9, 2020 (Dkt. #41); and Defendants filed their reply on November 19, 2020 (Dkt. #42). Defendants' motion to dismiss is now fully briefed and ripe for resolution by the Court.

## DISCUSSION

### A. Applicable Law

#### 1. Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

Defendants move for dismissal of Plaintiff's claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. (Def. Br. 2; *see also* Dkt. #34). To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). Where, as here, a plaintiff brings an

employment discrimination claim, "[t]he facts required by *Iqbal* to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. They need only give plausible support to a minimal inference of discriminatory motivation." *Littlejohn* v. *City of New York*, 795 F.3d 297, 311 (2d Cir. 2015); *accord Vega* v. *Hempstead Union Free Sch. Distr.*, 801 F. 3d 72, 86-87 (2d Cir. 2015).

In determining the viability of Plaintiff's claims, the Court must accept as true all well-pleaded factual allegations in the complaint. *Iqbal*, 556 U.S. at 678. Additionally, the Court may consider not only the complaint itself, but also any written instrument attached to the complaint as an exhibit, any statements or documents incorporated by reference in the complaint, and documents that are "integral" to the complaint even if they are not incorporated by reference. *See Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); *see also Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (discussing materials that may properly be considered in resolving a motion brought under Fed. R. Civ. P. 12(b)(6)).

### 2. The *McDonnell Douglas* Framework

Claims under Title VII and certain claims under the NYSHRL are analyzed using the burden-shifting framework adopted in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973). *See, e.g., Walsh* v. *N.Y.C. Hous. Auth.*, 828

F.3d 70, 74 (2d Cir. 2016); *Tolbert* v. *Smith*, 790 F.3d 427, 434 (2d Cir. 2015).[2] At the motion to dismiss stage, only the first step — the plaintiff's burden to allege a *prima facie* case of discrimination — is at issue. *See Littlejohn*, 795 F.3d at 311. To establish a *prima facie* case for Title VII claims and for NYSHRL claims that pre-date October 11, 2019,[3] a plaintiff must show that: "[i] he was a member of a protected class; [ii] he was competent to perform the job in question, or was performing the job duties satisfactorily; [iii] he suffered a materially adverse employment action; and [iv] the action occurred under circumstances that give rise to a minimal inference of discrimination." *Jeune* v. *City of New York*, No. 11 Civ. 7424 (JMF), 2014 WL 83851, at *4 (S.D.N.Y. Jan. 9, 2014). The showing required for NYCHRL claims, and for NYSHRL claims that post-date October 11, 2019, differs, as the adverse action need not be "material"; instead, a plaintiff need only demonstrate differential treatment

---

[2]    While it is "unclear whether, and to what extent, the *McDonnell Douglas* burden-shifting analysis has been modified for NYCHRL claims," *Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F. 3d 102, 110 n.8 (2d Cir. 2013), more recent decisions from the Second Circuit have suggested a separate analysis. *See, e.g.*, *Gachette* v. *Metro-N. Commuter R.R. Co.*, 804 F. App'x 65, 67 (2d Cir. 2020) (summary order) ("Under the NYCHRL — which must be analyzed separately from state and federal law claims — Gachette must demonstrate, by a preponderance of evidence, that he 'has been treated less well than other employees' because of his race or national origin." (quoting *Mihalik*, 715 F.3d at 110)); *Emengo* v. *Stark*, 774 F. App'x 26, 29 (2d Cir. 2019) (summary order) ("Emengo's discrimination claims, aside from those brought under the NYCHRL, proceed under the burden-shifting analysis set forth in *McDonnell Douglas*[.]" (citing *Garcia* v. *Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013); *Lore* v. *City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012))).

[3]    The New York State Legislature passed several amendments to the NYSHRL in June 2019, the effect of which is to render the standard for claims closer to the standard under the NYCHRL. *See* A8421/S6577 (as amended by S6594/A8424). These amendments were signed into law by Governor Andrew Cuomo on or about August 12, 2019. Significantly, however, these amendments only apply to claims that accrue on or after the effective date of October 11, 2019. *See Wellner* v. *Montefiore Med. Ctr.*, No. 17 Civ. 3479 (KPF), 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019).

that is "more than trivial, substantial, or petty." *Gorman* v. *Covidien, LLC*, 146

F. Supp. 3d 509, 530 (S.D.N.Y. 2015) (quoting *Williams* v. *Regus Mgmt. Grp.,*

*LLC*, 836 F. Supp. 2d 159, 173 (S.D.N.Y. 2011)); *see generally Mihalik* v. *Credit*

*Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (concluding

that to state a claim for discrimination under the NYCHRL, "the plaintiff need

only show differential treatment — that []he is treated 'less well' — because of"

a protected characteristic).[4]

### 3.     The Timeliness of Plaintiff's Claims

To bring a claim in federal court under Title VII, plaintiffs are required to

exhaust their administrative remedies by filing a complaint alleging

discrimination with the EEOC. *See* 42 U.S.C. § 2000e-5(f)(1). In New York, a

complaint must be filed with the EEOC within 300 days of the alleged

discriminatory acts. *See* 42 U.S.C. § 2000e-5(e); *Ragone* v. *Atl. Video at*

*Manhattan Ctr.*, 595 F.3d 115, 126 (2d Cir. 2010). The 300-day period

effectively acts as a statute of limitations. *See Ragone*, 595 F.3d at 126; *see*

*also Dickens* v. *Hudson Sheraton Corp., LLC*, 167 F. Supp. 3d 499, 514

(S.D.N.Y. 2016). Plaintiffs have 90 days from when they receive a notice of

right to sue from the EEOC to file a lawsuit based on the charge presented.

*See* 42 U.S.C. § 2000e-5(f)(1).

---

[4]     As discussed later in this Opinion, the Court declines to exercise supplemental
jurisdiction over Plaintiff's NYSHRL and NYCHRL claims. This being the case, the
difference in standards for Title VII and pre-amendment NYSHRL claims on the one
hand, and for NYCHRL and post-amendment NYSHRL claims on the other, is of no
ultimate consequence in this matter.

Claims brought under the NYSHRL and the NYCHRL must be commenced within three years of the alleged discriminatory acts. *See Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007) (citing N.Y. Exec. Law § 296; N.Y. C.P.L.R. § 214(2); N.Y.C. Admin. Code. § 8-502(d)).

## B. Analysis

### 1. Overview of Plaintiff's Causes of Action

Plaintiff raises eight causes of action in his SAC: (i) a race and national origin-based discrimination claim against the City, pursuant to Title VII (SAC ¶¶ 209-214); (ii) a hostile work environment claim against the City, pursuant to Title VII (*id.* at ¶¶ 215-219); (iii) a retaliation claim against the City, pursuant to Title VII (*id.* at ¶¶ 220-225); (iv) a municipal liability claim pursuant to 42 U.S.C. § 1983 (*id.* at ¶¶ 226-236); (v) a race and national origin-based discrimination claim against all Defendants, pursuant to the NYSHRL and the NYCHRL (*id.* at ¶¶ 237-242); (vi) a hostile work environment claim against all Defendants, pursuant to the NYSHRL and the NYCHRL (*id.* at ¶¶ 243-247); (vii) a retaliation claim against all Defendants, pursuant to the NYSHRL and the NYCHRL (*id.* at ¶¶ 248-254); and (viii) a claim against Urprasad for aiding, abetting, inciting, compelling, and coercing acts forbidden under the NYCHRL (*id.* at ¶¶ 255-257). The Court begins with Plaintiff's federal claims, as they are the proffered bases for the Court's jurisdiction.

### 2. Plaintiff's Title VII Claims

#### a. Plaintiff Fails to State a Claim for Race or National Origin Discrimination Under Title VII

##### i. Certain of Plaintiff's Allegations Are Untimely

Plaintiff filed complaints with the EEOC on November 21, 2017, February 8, 2019, and July 9, 2020. (SAC ¶¶ 7, 158). Plaintiff received notices of right to sue in connection with the latter two complaints. (*See id.* at Ex. A, B). Plaintiff does not allege that he received, nor does he attach to his SAC, a notice of right to sue in connection with the November 21, 2017 EEOC complaint. Consequently, only those claims stemming from Plaintiff's February 8, 2019 and July 9, 2020 EEOC complaints are properly before the Court.

Defendants argue that any allegations of adverse employment actions occurring prior to April 14, 2018 — 300 days before February 8, 2019 — are time-barred under Title VII. (Def. Br. 8). This includes Plaintiff's claims regarding his assignment to foot posts and other unfavorable tasks in 2015-2017; claims that he was denied a promotion in 2015 and in 2017; and claims regarding the charges and specifications he received as a result of the January 10, 2018 IAB test. Plaintiff responds that acts that occurred outside the respective limitations periods may nevertheless be considered as background information or pursuant to the "continuing violations doctrine." (Pl. Opp. 19-24).

Under the continuing violations doctrine, "if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance

of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Chin* v. *Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 155-56 (2d Cir. 2012). Use of the continuing violations doctrine is disfavored in this Circuit absent a showing of compelling circumstances. *See, e.g.*, *Doe* v. *Anonymous Inc.*, No. 18 Civ. 10924 (PAC), 2019 WL 2616904, at *4 (S.D.N.Y. June 25, 2019); *Collins* v. *City of New York*, 156 F. Supp. 3d 448, 458 (S.D.N.Y. 2016); *Trinidad* v. *N.Y.C. Dep't of Corr.*, 423 F. Supp. 2d 151, 165 n.11 (S.D.N.Y. 2006).

In any event, the doctrine only applies "to cases where there are specific discriminatory 'policies or mechanisms' being employed by the defendant." *Gindi* v. *Bennett*, No. 15 Civ. 6475 (RRM) (RER), 2018 WL 4636794, at *2 (E.D.N.Y. Sept. 27, 2018) (citing *Valtchev* v. *City of New York*, 400 F. App'x 586, 588 (2d Cir. 2010) (summary order)), *aff'd sub nom. Gindi* v. *N.Y.C. Dep't of Educ.*, 786 F. App'x 280 (2d Cir. 2019) (summary order). "Discrete acts," such as transfers, demotions, and failure to promote, are "not actionable if time barred, even when they are related to acts alleged in timely filed charges." *National R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 113-14 (2002)); *see also Rivera* v. *N.Y.C. Dep't of Educ.*, No. 19 Civ. 11624 (KPF), 2020 WL 7496282, at *4-6 (S.D.N.Y. Dec. 21, 2020) (finding no continuing violation in allegations of failure to hire and failure to renew plaintiff's position); *Anderson* v. *N.Y.C. Dep't of Fin.*, No. 19 Civ. 7971 (RA), 2020 WL 1922624, at *4 (S.D.N.Y. Apr. 21, 2020) (finding no continuing violation in allegations of failure to promote, failure to compensate for overtime, repeated transfers, and receipt of negative

comments). Instead, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Morgan*, 536 U.S. at 113.

The Court agrees with Defendants that Plaintiff's allegations of adverse employment actions occurring before April 14, 2018 — his assignment to unfavorable shifts and posts, his non-selection for promotion in 2015 and 2017 and for assignment to the "Jamaica Auto" squad, and his receipt of formal charges related to the January 10, 2018 IAB test — set forth only discrete acts. Furthermore, Plaintiff does not plausibly allege an actual discriminatory policy on the part of the City, or that "specific and related instances of discrimination [were] permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell* v. *Robinson*, 23 F.3d 694, 704 (2d Cir. 1994). Consequently, the continuing violations doctrine does not apply and the Court will consider Plaintiff's allegations of acts occurring before April 14, 2018, only as background to his timely allegations under Title VII. *See Reyes* v. *Westchester Cty. Health Care Corp.*, No. 19 Civ. 8916 (PMH), 2021 WL 310945, at *9 (S.D.N.Y. Jan. 29, 2021); *LaFontant* v. *Neale*, No. 18 Civ. 23 (KMK), 2019 WL 1953942, at *7 (S.D.N.Y. May 2, 2019).

### ii.    Plaintiff's Timely Allegations Are Insufficient to State a Claim

Plaintiff's theory of the case is that the City "unlawfully and systemically discriminated against African American employees of Defendant City's NYPD, [and] treated them less favorably than similarly situated Police Officers not of African American descent." (SAC ¶ 3). Specifically, Plaintiff claims that Defendant Urprasad, who is of Indo-Guyanese descent, favored other Guyanese

officers and discriminated against Plaintiff because he is African American. (*See id.* at ¶¶ 3, 66). Plaintiff's remaining allegations in support of that theory, covering the period from April 15, 2018, through when Plaintiff was placed on disciplinary dismissal probation in February 2020, are that:

> (i)    on April 17, 2018, Plaintiff was served with formal charges and specifications arising out of his conduct during the January 10, 2018 IAB test that resulted in the separation of another officer (SAC ¶¶ 168-175);

> (ii)    on April 15, 2018, while Plaintiff was patrolling a festival in the 102nd Precinct, Defendant Urprasad drove away when Plaintiff and another officer approached his vehicle, and later Sergeant Centeno yelled at Plaintiff to stand at a different location rather than remain in his vehicle (*id.* at ¶¶ 176-182);

> (iii)    Plaintiff was subjected to an IAB test on May 3, 2018, as a result of which he was served on January 15, 2019 with charges and specifications, for which he ultimately received a departmental trial (*id.* at ¶¶ 183-188, 194-196);

> (iv)    Plaintiff was transferred to the 70th Precinct in Brooklyn in or around August 2018, without being given prior justification for the transfer, and did not receive favorable assignments while serving at that precinct (*id.* at ¶¶ 189, 193); and

> (v)    Plaintiff's departmental trial resulted in the charges related to the May 3, 2018 IAB test being upheld against him, and on February 6, 2020, he was notified that the Police Commissioner approved a penalty of dismissal, to be held in abeyance for a one-year probationary period (*id.* at ¶¶ 199-201).

Defendants argue that these allegations fails to satisfy the first, third, and fourth prongs of the *McDonnell Douglas* framework, *i.e.*, Plaintiff fails to

identify the protected national origin class of which he is a part, most of the actions complained of do not plausibly constitute actionable adverse employment actions, and the actions complained of fail to raise an inference of discrimination.  (Def. Br. 11-18; Def. Reply 5-7).  Plaintiff counters that the SAC alleges sufficient facts to make out a *prima facie* claim of discrimination: (i) Plaintiff is in a protected class as an African American; (ii) he is competent to perform his job duties; (iii) he was given demeaning assignments and ultimately tried on formal charges and put on dismissal probation; and (iv) the "mosaic" of information presented supports an inference of discrimination.  (Pl. Opp. 24-26).

The Court finds that Plaintiff has adequately pleaded that he is a member of a protected class and that he is competent to perform his job duties. But the Court agrees with Defendants that most of the acts of which Plaintiff complains do not rise to the level of materially adverse employment actions, and, further, that those acts that are actionable do not support an inference of discrimination.

"A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." *Malcolm* v. *Honeoye Falls Lima Cent. Sch. Dist.*, 483 F. App'x 660, 662 (2d Cir. 2012) (summary order) (citing *Galabya* v. *N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000), *abrogation on other grounds recognized by Davis-Garett* v. *Urban Outfitters, Inc.*, 921 F.3d 30 (2d Cir. 2019)).  For an employment action to be materially adverse, it must be "more disruptive than a mere

inconvenience or an alteration of job responsibilities." *Galabya*, 202 F.3d at 640. "'Not every unpleasant matter short of discharge or demotion creates a cause of action.'" *Katz* v. *Beth Isr. Med. Ctr.*, No. 95 Civ. 7183 (AGS), 2001 WL 11064, at *14 (S.D.N.Y. Jan. 4, 2001) (quoting *Wanamaker* v. *Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997)). The Second Circuit has held that "a termination of employment, a demotion as evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities" qualifies as a materially adverse change. *Galabya*, 202 F.3d at 640. "[I]t is not enough that defendants gave plaintiff a subjectively less preferred ... assignment; the assignment must be materially less prestigious, materially less suited to h[is] skills and expertise, or materially less conducive to career advancement." *Kunik* v. *N.Y.C. Dep't of Educ.*, 436 F. Supp. 3d 684, 694 (S.D.N.Y. 2020) (internal quotation marks omitted), *aff'd*, 842 F. App'x 668 (2d Cir. 2021) (summary order); *accord Marquez* v. *Hoffman*, No. 18 Civ. 7315 (ALC), 2021 WL 1226981, at *13 (S.D.N.Y. Mar. 31, 2021).

With respect to the first set of charges and specifications Plaintiff received on April 17, 2018, related to the January 10, 2018 IAB test, Plaintiff does not plead that the charges resulted in any material adverse change in the terms of his employment. (*See* SAC ¶ 175). Courts in this Circuit have consistently held that disciplinary charges, without more, do not constitute adverse employment actions. *See, e.g.*, *Carrington* v. *N.Y.C. Hum. Res. Admin.*, No. 19 Civ. 10301 (LAP), 2020 WL 2410503, at *5 (S.D.N.Y. May 12, 2020) ("Letters to the file and disciplinary charges only constitute adverse

employment actions if they result in material negative consequences[.]"); *accord Sotomayor* v. *City of New York*, 862 F. Supp. 2d 226, 255 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013); *Salerno* v. *Town of Bedford*, No. 05 Civ. 7293 (SCR), 2008 WL 5101185, at *2 (S.D.N.Y. Dec. 3, 2008).

Likewise, the events of April 15, 2018 — when Defendant Urprasad drove away from Plaintiff at the Sikh festival and a sergeant later yelled at him (SAC ¶¶ 176-182) — do not constitute a material adverse employment action. *See Boonmalert* v. *City of New York*, No. 16 Civ. 4171 (KMW) (KNF), 2017 WL 1378274, at *4 (S.D.N.Y. Apr. 12, 2017) ("Being yelled at [and] receiving unfair criticism … do not rise to the level of adverse employment actions." (quoting *Katz*, 2001 WL 11064, at *14)).

Plaintiff's transfer to the 70th Precinct presents a closer question. For an employee's reassignment to a different location to rise to the level of an "adverse action," it must impact the terms of a plaintiff's employment in a substantially negative way. *See Felder* v. *Madison Square Garden*, No. 15 Civ. 4038 (GBD) (DF), 2018 WL 1872061, at *7 (S.D.N.Y. Jan. 29, 2018) (citing *Ward* v. *Shaddock*, No. 14 Civ. 7660 (KMK), 2016 WL 4371752, at *5 (S.D.N.Y. Aug. 11, 2016)), *report and recommendation adopted*, 2018 WL 1089743 (S.D.N.Y. Feb. 26, 2018). "Typically, lateral transfers or shift changes without a loss of pay or other material changes in working conditions do not constitute an adverse employment action." *Booker* v. *Fed. Res. Bank of N.Y.*, No. 01 Civ. 2290 (DC), 2003 WL 1213148, at *11 (S.D.N.Y. Mar. 17, 2003). However, the Second Circuit has held that "[t]he transfer of an employee from an 'elite'

position to one that is 'less prestigious with little opportunity for professional growth'" could be seen as materially adverse. *Lore* v. *City of Syracuse*, 670 F.3d 127, 170 (2d Cir. 2012) (quoting *de la Cruz* v. *N.Y.C. Hum. Res. Admin.*, 82 F.3d 16, 21 (2d Cir. 1996)); *see also Feliciano* v. *City of New York*, No. 14 Civ. 6751 (PAE), 2015 WL 4393163, at *7 (S.D.N.Y. July 15, 2015) (observing that a difference in "pay, responsibilities, [and] prestige" could constitute an adverse employment action); *Patrolmen's Benevolent Ass'n* v. *City of New York*, 74 F. Supp. 2d 321, 335 (S.D.N.Y. 1999) ("The key inquiry regarding involuntary transfers is whether the transfer constitutes a negative employment action tantamount to a demotion." (internal quotation marks omitted)).

Here, Plaintiff does not allege a change in title or reduction in pay or responsibilities as a result of his transfer to the 70th Precinct, but he does allege that the "70th Precinct has a well-known reputation within the NYPD and the City of New York as the precinct [to which] COs banish POs they deem 'problem' Officers." (SAC ¶ 189). Accepting that allegation as true, as it must at this stage, the Court concludes that Plaintiff's transfer to the 70th Precinct could have materially affected Plaintiff's chances for receiving favorable assignments and career advancement in the future as a result of the stigma that would allegedly attach to him as a member of that unit.

Finally, there is the matter of the charges Plaintiff received on January 15, 2019, following the May 3, 2018 IAB test involving the domestic dispute, on which charges Plaintiff was tried in a departmental trial before a Judge Advocate. (SAC ¶¶ 194-196, 199). While, as discussed above, the mere

receipt of charges and specifications does not constitute a materially adverse employment action, in this instance Plaintiff's departmental trial resulted in the validation of the charges and the Police Commissioner imposing a penalty of dismissal, subject to abeyance during a one-year probationary period. (*Id.* at ¶¶ 199-202). Such a penalty is plainly a "materially adverse change in the terms and conditions of employment." *Galabya*, 202 F.3d at 640 (internal quotation marks omitted).

Having narrowed the viable adverse actions to Plaintiff's transfer to the 70th Precinct and his trial and probationary dismissal, the Court next considers whether Plaintiff has adequately pleaded discriminatory intent behind either of these actions. The Court agrees with Defendants that Plaintiff has not.

"[T]he ultimate issue in an employment discrimination case is whether the plaintiff has met [his] burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,' *i.e.*, a discriminatory reason." *Vega*, 801 F.3d at 87 (internal quotation marks omitted) (quoting *Stratton* v. *Dep't for the Aging*, 132 F.3d 869, 878 (2d Cir. 1997)). At the pleadings stage, the facts "need only give plausible support to a minimal inference of discriminatory motivation." *Littlejohn*, 795 F.3d at 311. To carry his burden, a plaintiff must allege "facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Vega*, 801 F.3d at 87.

Direct evidence of discrimination includes, most commonly, disparaging comments regarding a protected class. *See, e.g.*, *Littlejohn*, 795 F.3d at 312 (noting that an inference of discrimination may arise from "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group"); *accord Marquez*, 2021 WL 1226981, at *14. Here, Plaintiff does not allege that any person involved in the decision to transfer him to the 70th Precinct, to subject him to the May 3, 2018 IAB test, to issue charges and specifications against him as a result of that test, to conduct a departmental trial on those charges, or to impose a penalty of dismissal probation, made any overtly prejudiced comments.[5]

Indirect evidence includes evidence that similarly situated comparators outside of Plaintiff's protected class were treated more favorably than Plaintiff. *Littlejohn*, 795 F.3d at 312 (explaining that a causal connection can be shown indirectly "through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct"). When assessing indirect evidence, courts generally will look to whether a plaintiff and his comparators were (i) "subject to the same performance evaluation and discipline standards" and (ii) "engaged in comparable conduct." *Graham* v. *Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000). Plaintiff must show that he was "'similarly situated

---

[5]     Indeed, Plaintiff does not identify who made relevant decisions regarding the May 3, 2018 IAB test, the charges and specifications Plaintiff received as a result of that test, and Plaintiff's transfer to the 70th Precinct, let alone allege that such individuals made discriminatory comments about Plaintiff specifically or African Americans generally.

in all material respects' to the individuals with whom [he] seeks to compare [himself]." *Id.*; *accord Malcolm*, 483 F. App'x at 662.

With respect to the charges Plaintiff received following the May 13, 2018 IAB test, the only comparator Plaintiff provides is his partner, PO Ahmed Ali (SAC ¶¶ 183-188), but Plaintiff does not indicate Ali's race or national origin to facilitate comparison. In any event, Ali was also investigated and charged following the IAB test. (*Id.* at ¶¶ 188, 196). This being the case, Plaintiff provides no basis for the Court to infer that race or national origin played a role in the decision to charge him for his conduct. Nor does Plaintiff allege any facts that support the inference that his transfer to the 70th Precinct was motivated by racial or national origin-based animus, as opposed to, *e.g.*, Plaintiff's conduct during the IAB test. (*See id.* at ¶¶ 188-189). Additionally, Plaintiff does not allege that either the Judge Advocate who presided over his trial and recommended punishment (*id.* at ¶ 199), or the Police Commissioner who approved the penalty of possible dismissal following a probationary period (*id.* at ¶ 201), harbored any animus towards African American officers like Plaintiff.

The only individual named in the SAC whom Plaintiff accuses of discriminatory views is Defendant Urprasad, and he left the 102nd Precinct in late November 2017, approximately nine months before Plaintiff was notified that he was being transferred to the 70th Precinct. (*See* SAC ¶¶ 96, 189). Plaintiff does not allege any specific facts indicating that Urprasad ordered or otherwise played a role in what happened to Plaintiff from 2018 through

2020 — Plaintiff merely states in conclusory terms that "Defendant Urprasad retained oversight of the 102nd Precinct" after his promotion (*id.* at ¶ 159), and that all "acts complained of were carried out by Defendant Urprasad in his capacities as Commanding Officer and Full Inspector" (*id.* at ¶ 228). Such musings are an insufficient "mosaic" of facts to support a plausible inference of discrimination in relation to any of these events. *Vega*, 801 F.3d at 87.[6] The Court thus concludes that Plaintiff has failed to state a viable claim for race and national origin-based discrimination under Title VII, and dismisses the claim accordingly.

### b. Plaintiff Fails to State a Hostile Work Environment Claim

### i. The Timeliness of Plaintiff's Allegations

In contrast to discrimination claims based on discrete acts, a hostile work environment claim is considered timely under the continuing violations doctrine so long as one relevant act occurred within the statutory period; if it did, "the entire time period of the hostile environment may be considered by a

---

[6] With the aim of "support[ing] the inference of the origin of the discriminatory animus Defendant Urprasad harbors towards Plaintiff Raine Pease as an African American" (SAC ¶ 25), Plaintiff presents in his SAC a history of racial tensions between Indo-Guyanese populations and populations of African heritage (*id.* at ¶¶ 25-43). Even if this history were accurate, a matter on which the Court takes no position, Plaintiff does not draw any direct connection between this history and Urprasad personally. More fundamentally, the Court will not make the logical leap from accepting that some individuals of Indo-Guyanese heritage may be prejudiced against African Americans, to assuming that all individuals of Indo-Guyanese heritage, including Urprasad, likely share such prejudices.

Additionally, to the extent that Plaintiff includes allegations regarding misconduct by the "Jamaica Auto" unit (SAC ¶¶ 160-166) to provide a comparator for the conduct for which he was disciplined, the Court concludes that Plaintiff has not adequately alleged that he was "'similarly situated in all material respects' to the individuals with whom [he] seeks to compare [himself]," *Graham* v. *Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000), or that race played a role in Urprasad's decisions concerning that unit.

court for the purposes of determining liability." *Patterson* v. *County of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004) (quoting *Morgan*, 536 U.S. at 117). This is because the "very nature" of a hostile working environment "involves repeated conduct." *Morgan*, 536 U.S. at 115. The unlawful employment practice in this context does not "occur on any particular day," but rather "occurs over a series of days or perhaps years," and as a result "such claims are based on the cumulative effect of individual acts." *Id.*; *accord Davis-Garett*, 921 F.3d at 42. Consequently, the Court may consider all of Plaintiff's allegations — including those that are untimely for Plaintiff's discrimination claims, as discussed above — in assessing whether Plaintiff has adequately alleged a hostile work environment claim. Nevertheless, for the reasons discussed below, even considering the totality of Plaintiff's allegations, the Court concludes that Plaintiff has failed to allege a viable hostile work environment claim.

### ii. Plaintiff Has Not Pleaded a Hostile Work Environment

To prove a hostile work environment claim under Title VII, "[t]he plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his] employment were thereby altered." *Alfano* v. *Costello*, 294 F.3d 365, 373 (2d Cir. 2002). This "requires evidence not only that the victim subjectively perceived the environment to be hostile or abusive, but also that the environment was objectively hostile and abusive[.]" *Hayut* v. *State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003). Additionally, Plaintiff must demonstrate that he "was subjected to the hostility because of [his] membership in a protected

class." *Brennan* v. *Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999). In determining whether an environment is hostile or abusive, the Court must consider the totality of the circumstances, including: "[i] the frequency of the discriminatory conduct; [ii] its severity; [iii] whether it is physically threatening or humiliating, or a mere offensive utterance; and [iv] whether it unreasonably interferes with an employee's work performance." *Harris* v. *Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *accord Schiano* v. *Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir. 2006).

To reiterate, Plaintiff does not allege that any of his peers or superior officers, including Urprasad, ever commented on Plaintiff's race or national origin, or disparaged African Americans generally. Instead, he alleges that Urprasad commented once on Plaintiff's medical condition (SAC ¶ 89), ignored him on two occasions (*id.* at ¶¶ 88, 180), unfairly imposed discipline on him (*id.* at ¶¶ 117, 148-149), and ordered that Plaintiff be placed on a series of undesirable work assignments (*id.* at ¶¶ 87, 92-94, 98-99, 119-127, 144, 149-154). These incidents do not reflect "discriminatory intimidation, ridicule, and insult," *Alfano*, 294 F.3d at 373, nor do they rise to the level of being "severe or pervasive enough to create an objectively hostile or abusive work environment," *Harris*, 510 U.S. at 21. *See, e.g.*, *Sealy* v. *State Univ. of N.Y. at Stony Brook*, 834 F. App'x 611, 615-16 (2d Cir. 2020) (summary order) (finding allegations that plaintiff was reassigned to a less favorable work location, denied overtime opportunities, restricted in his access to workplace facilities, provided an inadequate work vehicle, assigned a coworker to supervise him, and denied

33

assistance with an assignment to be too "minor and sporadic" to support a finding that plaintiff's environment was "objectively hostile and abusive"); *Littlejohn*, 795 F.3d at 321 (holding that plaintiff failed to plausibly allege a hostile work environment based on allegations that her supervisor made negative comments about her, wrongfully reprimanded her, declined to meet with her, replaced her at meetings, and increased her reporting schedule).

What is more, Plaintiff does not provide any concrete facts — as opposed to mere speculation — supporting the inference that these actions were motivated by discriminatory animus rather than, *e.g.*, dissatisfaction with Plaintiff's performance of his duties. This flaw dooms Plaintiff's hostile work environment claim. *See, e.g.*, *Gong* v. *City Univ. of N.Y.*, 846 F. App'x 6, 9 (2d Cir. 2021) (summary order) (affirming dismissal of a hostile work environment claim where "many of the alleged incidents lack any racial overtone"); *Anderson*, 2020 WL 1922624, at *9 (dismissing hostile work environment claim where plaintiff made only generalized assertions that allegedly hostile behavior was motivated by race).

The Court therefore grants Defendants' motion to dismiss Plaintiff's hostile work environment claim.

### c.      Plaintiff Fails to State a Retaliation Claim

Plaintiff alleges that he "engaged in protected activities when he made multiple complaints of discrimination against [Urprasad] to his supervisors, the EEO Office and the EEOC," and that in response the City retaliated against him in violation of Title VII. (SAC ¶¶ 221-223). Defendants argue that

34

Plaintiff's allegations are "wholly conclusory" and fail to establish the requisite causal connection between his protected activity and the alleged retaliation. (Def. Br. 22-24). The Court again agrees with Defendants.

Title VII prohibits retaliation for the assertion of rights protected under its provisions. *See* 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation, a plaintiff must allege that: (i) he participated in protected activity; (ii) his participation was known to the employer, (iii) the employer undertook an action that was materially adverse to him, and (iv) there was a causal connection between the protected activity and the adverse action. *Kessler* v. *Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006); *accord Gorzynski* v. *JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). The criteria for timeliness and material adversity that apply to Plaintiff's discrimination claim apply just the same to his retaliation claim. *See Anderson*, 2020 WL 1922624, at *7. For the reasons stated previously, the Court considers only Plaintiff's allegations regarding his transfer to the 70th Precinct and his charges, trial, and probationary dismissal related to the May 3, 2018 IAB test. In doing so, the Court concludes that Plaintiff has failed to state a viable retaliation claim because he does not adequately allege relevant individuals' knowledge of his protected activity or a causal connection.

*First*, with respect to knowledge, Plaintiff alleges that in November 2017, he spoke with his union delegates, Lieutenant Alberano, Lieutenant Maldonado, Sergeant Rozenfeld, a POPPA representative, and a departmental EEO investigator regarding Urprasad's treatment of him and filed his first

EEOC complaint. (SAC ¶¶ 129-142, 155-158). But he does not allege that any of the people with whom he spoke subsequently told Urprasad about their conversations; to the contrary, they were all apparently unwilling to raise Plaintiff's concerns with Urprasad. (*See id.* at ¶¶ 132, 139, 141, 157). Plaintiff's efforts to schedule a meeting with Defendant Urprasad to discuss his concerns directly were also rebuffed. (*Id.* at ¶ 137). Consequently, even assuming that Urprasad was generally aware of Plaintiff's grievances against him, Plaintiff does not allege any facts suggesting that Urprasad was specifically aware that Plaintiff had engaged in protected activity, namely, that Plaintiff had spoken with his union delegates, various supervisors, the NYPD EEO, or the EEOC in November 2019. Plaintiff similarly fails to allege that Urprasad knew about Plaintiff's second EEOC complaint lodged in February 2019 (*see id.* at ¶ 197), or his filing of this action on August 16, 2019 (*see id.* at ¶ 200).[7] Plaintiff therefore fails to establish that Urprasad knew that Plaintiff had engaged in protected activity.

*Second*, with respect to causation, a plaintiff "must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." *Vega*, 801 F.3d at 90; *see generally Univ. of Tex. Sw. Med. Ctr.* v. *Nassar*, 570 U.S. 338, 360 (2013). This causal connection can be demonstrated by direct evidence of retaliatory animus or inferred from temporal proximity. *Wang* v. *Palmisano*, 157 F. Supp. 3d 306, 327 (S.D.N.Y. 2016).

---

[7]    An affidavit of service filed on January 7, 2020, reflects that Defendant Urprasad was served in this matter on December 31, 2019. (Dkt. #9).

Here, Plaintiff does not plead direct evidence of retaliatory animus. As previously discussed, Plaintiff does not provide facts to support his allegation that Urprasad played a role in Plaintiff being subject to an IAB test in May 2018 and charged for his conduct during that event, being transferred to the 70th Precinct in August 2018, or being tried and put on probationary dismissal based on the charges against him. Plaintiff also does not cite any statements by other individuals involved in Plaintiff's IAB test, transfer, trial, and probationary dismissal that might indicate a retaliatory motive.

In the absence of such evidence, the Court must determine whether it can reasonably infer retaliatory action from the sequence of events. When relying solely on temporal proximately as evidence of causality, the Supreme Court and courts in this Circuit have held that "the temporal proximity must be very close." *Clark Cnty. Sch. Dist.* v. *Breeden*, 532 U.S. 268, 273 (2001) (internal quotation marks omitted); *accord Abrams* v. *Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014); *Wang*, 157 F. Supp. 3d at 327. While "there is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Abrams*, 764 F.3d at 254 (internal quotation marks omitted), the Second Circuit has said that "[t]emporal proximity alone is generally insufficient after about three months," *Berrie* v. *Bd. of Educ. of the Port Chester-Rye Union Free Sch. Dist.*, 750 F. App'x 41, 49 (2d Cir. 2018) (summary order) (citing *Hollander* v. *Am. Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir. 1990)).

Plaintiff's first round of protected activity occurred in November 2017. (SAC ¶¶ 129-141, 155-158). But the relevant adverse employment action — Plaintiff's transfer to the 70th Precinct — did not occur until August 2018, more than nine months later. (*Id.* at ¶ 189). Plaintiff was not served with charges related to the May 3, 2018 IAB test until January 15, 2019, nearly fourteen months after the November 21, 2017 EEOC complaint. (*Id.* at ¶ 194). Preparations for Plaintiff's trial on those charges began a few weeks later, on February 5, 2019. (*Id.* at ¶ 196). Only after that did Plaintiff file his second EEOC complaint on February 8, 2019. (*Id.* at ¶ 197). Approximately five months later, in or about July 2019, the charges against Plaintiff were upheld at trial. (*Id.* at ¶ 199). A month later, Plaintiff filed this action. (*Id.* at ¶ 200). Plaintiff's punishment of dismissal probation was imposed in January 2020 (*id.* at ¶¶ 201-202), and Plaintiff filed his third and final EEOC complaint on July 9, 2020 (*id.* at ¶ 204).

With this timeline in mind, the Court concludes that Plaintiff's transfer and charges were too temporally attenuated from his protected conduct in November 2017 for the Court to reasonably draw an inference of retaliation. *See Uddin* v. *City of New York*, 427 F. Supp. 2d 414, 434 (S.D.N.Y. 2006) ("Any alleged actions that took place more than nine months after the last alleged protected activity ... are too remote to establish a causal connection."); *accord Anderson*, 2020 WL 1922624, at *8. And with respect to his second EEOC complaint and filing of this action, the facts suggest the inverse causal relationship from that which is required: Plaintiff's protected activity occurred

immediately after — and seemingly was responsive to — the adverse employment actions against him, rather than the other way around. Furthermore, the inference of a causal connection between Plaintiff's protected activity and his dismissal probation is undermined by the fact that the conduct for which Plaintiff was disciplined preceded his protected activity. *See, e.g.*, *Slattery* v. *Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."); *Saenger* v. *Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 519 (S.D.N.Y. Mar. 31, 2010) ("A plaintiff fails to allege a sufficient causal connection between protected activity and adverse employment action when the protected activity is preceded by significant misconduct.").

In sum, Plaintiff fails to establish all elements of a retaliation claim under Title VII. Therefore, this claim must be dismissed.

### 3. Plaintiff's Municipal Liability Claim

Plaintiff next brings a claim pursuant to 42 U.S.C. § 1983, alleging that Defendant Urprasad discriminated against Plaintiff on the basis of race and national origin "in his capacities as Commanding Officer and Full Inspector pursuant to the customs, policies, usages, practices, procedures and rules of Defendant City," which practices include: (i) discriminating against African American police officers by giving them unfavorable assignments; (ii) failing to train officers properly; (iii) failing to supervise officers properly; (iv) failing to

implement and enforce EEO policies prohibiting discrimination and retaliation properly; and (v) subjecting NYPD employees to violations of their constitutionally protected rights, as well as rights protected by state and local law. (SAC ¶¶ 229-230). Plaintiff asks the Court to infer the "existence of the aforesaid unconstitutional customs, policies, usages, practices, procedures[,] and rules" from "the actions taken by the Defendant Urprasad, individually and in his official capacity." (*Id.* at ¶ 231). While it is somewhat unclear from Plaintiff's SAC whether he intended to bring a Section 1983 claim against Defendant Urprasad individually or instead against the City for municipal liability — the cause of action is styled as a claim for "Municipal Liability (§ 1983) Against Defendant Deodat Urprasad" — Plaintiff's opposition to the motion to dismiss frames his claim as one against the City under *Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658 (1978). (Pl. Opp. 30-32). The Court proceeds with its analysis accordingly.

To establish a claim for municipal liability under *Monell*, Plaintiff must plead and prove: (i) actions taken under color of law; (ii) deprivation of a constitutional or statutory right; (iii) causation; (iv) damages; and (v) that an official policy of the municipality caused the constitutional injury. 436 U.S. at 690-91. With respect to the fifth prong, "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." *Roe* v. *City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (quoting *Bd. of Cnty. Comm'rs* v. *Brown*, 520 U.S. 397, 404 (1997)). A plaintiff may satisfy this requirement by alleging the existence of: "[i] a formal policy

officially endorsed by the municipality; [ii] actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; [iii] a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policymaker must have been aware; or [iv] a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Brandon* v. *City of New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010) (internal citations omitted) (collecting cases).

Plaintiff does not provide any facts supporting the existence of a formal policy, endorsed by the City, of discrimination against African American police officers, nor does he allege that Defendant Urprasad held the authority to establish municipal policies and thus was a policymaker within the meaning of Section 1983. Plaintiff attempts to establish the existence of a widespread and consistent practice of discrimination against African American police officers in the NYPD by citing statistics about the number of African American officers in the Department, the number of Civilian Complaint Review Board complaints NYPD officers have received, the number of civil rights lawsuits filed against officers in the Queens Precinct between 2015 and 2018, and the amount of money the City has paid out as part of litigation settlements. (*See* SAC ¶¶ 45-51). But Plaintiff does not explain, and the Court is unable to discern, how these statistics support Plaintiff's claim.

Plaintiff also discusses a federal class action lawsuit involving Latino and African American police officers who alleged that they were subjected to unfair disciplinary action and that the NYPD created a hostile work environment for them.  (SAC ¶¶ 52-58).  That suit addressed alleged discriminatory practices between 1996 and 2003.  (*Id.* at ¶ 53).  The City and the NYPD entered into a settlement agreement sometime prior to December 2003, pursuant to which agreement the defendants in that case agreed to establish various procedures to identify and prevent discrimination in the NYPD disciplinary system.  (*Id.* at ¶¶ 59-65).  Putting aside the fact that settlement does not constitute an admission of liability on the part of those defendants, Plaintiff does not draw any connection between this settlement and how he was treated many years later, between 2015 and 2020.  Furthermore, even accepting for the sake of argument that there was a pattern of unconstitutional activity during the period covered by the lawsuit, Plaintiff has not alleged any facts demonstrating that the City "consistently failed" to address those prior allegations and thus was deliberately indifferent to ongoing constitutional violations.  *See Falls* v. *Campbell*, No. 17 Civ. 35 (KMK), 2019 WL 1255768, at *7 (S.D.N.Y. Mar. 19, 2019) (citing *Tieman* v. *City of Newburgh*, No. 13 Civ. 4178 (KMK), 2015 WL 1379652, at *21 (S.D.N.Y. Mar. 26, 2015)); *Falls* v. *Orange County*, No. 17 Civ. 1339 (VB), 2018 WL 718417, at *4 (S.D.N.Y. Feb. 5, 2018) ("[N]one of the cited lawsuits resulted in an adjudication of admission of liability.  Thus, there is no basis for the Court to assess whether the City made 'meaningful efforts' to prevent unconstitutional officer conduct.").

Finally, Plaintiff offers a few anecdotes about other African American police officers being treated less favorably than officers of other races. (SAC ¶¶ 125, 160, 193). But these anecdotes and the other facts alleged do not plausibly establish the existence of a practice that is "'so widespread as to have the force of law.'" *Tieman*, 2015 WL 1379652, at *16 (quoting *Brown*, 520 U.S. at 404). Furthermore, Plaintiff does not explain in what way the NYPD failed to train and supervise its officers properly and how the lack of such training and supervision resulted in the treatment Plaintiff and other African American officers allegedly faced. *See Campbell*, 2019 WL 1255768, at *7 ("Even if Plaintiff had sufficiently alleged that [the defendant municipality] was aware of unconstitutional conduct by [its officers] and failed to respond with appropriate training or supervision, Plaintiff does not point to how an absence of training or supervision *caused* the constitutional violations he alleges."); *Johnson* v. *City of New York*, No. 06 Civ. 9426 (GBD), 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that "a plaintiff must establish a causal connection — an affirmative link — between the [municipal] policy and the deprivation of his constitutional rights" (internal quotation marks omitted)).

Given Plaintiff's failure to plead facts supporting each of the requisite elements to establish municipal liability, the Court dismisses Plaintiff's Section 1983 claim.

### 4.    Plaintiff's Claims Under the NYSHRL and the NYCHRL

Plaintiff's remaining four causes of action arise under the NYSHRL and the NYCHRL: a race and national origin-based discrimination claim (SAC

¶¶ 237-242); a hostile work environment claim (*id.* at ¶¶ 243-247); a retaliation claim (*id.* at ¶¶ 248-254); and a claim against Defendant Urprasad for aiding, abetting, inciting, compelling, and coercing, in violation of the NYCHRL (*id.* at ¶¶ 255-257). These claims overlap in significant ways with Plaintiff's Title VII claims, but there are also differences. For the reasons that follow, the Court declines to consider the merits of these claims.

Federal district courts have supplemental jurisdiction over non-federal law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). But a district court "may decline to exercise supplemental jurisdiction over a claim" once it "has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ.* v. *Cohill*, 484 U.S. 343, 350 n.7 (1988); *accord Kolari* v. *N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006); *Valencia ex rel. Franco* v. *Lee*, 316 F.3d 299, 305 (2d Cir. 2003).

Here, the Court has already granted Defendants' motion to dismiss as to Plaintiff's federal claims under Title VII and Section 1983. Because the Court dismisses these claims at the pleading stage, the Court concludes that the relevant factors counsel in favor of declining jurisdiction over the remaining

NYSHRL and NYCHRL claims.  Accordingly, the Court declines to exercise supplemental jurisdiction over these claims.

## CONCLUSION

For the reasons stated herein, the Court GRANTS Defendants' motion to dismiss the SAC in full.

In his memorandum of law in opposition to Defendants' motion, Plaintiff perfunctorily requests leave to amend under Federal Rule of Civil Procedure 15. The Court declines to grant such leave, given that Plaintiff already has been provided the opportunity to amend with aid of counsel twice and the anticipated grounds for Defendants' motion were discussed at length during the June 18, 2020 conference.  (*See generally* Dkt. #30).  *See Cosgrove* v. *Oregon Chai*, No. 19 Civ. 10686 (KPF), 2021 WL 706227, at *17 (S.D.N.Y. Feb. 21, 2021) (citing *Nat'l Credit Union Admin. Bd.* v. *U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-57 (2d Cir. 2018)).  Consequently, Plaintiff's federal claims under Title VII and Section 1983 are dismissed with prejudice.  Because the Court declines to exercise supplemental jurisdiction over the remaining NYSHRL and NYCHRL claims, it dismisses those claims without prejudice.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     June 28, 2021
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge